**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| COALITION FOR OPEN DEMOCRACY,<br>*Plaintiff*,<br>v.<br>DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General,<br>*Defendants*. | Case No. 1:26-cv-00647-JL-TSM |

**<u>OBJECTION TO MOTION FOR PRELIMINARY INJUNCTION</u>**

Defendants New Hampshire Secretary of State David M. Scanlan and New Hampshire Attorney General John M. Formella, each in their official capacities, by and through counsel, the Office of the Attorney General, hereby object to Plaintiff Coalition for Open Democracy's Motion for Preliminary Injunction (ECF No. 2), and state as follows:

## INTRODUCTION

House Bill 323 ("HB 323") represents a public policy choice made by the New Hampshire General Court. The political branches decided that only federal, state, and local-issued IDs should be accepted to verify the identity of a person who registers to vote or obtains a ballot. HB 323 amended prior state law that permitted private and public school IDs for those purposes. Governor Ayotte signed HB 323 into law on April 3, 2026, and it went into effect on June 2, 2026. The Secretary of State's office spent two months implementing HB 323 and other election law amendments, and it has been educating local election officials and the public regarding the change to voter identity verification since. Now, more than two months after

HB 323's effective date, Plaintiff Open Democracy asks this Court to enjoin a state election law on the eve of the September primaries and the November general election.

The Court need not reach the merits of Open Democracy's Motion for Preliminary Injunction, however. As a threshold matter, Open Democracy has not clearly established Article III standing. And given Open Democracy's unjustified delay in seeking this drastic relief, the doctrine of laches bars an injunction at this late stage of the election cycle. The *Purcell* principle also acts as a bar. Federal courts must not alter election rules when voting is underway and an election is close at hand. Both dynamics are true here—absentee voting has begun and the primaries are just eight days after the scheduled preliminary injunction hearing.

The Motion also fails on the merits. Open Democracy brings facial constitutional challenges to a generally applicable voter-identification law, but it has not shown that RSA 659:13 (as amended by HB 323) is unconstitutional in all its applications, that it unlawfully burdens the right to vote, or that it discriminates on the basis of age. Moreover, its state constitutional claim is independently barred by the Eleventh Amendment. Because Open Democracy cannot establish likely success or irreparable harm, and because an injunction would substantially disrupt the State's administration of imminent elections, the remaining equitable factors likewise favor denial. Accordingly, Defendants respectfully request that the Court deny Plaintiff's Motion for Preliminary Injunction.

**BACKGROUND & PROCEDURAL POSTURE**

Plaintiff Coalition for Open Democracy simultaneously filed a four-count Complaint and a Motion for Preliminary Injunction on August 11, 2026. Compl., ECF No. 1; Mot. Prelim. Inj., ECF No. 2. The Complaint alleges that RSA 659:13, amended by HB 323, violates the First, Fourteenth, and Twenty-Sixth Amendments to the United States Constitution, and Part I, Article 37 of the New Hampshire Constitution. *Id.* ¶¶ 232-271. Open Democracy asserts facial

constitutional challenges, seeking declaratory and injunctive relief, pursuant to 42 U.S.C. §§ 1983 and 1988. *Id.* ¶¶ 2-3.

On August 13, 2026, the Court held a conference and issued a Procedural Order: Preliminary Injunction Hearing immediately thereafter. P. Order, ECF No. 11. The Court ordered the parties to submit: (1) a joint, single timeline setting forth all pertinent dates, times, and events on or before August 25, 2026 at 5:00 p.m.; (2) a joint, single statement of agreed facts and a statement of disputed facts on or before August 25, 2026 at 5:00 p.m.; (3) party-specific witness and exhibit lists on or before August 27, 2026 at 4:00 p.m.; (4) party-specific proposed findings of fact and rulings of law on or before August 27, 2026 at 4:00 p.m.; and (5) Plaintiff must propose an order compliant with Rule 65 and Local Rule 65.1 and addressing a Rule 65(c) bond, if any, on or before August 28, 2026 at 3:00 p.m. *Id.* At a follow-up conference on August 14, 2026, the Court set Defendants' deadline to file an objection to Plaintiff's Motion for 2:30 p.m. on August 26, 2026, and Plaintiff's deadline to file a reply for 3:00 p.m. on August 29, 2026. At the August 13 conference, Plaintiff indicated that it expects to present two witnesses at the preliminary injunction hearing. The Court scheduled the preliminary injunction hearing for a half-day, beginning at 8:30 a.m. on Monday, August 31, 2026.

## STATEMENT OF MATERIAL FACTS

Defendants incorporate by reference the parties' forthcoming Single Timeline and Single Statement of Agreed Facts & Disputed Facts, and Defendants' forthcoming Proposed Findings of Facts & Rulings of Law. *See* ECF No. 12 at 2 (expressly discouraging recycling factual statements submitted in prior filings).

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Rubygold Main Holdings, LLC v. Brian Gardner Carpentry, LLC*, No. 20-cv-1006-JL,

2021 U.S. Dist. LEXIS 12640, *12 (D.N.H. Jan. 22, 2021) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). The movant's burden of persuasion is to establish a "clear and unequivocal" right to such drastic relief. *Nw. Bypass Grp. v. United States Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 36 (D.N.H. 2007) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)); *Boudreau v. Englander*, No. 09-cv-247-SM, 2009 U.S. Dist. LEXIS 116193, *5 (D.N.H. Dec. 14, 2009) ("[A] preliminary injunction … should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

The governing inquiry has four parts. The movant must clearly establish that: (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm absent extraordinary relief; (3) the balance of the equities favor the injunction; and (4) the injunction is in the public interest. *See CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020). Where an injunction could issue against State officials, the balance-of-equities and public-interest factors merge. *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). But the first factor, "likelihood of success[,] is the main bearing wall of this framework." *Rubygold*, 2021 U.S. Dist. LEXIS 12640, *12-13 (quoting *W Holding Co. v. AIG Ins. Co.*, 748 F.3d 377, 383 (1st Cir. 2014)) (quotations omitted). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

**ARGUMENT**

The Court should deny the Motion for Preliminary Injunction for at least four reasons, any one of which would be sufficient to deny Open Democracy's request for extraordinary relief. First, Open Democracy cannot succeed on the merits because the Court will not reach the merits—Open Democracy does not have standing to challenge RSA 659:13. Second, equitable

principles bar Open Democracy's request. Third, even if standing and equitable principles do not preclude issuance of an injunction, Open Democracy's failure to clearly establish a likelihood of success on the merits on any of its claims does so. Fourth, Open Democracy will not suffer irreparable harm absent an injunction, and as a matter of law, New Hampshire's interest in the efficient administration of its elections and the public interest warrant denial of the Motion and maintaining the status quo.

## I. The Court Lacks Subject Matter Jurisdiction to Reach the Merits of Open Democracy's Challenge to RSA 659:13, as Amended by House Bill 323

Open Democracy has not demonstrated that it has Article III standing to assert its claims. Organizations like Open Democracy may assert direct standing to sue on their own behalf, but they must "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U. S. 363, 378-79 (1982)). Open Democracy's burden is to establish each of these elements of standing, and to do so "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). This is not the pleadings stage standard applied to a motion to dismiss.

Plaintiff's Motion for Preliminary Injunction imposes an "affirmative burden of showing a likelihood of success on the merits … [which] necessarily includes a likelihood of the court's ***reaching*** the merits, which in turn depends on a likelihood that plaintiff has standing." *See Pietrangelo v. Sununu*, No. 21-cv-124-PB, 2021 U.S. Dist. LEXIS 65632, *13-14 (D.N.H. Apr. 5, 2021) (quoting and citing *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018); D.C. Cir. and 9th Cir. cases) (quotations omitted; emphasis added).

Open Democracy has not met its burden to prove standing, so the Court should deny the preliminary injunction.

**A. Open Democracy Has Not Suffered an Injury-in-Fact to Clearly Establish a Perceptible Impairment to Its Core Business Activities**

Where an organization challenges a law that does not directly regulate the organization, a plaintiff's standing "is ordinarily substantially more difficult to establish." *All. Hippocratic Med.*, 602 U.S. at 382 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)) (quotations omitted). The Supreme Court has explained that an organization's principal obstacle to direct standing typically lies in causation: "that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *See id.* at 382-83 (collecting cases). Plaintiffs cannot adequately allege or prove causation by "rely[ing] on speculation about the unfettered choices made by independent actors not before the courts." *See id.* at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415, n.5 (2013)) (quotations omitted). So, "to thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *Id.* (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)).

A non-regulated organization may thread the causation needle by establishing that a law perceptibly impairs the organization's core business activities. *See id.* at 395 (citing *Havens Realty Corp.*, 455 U.S. at 379). The Supreme Court's perceptible impairment framework requires a showing of: (1) a concrete and demonstrable injury; (2) to an established core activity; (3) resulting in a "drain" on resources; (4) that was involuntary due to the challenged law's operational interference with the core activity. *See Havens Realty Corp.*, 455 U.S. at 379; *All. for Hippocratic Med.*, 602 U.S. at 394-96; *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173-74 (2d Cir. 2021); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).

> Moreover, the consequent "drain" on resources must go beyond normal operating costs—that is, an organization does not suffer an injury in fact where it "expend[s] resources to educate its members and others" unless doing so subjects the organization to "operational costs beyond those normally expended."

*Military-Veterans Advocacy v. Sec'y of Veterans Affairs*, 7 F.4th 1110, 1129 (Fed. Cir. 2021) (quoting *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). HB 323 does not directly regulate Open Democracy—that fact is undisputed.

Even if the Court were to accept the declarations of Executive Director Zink as true, Open Democracy has not clearly shown injury-in-fact. Its "mission is to bring about and safeguard political equality for the people of New Hampshire[,]" and it focuses its activities on young people—high schoolers in particular. Zink Decl., ECF No. 2-2, ¶¶ 2, 4, 6 (Aug. 11, 2026). Ms. Zink identified three categorical activities that advance Open Democracy's mission: (i) planning and hosting events; (ii) developing and printing educational materials; (iii) and training its volunteers. *See id.* ¶ 5. She asserts that Open Democracy's core impaired service is its high school voter registration drive program. *See id.* ¶¶ 6, 8, 11-13. She alleges that the organization has diverted resources to modify promotional materials, sample letters, and social media posts; retrain its volunteers; and recruit additional poll workers and observers. *See id.*

These allegations are insufficient to form injuries-in-fact because ordinary expenditures that are consistent with an organization's mission are not concrete injuries. *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001) ("[O]rdinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing."); *Coal. for Humane Immigrant Rights v. Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 88 (D.D.C. 2025) ("[I]t is not enough if the organization merely 'diverts its resources in response to a defendant's actions' such that it has not been 'subjected . . . to operational costs beyond those normally expended' to fulfill its core aims.") (quoting *All. for Hippocratic Med.*, 602 U.S. at 395); *NAACP v. City of Kyle*, 626

F.3d 233, 238 (5th Cir. 2010) (explaining that resource diversion must reflect differences from routine activities); *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 320 (5th Cir. 2025). If a routine and expected expense established "a cognizable injury[,] would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'" *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

**B. Open Democracy Has Not Clearly Established a Causal Nexus Linking RSA 659:13 to Open Democracy's Purported Diverted Resources**

Even assuming Open Democracy's foregoing allegations sufficed to show injury-in-fact, arguendo, it has not threaded the causation needle to link the purported injury to RSA 659:13 or HB 323. Causation requires more than just a diversion of resources in response to the law. *All. for Hippocratic Med.*, 602 U.S. at 395. Were it otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.*

Open Democracy alleges that HB 323's amendment to New Hampshire voter registration law "is forcing Open Democracy to abandon its core services and organization priorities," and that "the law makes it effectively impossible for Open Democracy to provide its core services[.]" ECF No. 2-2, ¶¶ 17, 20. But Open Democracy has not shown that "third parties will likely react in predictable ways" and that those predictable actions will likely cause it injury. *See All. Hippocratic Med.*, 602 U.S. at 383. For example, it alleges that many "young" voters find obtaining a state-issued identification card to be a significant burden. ECF No. 1, ¶ 60. Instead of supporting this assertion with empirically verifiable facts, Open Democracy alleges generalities about where DMVs are located, whether public transportation is "robust," parking is restricted on some college campuses, and many other sundry summaries and opinions about

students' lives. *See id.* ¶¶ 61-79. These statements fall short of even impermissibly hypothetical. They offer no context whatsoever for the choices that any student has made or will make due to HB 323's amendment. There is no indication of how many of the voting-eligible students do not have driver's licenses. And of those who do not, it does not indicate how many will get licenses before the next election or currently have other federal, state, or local-issued IDs. It is impossible to reasonably infer from these allegations that Open Democracy must divert resources to its high school voter registrations from other core business activities, much less clearly establish the causal link to HB 323. It is far too attenuated to support standing.

The inquiry into whether an organization has suffered a "perceptible impairment" is not about the degree of harm suffered, it is about the nexus of the alleged harm to the challenged law. *See id.* at 395. In other words, Open Democracy was required to clearly show HB 323 operationally interfered with its core business activities. *See Havens Realty*, 455 U.S. at 379; *All. for Hippocratic Med.*, 602 U.S. at 395-96; *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173-74 (2d Cir. 2021); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Open Democracy has not offered any evidence to establish that its resource allocations were involuntary. *See Havens Realty Corp.* at 379 (requiring plaintiff to show a "***consequent*** drain on the organization's resources") (emphasis added); *see also Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992 (6th Cir. 2025) ("*Alliance* thus clarified that the expenditure of resources in opposition to a defendant's actions, standing alone, is insufficient to establish standing under *Havens*.").

### C. Open Democracy Seeks Prospective Relief that this Court Cannot Grant, and Open Democracy Has Not Clearly Established that an Injunction Would Remedy Its Purported Injuries

The Court does not have authority to grant the prospective relief that Open Democracy requests, nor has Open Democracy clearly established that a favorable decision would remedy its

alleged injuries. "To satisfy the redressability requirement, 'the plaintiff [must] allege that a favorable resolution of [its] claim would likely redress the professed injury.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 319 (1st Cir. 2024) (quoting *Dantzler, Inc. v. Empresas Berríos Inventory & Ops., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020)) (quotations omitted). Redressability may not require certainty or comprehensiveness, but it requires more than mere speculation and a court must have the authority to award the requested relief. *See id.*

Although this Court may declare a state law unconstitutional and enjoin an unconstitutional law's enforcement, the Court cannot use a prospective injunction to rewrite the law. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006). Open Democracy asks the Court to enjoin implementing and enforcing HB 323, but that is not how an injunction would operate. In the two months between HB 323's enactment and its effective date, HB 323 was implemented. That process was ***completed*** on June 2, 2026. Ongoing training and support of local election officials continues, but HB 323's amendment to RSA 659:13 was in full force and effect for 70 days before Open Democracy filed this lawsuit. The current state of New Hampshire election law is the status quo ante, and an injunction would impose affirmative duties on Defendants to reinstitute prior policies, procedures, and guidance.

Open Democracy has also not clearly established that its requested relief would redress its alleged injuries. This is so because "causation and redressability—are often flip sides of the same coin." *All. for Hippocratic Med.*, 602 U.S. at 380 (quotations and citations omitted). For the reasons stated above, Open Democracy's allegations are too threadbare to clearly establish injury-in-fact, and too attenuated from RSA 569:13 to clearly establish a causal link to HB 323. For example, without evidence of the number of voting-eligible students who do not have federal, state, or local-issued IDs, it is impossible to know whether requiring New Hampshire to

accept private and public school IDs as identification verification would cure Open Democracy's purported diversion of resources.

## II. The Court Should Deny Preliminary Relief on the Equitable Grounds of the Doctrine of Laches and the *Purcell* Principle

Regardless of Open Democracy's Article III standing or the merits of its claims, well-established equitable principles preclude preliminary injunctive relief. At this late stage on the elections calendar, Open Democracy's unjustified delay in seeking preliminary injunctive relief would be substantially prejudicial to the administration of the primaries and general elections. Notwithstanding that equitable bar, the *Purcell* principle calls for judicial restraint this close to an election to avoid voter and administrator confusion.

### A. The Doctrine of Laches Bars an Injunction on the Eve of the September Primaries and November General Election

"[T]he doctrine of laches restricts the assertion of claims or defenses by litigants who have slept upon their rights or prerogatives and, thus, have prejudiced opposing parties by or through their inexcusable delay." *Concord Hosp., Inc. v. N.H. HHS*, 743 F. Supp. 3d 325, 353 (D.N.H. 2024) (quoting *United States v. Letter from Hamilton to De Lafayette (July 21, 1780)*, 15 F.4th 515, 526 (1st Cir. 2021)). Open Democracy cannot reconcile its delay in bringing this lawsuit with its simultaneous demand for emergency preliminary relief.

Laches is "an equitable doctrine which penalizes a litigant for negligent or willful failure to assert [its] rights." *Id.* (quoting *Oriental Fin. Grp., Inc. v. Cooperativa De Ahorro Y Crédito Oriental*, 698 F.3d 9, 20 (1st Cir. 2012) (alterations in original; quotations and citations omitted). When asserting laches as an equitable defense, a defendant must show: "(1) that the plaintiff's delay in bringing its claim was unreasonable, and (2) that the delay resulted in prejudice to the defendant." *Id.* (citing *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989)).

Open Democracy initiated this lawsuit—while simultaneously requesting preliminary relief—***130 days*** after Governor Ayotte signed HB 323 into law (April 3, 2026), and ***70 days*** after HB 323's effective date (June 2, 2026). In the 130 days between enactment and Open Democracy's Motion, the Secretary of State's Office has been implementing HB 323. Among other things, the Election Procedure Manual, Department of State's website, social media outreach, radio ads, professionally printed statutorily mandated polling place posters, and ballot clerk procedure manuals, have been published and distributed to reflect current New Hampshire election law, including HB 323's amendment to RSA 659:13. More than 300 primary elections packages have been shipped to polling locations across the state. To reverse course by the September primaries, which will be held just eight days after the evidentiary hearing, is certainly impossible. To reverse course by the November general election just 56 days later is nearly impossible, considering the Office's engagement in the post-primary and pre-general election process. Among other things, that process includes audits of ballot counting devices; vote canvassing; recount management which will likely start on September 14; Ballot Law Commission recount appeal meeting on September 17; preparation of the UOCAVA November general election ballots by September 19; drafting, proofing, and printing absentee and official ballots—320 unique ballots; and OmniBallot accessible voting system testing for each 320 unique ballots. General election ballots rely upon the results of the primary elections—September and November are inextricably intertwined. The substantial prejudice to the State in reversing course this late in the elections process is manifest.

Open Democracy has not provided any justification for its delay in seeking equitable relief. Where a plaintiff is aware of election law requirements, but chooses to challenge the law after the primaries and within three months of an election, the "emergency" is one of its own

making. *See Respect Me. PAC v. McKee*, 622 F.3d 13, 7-8 (1st Cir. 2010). Although New Hampshire's primaries have not yet occurred, they are imminent, and three months would work substantial, unjustified prejudice on the State's operation of its election system. *See id.*

### B. The *Purcell* Principle Bars an Injunction on the Eve of the September Primaries and November General Election

Open Democracy's delay notwithstanding, the Court should not enjoin an election law just 64 days from a general election (or eight days before state primaries). The Supreme Court has warned that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam). It has also consistently held that each state "has a compelling interest in protecting voters from confusion" and "preserving the integrity of its election process." *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 199 (1992). That is why its decisions have "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (collecting cases). The *Purcell* principle bars Open Democracy's injunction request this close to an election.

"[E]lections are complex and election calendars are finely calibrated processes, and significant upheaval and voter confusion can result if changes are made late in the process." *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222, 1324 (N.D. Ga. 2022). "[A]t every step, state and local officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting." *Democratic Nat'l Comm. v. Wis. State Legis.*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring). So, courts should be circumspect and exercise judicial restraint when an election is near. *See id.* at 1044.

> That important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election.

*Id.* (collecting cases). "When an election is close at hand, the rules of the road should be clear and settled." *Id.* at 1043.

Over the last four months, local election officials have been trained on the new identity verification rules. The public has read social media posts and heard radio broadcast about the change. Re-educating election administrators and the public in such a short period further condensed by post-primary and pre-general election demands, would cause considerable election administration inefficiencies, likely cause voter confusion, increase the risk of inconsistent application of the law, and possibly undermine voter confidence in the elections. The purpose of the *Purcell* principle is to avoid such results.

Earlier this year, seven days after early voting started in Indiana, the Seventh Circuit Court of Appeals granted Indiana's motion to stay a district court judgment holding a state voter-ID law unconstitutional. For 20 years, the state accepted student IDs from state-run universities to prove identity when casting an in-person ballot. *Count Us In v. Morales*, 172 F.4th 974, 975 (7th Cir. 2026). In April 2025, Indiana prohibited this option for voter identity verification. *Id.* The plaintiff-organizations challenged the new law as an unconstitutional burden on the right to vote and unconstitutional age discrimination. *Id.* Although filed one month after the law's enactment, the plaintiffs did not move for a preliminary injunction to prevent the voter-ID law's application in the upcoming primary elections until February 2026. *Id.* The district court granted the injunction on April 14, but early voting started one week earlier. *Id.* The Court of Appeals acknowledged the admonitions from the Supreme Court's 2020 *Rep. Nat'l Comm.* per curiam decision and Justice Kavanaugh's 2022 *Merrill* concurrence regarding federal courts

"tinkering with election laws" on the eve of an election. *See id.* at 976 (citations omitted). The court explained that it:

> view[ed] the risk of disruption to Indiana's primary election as very serious. In no uncertain terms, the district court's injunction will alter who can cast a ballot in this election. And this change—imposed unilaterally by a federal court—comes seven days after voting in the election has already begun.

*Id.* (quoting *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring)). The court did not categorically prohibit injunctions while an election is ongoing, but it applied the *Purcell* principle to hold that the injunction should be stayed pending appeal. *Id.*

The *Count U.S. In* decision is relevant persuasive authority regarding the *Purcell* principle's application to the Motion. In New Hampshire, applications for absentee voting require photo IDs consistent with the requirements of RSA 659:13. RSA 657:17-c. Absentee ballot applications may be made within six months of an election, so April for the 2026 primaries and June for the 2026 general election. RSA 657:6. Were the Court to issue an injunction, proof of identity requirements for some absentee voters in both the September primaries and November general elections, would be different. The Court should follow the Seventh Circuit, and not permit such a result.

## III. The Court Should Deny Preliminary Relief Because Open Democracy Has Not Clearly Established that It Is Likely to Succeed on the Merits of Its Claims

Open Democracy has not met its high burden to demonstrate that it is likely to succeed on the merits of its claims. Each of the Complaint's four counts has a common denominator that precludes a finding that it will likely succeed—each is a facial constitutional challenge. Facial constitutional challenges require a plaintiff to demonstrate that "no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotations and citations omitted). "A facial challenge must fail where the statute has a plainly

legitimate sweep." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) (quotations and citations omitted). Moreover, a court must not "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449-50 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

The Supreme Court disfavors facial challenges because they often rely upon speculation and barebone facts, they risk premature statutory interpretation, they may cause a court to anticipate constitutional questions or to formulate broader constitutional rules than necessary, and they threaten to short-circuit the democratic process. *See id.* at 450-51 (collecting cases). So, where a plaintiff asks a court to invalidate a state law in all its applications, a plaintiff "bear[s] a heavy burden of persuasion." *Crawford*, 553 U.S. at 200 (plurality). The district court did not apply the Supreme Court's rigorous standard governing facial constitutional challenges.

### A. Open Democracy Has Not Clearly Established that RSA 659:13 as Amended Unjustifiably Burdens the Right to Vote (Count I)

Open Democracy is not likely to succeed on its claim that New Hampshire's policy of requiring identity verification through federal, state, or local government-government issued IDs facially violates the First and Fourteenth Amendments. Courts apply the *Anderson-Burdick* framework where a facial constitutional challenge alleges that a state law unduly burdens the right to vote. *Libertarian Party v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011). This requires weighing the character and magnitude of the burden to the state's justification for the burden. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Other federal courts ruling on similar challenges to student voter-ID requirements have applied the *Anderson-Burdick* framework and upheld the constitutionality of the restrictions. *See, e.g.*, *March for our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128 (D. Idaho 2024); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749 (M.D. Tenn. 2015).

New Hampshire's interest is a matter of law. "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford*, 553 U.S. at 196 (plurality). "Consequently, there is a strong state interest in regulating all phases of the electoral process, including ballot access." *Perez-Guzman v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003) (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974); *Libertarian Party of Me. v. Diamond*, 992 F.2d 365, 370 (1st Cir. 1993)). Time and again, courts have upheld voter-ID laws as constitutional, due to the importance of this state interest. *See, e.g.*, *Crawford*, 553 U.S. 181; *Lee v. Va. State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016); *Frank v. Walker*, 769 F.3d 494 (7th Cir. 2014); *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009).

RSA 659:13 is just such a law. It is broadly applicable, regulating ballot access when a person registers to vote and obtains a ballot. It does not impose special burdens on any class of voter—it applies to all registering voters and all voters obtaining ballots. In this context, the *Anderson-Burdick* framework does not permit a court to select individuals or a subset of voters circumstantial burdens on the burden-side of the analysis. *See Crawford*, 553 at 206 (Scalia, J., concurring). Indeed, "[t]hat was essentially the approach of the *Burdick* dissenters, who would have applied strict scrutiny to the laws because of their effect on 'some voters.'" *See id.* (quoting *Burdick*, 504 U.S. at 446 (Kennedy, J., dissenting)). The *Crawford* plurality is controlling:

> When we consider only the statute's broad application to all Indiana voters we conclude that it "imposes only a limited burden on voters' rights." *Burdick*, 504 U.S., at 439, 112 S. Ct. 2059, 119 L. Ed. 2d 245. The "'precise interests'" advanced by the State are therefore sufficient to defeat petitioners' facial challenge to SEA 483. *Id.*, at 434, 112 S. Ct. 2059, 119 L. Ed. 2d 245.

*Id.* 202-03 (plurality).

Open Democracy alleges that RSA 659:13 imposes a disparate burden on young voters. *See* ECF No. 1, ¶¶ 232-239. While this does not justify inquiry into individual or subset burdens, Open Democracy cannot establish its likelihood of success at this stage, even if the Court were

inclined to agree with this perspective on the *Anderson-Burdick* analysis. Instead of offering competent evidence or specific examples, Open Democracy makes impermissibly vague allegations. *See, e.g.*, *id.* ¶¶ 236 ("***Many*** of the ***significant number*** of ***young*** New Hampshire voters…."), 237 (describing unspecified "***young*** voters" as "***forc[ed]*** … to pay ***sums of money*** and/or deal with ***significant logistical challenges***[.]") (emphasis added). Hypothetical or vague allegations cannot sustain a facial constitutional challenge. *See Wash. State Grange*, 552 U.S. at 449-50. Moreover, "When evaluating a neutral, nondiscriminatory regulation of voting procedure, '[w]e must keep in mind that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Id.* at 203 (internal quotations and citations omitted; alterations in original). On the record established at this stage of the lawsuit, Open Democracy cannot clearly establish a likelihood of success on the merits of Count I.

### B. Open Democracy Has Not Clearly Established that RSA 659:13 as Amended Unconstitutionally Discriminates on the Basis of Age (Counts II & III)

Open Democracy is not likely to succeed on its claim that New Hampshire's policy of requiring identity verification through federal, state, or local government-government issued IDs facially violates the Fourteenth and Twenty-Sixth Amendments. The First Circuit requires a Twenty-Sixth Amendment claim to set forth at least "***some*** direct evidence that the state has denied or abridged those voters' ability to vote to state a cognizable claim." *See Hagopian v. Dunlap*, 480 F. Supp. 3d 288, 299 (D. Me. 2020) (citing *Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364 (1st Cir. 1975)) (emphasis added). With respect to the Fourteenth Amendment equal protection claim, RSA 659:13 does not classify voters by age. But even if it did, age is not a suspect classification. *Donahue v. City of Bos.*, 371 F.3d 7, 15 (1st Cir. 2004). Open Democracy does not offer any evidence of a denial or abridgment of a right based on age.

Open Democracy asserts that "[a]s alleged above, HB 323 creates a material burden on the right to vote[,]" presumably on the coattails of the vague allegations of Count I (ECF No. 1, ¶¶ 236-37). ECF No. 1, ¶ 248. Rather than provide "direct evidence" of a denial or abridgment of the right to vote, it makes the conclusory assertion that RSA 659:13 is burdensome and the burden "falls disproportionately on young people[.]" *See id.* ¶ 251. It does not define a "young person" nor does it provide competent evidence or specific examples. Instead, it argues that in contrast to HB 323, "New Hampshire extends several privileges to make voting easier for older voters." *See id.* Among the numerous flaws in this argument, is the failure to define "young voters" and "older voters," so it lacks a sufficient comparator. It does not cite (or define the meaning of) "privileges," nor does it explain what is "easier." Even if Defendants accepted the argument as true (which they do not), a voting ***convenience*** enjoyed by undefined "older" voters, standing alone, cannot clearly establish an ***abridgment*** of undefined "younger" voters' rights. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 189 (5th Cir. 2020) (rejecting plaintiff's argument that would "convert[] the Twenty-Sixth Amendment into the positive assertion that voting rights must be identical for all age groups at all times. Any indulgence solely for one age group of voters would fail; voters of all ages must get the same indulgence."). The Twenty-Sixth Amendment does not establish a right to age-neutral laws, nor does it confer special consideration for students who may or may not be "young."

The lack of defining characteristics for "young voters" is particularly problematic for Open Democracy's Fourteenth Amendment claim:

> "[S]tates may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83, 145 L. Ed. 2d 522, 120 S. Ct. 631 (2000). In addition, a state may rely on age as a proxy for other characteristics relevant to a state's legitimate interests, even if that reliance turns out to be misplaced. *See id.* at 84.

*Donahue v. City of Bos.*, 371 F.3d 7, 15-16 (1st Cir. 2004). Age-classifications will stand if the state articulates some "reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)) (quotations omitted). Any ***plausible*** justification will suffice—the facts need not be support by the evidentiary record. *Id.* (citing *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003); *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 145 (1st Cir. 2001)). "[T]he party challenging the constitutionality of the age classification bears the burden of 'negating any ***conceivable*** basis which might support it.'" *Id.* (quoting *Beach*, 508 U.S. at 315). On the record established at this stage of the lawsuit, Open Democracy cannot clearly establish a likelihood of success on the merits of Count II or III.

### C. The Eleventh Amendment and *Pennhurst* Doctrine Categorically Bar Open Democracy's Claim that Secretary Scanlan Violated the New Hampshire Constitution

This Court lacks subject matter jurisdiction to adjudicate Open Democracy's state law claim. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). "[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself." *Id.* Open Democracy alleges that Secretary Scanlan—a constitutional officer of the state of New Hampshire—"issued a directive to local municipalities that HB 323 has amended RSA 654:12 (governing the registration process) as well as RSA 659:13 (governing the voting process) and student identification cards are no longer valid forms of identification for registering to vote." ECF No. 1, ¶ 268. The allegation is factually incorrect, but even if it were true, the Pennhurst doctrine is clear that the Eleventh Amendment deprives the Court of jurisdiction to adjudicate this claim.

**IV. The Remaining Preliminary Injunction Factors, Closely Tied to the Merits, Compel Denial of Emergency Relief**

The Court should not issue emergency injunctive relief because Open Democracy has not clearly established prejudice if the Court does not enjoin HB 323, and the equities and public interest favor the status quo ante. The reasons for this have been articulated above. In summary, Open Democracy cannot be prejudiced absent a preliminary injunction because it waited 130 days to challenge the law—it cannot now claim otherwise. New Hampshire also has a strong interest in "regulating all phases of the electoral process, including ballot access." *See Perez-Guzman*, 346 F.3d at 238. Accordingly, the State would be substantially prejudiced if the Court compels it to unwind four months of implementation within the next 54 days, while finalizing the primary election results and preparing for the general election. Among other reasons stated above, the public interest is best served by deny injunctive relief because a "ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Crawford*, 553 U.S. at 203 (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006)) (quotations omitted).

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's request for a preliminary injunction.

Respectfully submitted,

DEFENDANTS DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: August 26, 2026

*/s/ Michael P. DeGrandis*
Matthew T. Broadhead, N.H. Bar No. 19808
Associate Attorney General
Michael P. DeGrandis, N.H. Bar No. 277332
Assistant Attorney General
James H. Holl, N.H. Bar No. 279633
Assistant Attorney General
matthew.t.broadhead@doj.nh.gov
michael.p.degrandis@doj.nh.gov
james.h.holl@doj.nh.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all parties of record through the Court's e-filing system.

*/s/ Michael P. DeGrandis*
Michael P. DeGrandis