**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| COALITION FOR OPEN DEMOCRACY,<br>*Plaintiff*,<br>v.<br>DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General,<br>*Defendants*. | Case No. 1:26-cv-00647-JL-TSM |

**DEFENDANTS' PROPOSED FINDINGS OF FACT & RULINGS OF LAW**

Defendants New Hampshire Secretary of State David M. Scanlan and New Hampshire Attorney General John M. Formella, each in their official capacities, by and through counsel, the Office of the Attorney General, respectfully request that the Court find and rule according to the following facts and law, and deny Plaintiff Coalition for Open Democracy's Motion for Preliminary Injunction (ECF No. 2).

**PROPOSED FINDINGS OF FACT**

On August 27, 2026, the parties jointly filed a Single Timeline (ECF No. 32) and a Single Statement of Agreed & Disputed Facts (ECF No. 33). Defendants incorporate the pertinent facts asserted in these documents, as cited below ("Prop. Finding"). Defendants also identify below that testimonial or documentary evidence that they will offer at the August 31, 2026 hearing ("P.I. Hearing").

**I. Facts Establishing the *Purcell* Principle's Bar to Open Democracy's Motion for Preliminary Injunction**

### A. General Public & Local Election Official Education & Implementation of HB 323

1. Governor Ayotte signed HB 323 into law on April 3, 2026. Single Timeline, ECF No. 32 at 1 (Aug. 27, 2026) ("Timeline").

2. "Since HB 323's enactment, the Secretary of State's Office has produced and distributed the Election Procedure Manual, social media outreach, radio ads, statutorily mandated polling place posters, ballot clerk procedure manuals, and student voting guides, all reflecting current New Hampshire election law, including HB 323." Single St. of Agreed & Disputed Facts, ECF No. 33, ¶¶ 96, 118 (Aug. 27, 2026) ("Single St.").

3. "Since HB 323's enactment, the Secretary of State's Office has implemented a change in the Statewide Voter Registration System, updated numerous sections of its website, conducted public speaking events, held election official retreats … all reflecting current New Hampshire election law, including HB 323." *Id.*

4. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that between April 3, 2026 and June 1, 2026, the Secretary's Office educated local election officials on HB 323's changes to voter identification requirements and prepared policies and procedures for implementing RSA 659:13's voter identification requirements.

5. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that between April 3, 2026 and June 1, 2026, the Secretary's Office engaged the public regarding HB 323's changes to voter identification requirements.

6. HB 323's effective date was June 2, 2026. Timeline at 1.

7. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that between June 2, 2026 and August 10, 2026, the Secretary's Office

educated local election officials HB 323's changes to voter identification requirements and finalized policies and procedures for implementing RSA 659:13's voter identification requirements.

8. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that between June 2, 2026 and August 10, 2026, the Secretary's Office engaged the public regarding HB 323's changes to voter identification requirements.

9. Plaintiff Coalition for Open Democracy simultaneously filed a four-count Complaint and a Motion for Preliminary Injunction on August 11, 2026. Compl., ECF No. 1; Mot. Prelim. Inj., ECF No. 2.

10. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that between August 12, 2026 to present, the Secretary's Office educated local election officials HB 323's changes to voter identification requirements and finalized policies and procedures for implementing RSA 659:13's voter identification requirements.

11. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that between August 12, 2026 to present, the Secretary's Office engaged the public regarding HB 323's changes to voter identification requirements.

12. "The New Hampshire Department of State has been implementing HB 323 and providing guidance to local election officials regarding the implementation and application of HB 323 since at least April 23, 2026." Single St. ¶ 118.

**B. Current Administration of the September Primaries**

13. Open Democracy filed its Complaint and Motion for Preliminary Injunction on August 11, 2026, which was 130 days after Governor Ayotte signed HB 323 into law and 70 days after HB 323 went into effect. *See* Single St. ¶¶ 100-101.

14. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that administration of the September primaries began more than three weeks prior to this lawsuit, in July 2026.

15. "On July 20 and 21, 2026, the Secretary of State's Office ordered the September 8, 2026 absentee ballots from the Office's third-party printer." Single St. ¶ 103.

16. "On July 27, 2026, the Secretary of State's Office sent its first batch of absentee ballots to local election officials by UPS. UPS records indicate that the first batch was received on July 28, 2026. The Office also hand-delivers absentee ballots to eight jurisdictions. August 18, 2026 was the date the last jurisdiction received its absentee ballots." Single St. ¶ 104.

17. "Local election officials mail absentee ballots after receiving them from the Secretary of State's Office." Single St. ¶ 105.

18. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that the earliest date voters could have started marking and returning absentee ballots is July 25 for UOCAVA voters and between July 28 and August 18 for other voters, depending on when their town received absentee ballots. By August 18, voters in every town could have started marking and returning absentee ballots.

19. "New Hampshire will hold its September 8, 2026 primaries eight days after the currently scheduled P.I. Hearing." Single St. ¶ 98.

20. "New Hampshire will hold its November 3, 2026 general election 64 days after the currently scheduled hearing on Open Democracy's Motion for Preliminary Injunction." *Id.* ¶ 99.

### C. Continuing Nature of Election Administration from the September Primaries to the November General Election

21. The November general election just 56 days after the P.I. Hearing.

22. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that reversing course on student IDs before the November general election is nearly impossible, as a practical matter.

23. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that the Secretary of State Office's engagement in the post-primary and pre-general election processes are intertwined and require all-hands level resources even when both elections are administered under identical rules.

24. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show that immediately after the September primaries, state election officials will audit ballot counting devices; canvass votes; administer election recounts; administer the Ballot Law Commission recount appeal meeting on September 17; prepare the UOCAVA November general election ballots by September 19; draft, proof, and manage printing of absentee and official ballots (320 unique ballots total); conduct OmniBallot accessible voting system testing for each 320 unique ballots; among other things.

## II. Facts Establishing the Doctrine of Laches' Bar to Open Democracy's Motion for Preliminary Injunction

25. Defendants incorporate the enactment and passage dates of HB 323 reflected in the Single Timeline and Single Statement.

26. Defendants incorporate the facts offered in Prop. Finding I that support the legal conclusion that the *Purcell* principle bars injunctive relief before the September primaries and November general election. These include facts related to the election calendar, steps Defendants have already taken to complete HB 323 implementation and to educate election officials and the public, steps they are currently taking to administer the primaries, and steps they will take to administer the general election.

27. Through testimonial and documentary evidence to be offered at the P.I. Hearing, Defendants will show additional prejudice and impracticability regarding changing voter ID requirements one the eve of the September primaries and November general election.

**III. Facts Establishing the State's Interest in HB 363**

28. Defendants incorporate the enactment and passage dates of HB 323 reflected in the Single Timeline and Single Statement.

29. New Hampshire voters have been required to verify their identities with photo IDs since 2012. Timeline at 1; Single St. ¶ 1.

30. HB 323 amended RSA 659:13 to eliminate student IDs as an exception to the principal requirements for photo identification to obtain a ballot. *See* Single St. ¶¶ 2, 7, 10-14.

31. "New Hampshire has a state interest in the efficient and orderly administration of elections." *Id.* ¶ 108.

32. "New Hampshire ballots are anonymous, and once an anonymous ballot is cast, it will be counted." *Id.* ¶ 109.

33. "If New Hampshire discovers that any ballot had been wrongfully cast, irrespective of the voter's intent, the ballot cannot be clawed back or discounted, and the election results cannot change." *Id.* ¶ 110.

34. "New Hampshire has a state interest in counting only the votes of eligible voters." *Id.* ¶ 111.

35. "New Hampshire has a state interest in preventing intentional and unintentional wrongful voting before it happens." *Id.* ¶ 112.

36. "New Hampshire has a state interest in regulating all phases of the electoral process, including ballot access." *Id.* ¶ 113.

37. "New Hampshire has a state interest in election integrity." *Id.* ¶ 114.

38. "New Hampshire has a state interest in high voter confidence in the integrity of New Hampshire's elections." *Id.* ¶ 115.

39. The minutes of a February 10, 2026 Senate Committee hearing on HB 323 reflect one state senator supporting HB 323 on the grounds that driver's licenses have "driver's licenses have 'security features' that make them more reliable than student identification cards. He did not specify which 'security features.' HB 323 February 10 Hearing, at 5." *Id.* ¶ 65.

40. "New Hampshire DMV-issued Real ID-compliant identification cards (driving and non-driving) are subject to federal statutory and regulatory requirements. Among other things, federal regulations require that 'States must include document security features on REAL ID driver's licenses and identification cards designed to deter forgery and counterfeiting, promote an adequate level of confidence in the authenticity of cards, and facilitate detection of fraudulent cards in accordance with this section.' 6 C.F.R. 37.15(a). 'REAL ID driver's licenses and identification cards must contain at least three levels of integrated security features that provide the maximum resistance to persons' efforts to—(1) Counterfeit, alter, simulate, or reproduce a genuine document; (2) Alter, delete, modify, mask, or tamper with data concerning the original or lawful card holder; (3) Substitute or alter the original or lawful card holder's photograph and/or signature by any means; and (4) Create a fraudulent document using components from legitimate driver's licenses or identification cards.' 6 C.F.R. 37.15(b)." *Id.* ¶ 116.

41. "New Hampshire schools do not issue Real ID-compliant identification cards, nor are they required by federal law to integrate security features into their cards." *Id.* ¶ 117.

## PROPOSED RULINGS OF LAW

On August 26, 2026, Defendants filed an Objection (ECF No. 25) to Plaintiff's Motion for Preliminary Injunction (ECF No. 2). The Motion should be denied for the reasons stated in Defendants' Objection (ECF No. 25) and for the reasons set forth below ("Prop. Ruling").

### I. Applicable Legal Standard

1. "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Rubygold Main Holdings, LLC v. Brian Gardner Carpentry, LLC*, No. 20-cv-1006-JL, 2021 U.S. Dist. LEXIS 12640, *12 (D.N.H. Jan. 22, 2021) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

2. As the movant, Open Democracy has the burden to establish a "clear and unequivocal" right to the requested injunction. *Nw. Bypass Grp. v. United States Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 36 (D.N.H. 2007) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)).

3. Accordingly, Open Democracy must clearly establish that: (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm absent extraordinary relief; (3) the balance of the equities favor the injunction; and (4) the injunction is in the public interest. *See CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020).

4. Since Open Democracy's requested injunction would issue against the New Hampshire Secretary of State and Attorney General in their official capacities, the balance-of-equities and public-interest factors merge. *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

5. The preliminary injunction factors are not equal in importance, as the "'[l]ikelihood of success is the main bearing wall' of this 'framework.'" *W Holding Co. v. AIG Ins. Co.*, 748 F.3d 377, 383 (1st Cir. 2014) (quoting *Ross Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).

6. If Open Democracy cannot establish that it is likely to succeed on the merits, the remaining factors are of little-to-no consequence. *See New Comm Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

## II. The *Purcell* Principle Bars Injunctive Relief

7. The Supreme Court's *Purcell* principle is controlling authority in determining whether the Court should issue the requested injunction.

8. "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam).

9. The United States Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing *Purcell*, 549 U. S. 1; *Frank v. Walker*, 574 U. S. 929 (2014); *Veasey v. Perry*, 574 U.S. 951 (2014)).

10. District courts should be circumspect and exercise judicial restraint when an election is near. *See Democratic Nat'l Comm. v. Wis. State Legis.*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring) ("[A]t every step, state and local officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting."); *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222, 1324 (N.D. Ga. 2022) ("[E]lections are complex and election calendars are finely calibrated processes, and significant upheaval and voter confusion can result if changes are made late in the process.").

11. The "important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in

running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *Id.* (collecting cases).

12. Where the laches doctrine could serve as an equitable bar to injunctions in some cases, laches does not bar injunctive relief where a plaintiff did not sit on its rights to the prejudice of a defendant. This put election systems at great risk in cases filed close to elections. *Cf. Purcell*, 549 U.S. at 4 (discussing balancing the right to vote with state interests in election administration).

13. The Supreme Court's *Purcell* principle is grounded in equitable principles, but it accounts for the practical limitations of time and resources. *See id.* at 4-5. Even where a state election law unconstitutionally burdens the fundamental right to vote, equitable balancing remains necessary in determining whether to enjoin its application. *See id.* The risks that a late change to election procedures could confuse voters or engender distrust the integrity of the election can disincentivize voting. *See id.* at 4-5. This is often a greater risk than allowing an unlawful statutory scheme to stay in place until the next election. *See id.* And an election draws closer, the risk of confusion and distrust increases. *See id.*

14. The Seventh Circuit's stay of a preliminary injunction in Indiana in April 2026 is instructive on *Purcell*'s application. For 20 years, Indiana accepted student IDs from state-run universities to prove identity when casting an in-person ballot. *Count Us In v. Morales*, 172 F.4th 974, 975 (7th Cir. 2026). In April 2025, Indiana prohibited student IDs for voter identity verification. *Id.* The plaintiff-organizations challenged the new law as an unconstitutional burden on the right to vote and unconstitutional age discrimination. *Id.* In February 2026, plaintiffs moved for a preliminary injunction, which the district court granted on April 14, but early voting had begun seven days earlier. *Id.* The court cited the Supreme Court's 2020 *Rep.*

*Nat'l Comm.* per curiam decision and Justice Kavanaugh's 2022 *Merrill* concurrence warning federal courts against "tinkering with election laws" on the eve of an election. *See id.* at 976 (citations omitted). Ruling that the *Purcell* principle bars the injunction while an election is occurring, the court explained that it:

> view[ed] the risk of disruption to Indiana's primary election as very serious. In no uncertain terms, the district court's injunction will alter who can cast a ballot in this election. And this change—imposed unilaterally by a federal court—comes seven days after voting in the election has already begun.

*Id.* (citing *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring)).

The *Count U.S. In* decision is important, persuasive authority regarding the *Purcell* principle's application to the Motion. New Hampshire does not have early voting, but applications for absentee voting require photo IDs consistent with the requirements of RSA 659:13, and an absentee ballot may be marked and submitted as soon as the voter receives it. RSA 657:17-c. Absentee ballot applications may be made within six months of an election—April for the 2026 primaries and June for the 2026 general election. RSA 657:6. Moreover, as Prop. Finding I.B show, while it is unknown precisely when the first primary absentee ballot was offered, it could have been marked and offered as early as July 25 for UOCAVA voters and August 18 – 19 for others.

15. An injunction here would contravene the practical and equitable underpinnings of the *Purcell* principle by likely altering who can cast a ballot after absentee voting has already begun. And with respect to the November general election, absentee applications with proof of identity have already been submitted by voters, so an injunction would equally as likely alter who may cast a ballot, despite that no vote has yet been cast in that election. The Seventh Circuit was correct in its application of the Purcell principle under similar circumstances.

16. As the evidence in Prop. Finding I.A-B above demonstrate, the Court should exercise restraint because enjoining HB 323's operation just eight days before the September primaries would likely cause voter and election administrator confusion and risk disenfranchisement or call into question the integrity of the election in voters' minds.

17. As the evidence in Prop. Finding I.A-C above demonstrate, the Court should exercise restraint because enjoining HB 323's operation just 56 days before the November general election would likely cause voter and election administrator confusion and risk disenfranchisement or call into question the integrity of the election in voters' minds.

**III. The Doctrine of Laches Is an Additional Reason to Bar Injunctive Relief**

18. "[T]he doctrine of laches restricts the assertion of claims or defenses by litigants who have slept upon their rights or prerogatives and, thus, have prejudiced opposing parties by or through their inexcusable delay." *Concord Hosp., Inc. v. N.H. HHS*, 743 F. Supp. 3d 325, 353 (D.N.H. 2024) (quoting *United States v. Letter from Hamilton to De Lafayette (July 21, 1780)*, 15 F.4th 515, 526 (1st Cir. 2021)).

19. Laches is "an equitable doctrine which penalizes a litigant for negligent or willful failure to assert [its] rights." *Id.* (quoting *Oriental Fin. Grp., Inc. v. Cooperativa De Ahorro Y Crédito Oriental*, 698 F.3d 9, 20 (1st Cir. 2012) (alterations in original; quotations and citations omitted).

20. Defendants' equitable defense of laches requires that they show: "(1) that the plaintiff's delay in bringing its claim was unreasonable, and (2) that the delay resulted in prejudice to the defendant." *Id.* (citing *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989)).

21. As the evidence in Prop. Finding I and II above demonstrate, enjoining HB 323's application in the September primaries or the November general election would cause great prejudice to Defendants.

22. Moreover, Open Democracy cannot seek such extraordinary relief 130 days after HB 323's enactment and 70 days after HB 323's effective date without offering any justification.

## IV. Open Democracy Has Not Clearly Established that Is Likely to Succeed on the Merits of Its Claims

23. Defendants incorporate the proposed rulings in Prop. Ruling I above regarding the applicable legal standard, including Open Democracy's burden to establish a "clear and unequivocal" right to the requested injunction.

24. Open Democracy asserts four counts in its Complaint, each related to HB 323's amendment to RSA 659:13, II(a), which repealed student IDs as an exception to the principal requirements of photo identification to obtain a ballot. *See* ECF No. 1, ¶¶ 232-271.

25. Count I alleges that prohibiting a voter from verifying identity with a student photo ID to obtain a ballot or register to vote is an unjustifiable burden on the right to vote, which is prohibited by the First and Fourteenth Amendments. *See id.* ¶¶ 232-239.

26. Count II alleges that prohibiting a voter from verifying identity with a student photo ID to obtain a ballot or register to vote is discrimination on the basis of age, which is prohibited by the Twenty-Sixth Amendment. *See id.* ¶¶ 240-255.

27. Count III alleges that prohibiting a voter from verifying identity with a student photo ID to obtain a ballot or register to vote fails to guarantee equal protection under the law on the basis of age, which is prohibited by the Fourteenth Amendment. *See id.* ¶¶ 256-264.

28. Count IV alleges that the Secretary of State violated the separation of powers guaranteed by the New Hampshire Constitution by purportedly misinterpreting HB 323's application to RSA 654:12. *See id.* ¶¶ 265-271.

**A. Open Democracy Has Not Clearly Established that RSA 659:13 Is Facially Unconstitutional**

29. Facial constitutional challenges require a plaintiff to demonstrate that "no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotations and citations omitted).

30. "A facial challenge must fail where the statute has a plainly legitimate sweep." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) (quotations and citations omitted).

31. A court must not "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449-50 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

32. The Supreme Court disfavors facial challenges because they often rely upon speculation and barebone facts, they risk premature statutory interpretation, they may cause a court to anticipate constitutional questions or to formulate broader constitutional rules than necessary, and they threaten to short-circuit the democratic process. *See id.* at 450-51 (collecting cases).

33. So, where a plaintiff asks a court to invalidate a state law in all its applications, a plaintiff "bear[s] a heavy burden of persuasion." *Crawford*, 553 U.S. at 200 (plurality).

34. Here, Open Democracy's heavy burden is to make a clear showing that RSA 659:13, II is unconstitutional in all its applications unless it permits student IDs as verification of identity to obtain a ballot or register to vote.

35. Open Democracy has not demonstrated that it is likely to succeed on Counts I, II, or III because there is a plainly legitimate sweep to voter ID requirements.

36. Time and again, federal courts find that minimal voting restrictions related to voter ID are not facially unconstitutional. *See, e.g.*, *March for our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128 (D. Idaho 2024); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749 (M.D. Tenn. 2015).

**B. Open Democracy Has Not Clearly Established that RSA 659:13, as Amended, Unjustifiably Burdens the Right to Vote (Count I)**

37. Courts apply the *Anderson-Burdick* framework where a facial constitutional challenge alleges that a state law unduly burdens the right to vote. *Libertarian Party v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011).

38. The *Anderson-Burdick* framework requires weighing the character and magnitude of the burden to the state's justification for the burden. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

39. On its face, RSA 659:13, as amended by HB 323, is a broadly applicable law that does not impose special burdens on any class of voter. It applies to all registering voters and all voters obtaining ballots is an evenhanded restriction to protect integrity and reliability of the electoral process itself. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-90 (2008) (plurality).

40. Voters' purported burdens be justified by relevant and legitimate state interests "sufficiently weighty to justify the limitation." *Id.* at 191.

41. Where a law is broadly applicable, the *Anderson-Burdick* analysis weighs the voting restriction as it purportedly burdens voters across the electorate. *See id.*, 553 U.S. at 206 (Scalia, J., concurring). Even if there is a subset of voters whose circumstantial burdens are greater than that typically experienced across the electorate, their idiosyncratic experiences should not be considered on the burden-side of the equation. *See id.* at 206.

42. Open Democracy's only identified voter burden is *de minimis* and common among the electorate. Where voters experience an ordinary and widespread burden caused by a nondiscriminatory voting law, the burden cannot be severe, regardless of how the requirement may affect any single voter. *See id.* (citing *Clingman v. Beaver*, 544 U.S. 581, 590-91 (2005))

43. Defendants have established sufficient state interest to overcome the burden imposed by the repeal of student IDs to prove identity.

44. Open Democracy acknowledges that New Hampshire ballots are anonymous, so a wrongfully cast ballot cannot be clawed back or discounted from election results. *Id.* ¶¶ 36-37.

45. Open Democracy agrees that New Hampshire has an interest in counting only the votes of eligible voters, preventing wrongful voting before it happens, and regulating all phases of the electoral process, including ballot access. Prop. Findings, ¶¶ 33-35.

46. New Hampshire has an interest in the efficient and orderly administration of elections, election integrity, and voter confidence. *Id.* ¶¶ 30, 36-37.

### C. Open Democracy Has Not Clearly Established that RSA 659:13, as Amended, Unconstitutionally Discriminates (Counts II & III)

47. Open Democracy's Claims II and III are age discrimination claims asserting two different theories, a violation of the Twenty-Sixth Amendment and the equal protection clause of the Fourteenth Amendment.

48. Regarding Count II's Twenty-Sixth Amendment claim, the First Circuit requires a Twenty-Sixth Amendment claim to set forth at least "***some*** direct evidence that the state has denied or abridged those voters' ability to vote to state a cognizable claim." *See Hagopian v. Dunlap*, 480 F. Supp. 3d 288, 299 (D. Me. 2020) (citing *Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364 (1st Cir. 1975)) (emphasis added).

49. Open Democracy has not provided any direct evidence to support its claim. It did not produce a witness who suffered the discrimination of which it complains.

50. To be sure, it makes generalized statements about the age of most students or most people who probably used student IDs to register or cast ballots, but these allegations are too vague and hypothetical to support a facial constitutional challenge.

51. Regarding Count III's equal protection claim, RSA 659:13 does not classify voters by age. But even if it did, age is not a suspect classification. *Donahue v. City of Bos.*, 371 F.3d 7, 15 (1st Cir. 2004).

52. Open Democracy has not offered any evidence of a denial or abridgment of a right based on age.

53. Moreover, the First Circuit has held that "states may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83, 145 L. Ed. 2d 522, 120 S. Ct. 631 (2000). In addition, a state may rely on age as a proxy for other characteristics relevant to a state's legitimate interests, even if that reliance turns out to be misplaced. *See id.* at 84." *Id.* at 15-16.

### D. The Eleventh Amendment and *Pennhurst* Doctrine Categorically Bar Open Democracy's Claim that Secretary Scanlan Violated the New Hampshire Constitution (Count IV)

54. Open Democracy alleges that Secretary Scanlan—a constitutional officer of the state of New Hampshire—"issued a directive to local municipalities that HB 323 has amended RSA 654:12 (governing the registration process) as well as RSA 659:13 (governing the voting process) and student identification cards are no longer valid forms of identification for registering to vote." ECF No. 1, ¶ 268.

55. Court lacks subject matter jurisdiction to adjudicate Open Democracy's state law claim. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984).

56. "[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself." *Id.*

## V. Open Democracy Has Not Clearly Established the Remaining Preliminary Injunction Factors, Which Are Closely Tied to the Merits

57. Defendants incorporate the proposed rulings in Prop. Ruling I above regarding the applicable legal standard, including Open Democracy's burden to establish a "clear and unequivocal" right to the requested injunction.

58. For the reasons described above, Open Democracy has not clearly established prejudice if the Court does not enjoin HB 323. Open Democracy cannot be prejudiced absent a preliminary injunction because it waited 130 days to challenge the law—it cannot now claim otherwise.

59. Also for the reasons described above, the equities and public interest favor the status quo ante. New Hampshire also has a strong interest in "regulating all phases of the electoral process, including ballot access." *See Perez-Guzman*, 346 F.3d at 238. Accordingly, the State would be substantially prejudiced if the Court compels it to unwind four months of

implementation within the next 54 days, while finalizing the primary election results and preparing for the general election.

60. The public interest is best served by deny injunctive relief because a "ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Crawford*, 553 U.S. at 203 (quoting *Ayotte* ***v****. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006)) (quotations omitted).

Respectfully submitted,

DEFENDANTS DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: August 28, 2026

*/s/ Michael P. DeGrandis*
Matthew T. Broadhead, N.H. Bar No. 19808
Associate Attorney General
Michael P. DeGrandis, N.H. Bar No. 277332
Assistant Attorney General
James H. Holl, N.H. Bar No. 279633
Assistant Attorney General
matthew.t.broadhead@doj.nh.gov
michael.p.degrandis@doj.nh.gov
james.h.holl@doj.nh.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all parties of record through the Court's e-filing system.

*/s/ Michael P. DeGrandis*
Michael P. DeGrandis