**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **Coalition for Open Democracy,**<br><br>Plaintiff,<br><br>vs.<br><br>**David M. Scanlan, in his official capacity as New Hampshire Secretary of State and John Formella, in his official capacity as New Hampshire Attorney General,**<br><br>Defendants. | **Case No. 1:26-cv-00647-JL-TSM** |

**PLAINTIFF'S REPLY TO DEFENDANTS' OBJECTION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# Table of Contents

I. Open Democracy Has Standing ........ 1
II. Plaintiff is likely to succeed on its *Anderson-Burdick* claim. ........ 3
III. Twenty-Sixth Amendment and Equal Protection Clause ........ 5
IV. *Purcell* Does Not Apply to This Motion For a Preliminary Injunction. ........ 7
V. Laches is not Applicable. ........ 10

## INTRODUCTION

Since New Hampshire implemented its voter ID law 14 years ago, students have been able to present student IDs to prove their identity to register and to vote—until now. The Court should grant a preliminary injunction because: plaintiff has standing, a permanent injunction is likely to be granted after trial, and the absence of preliminary relief will result in confusion at the polls, increase the harm to plaintiff, and most importantly cost young eligible voters the opportunity to cast a ballot, a harm for which there is no remedy.

### I. Open Democracy Has Standing

Open Democracy has standing pursuant to *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (organizations have standing where the challenged conduct "perceptibly impairs" the plaintiff's business activities)[1] and *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*Alliance*") (test is whether the challenged conduct "directly affected and interfered with" an organization's "core business activities"); *see also Town of Milton v. FAA*, 87 F.4th 91, 99 (1st Cir. 2023) (an organization has standing where, as here, "the challenged conduct frustrated

[1] The facts here are analogous to those of *Havens Realty*. There, an organization ("HOME") that provided "counseling and referral services" for homeseekers had standing to bring a lawsuit against defendants, who interfered with HOME's core business activity by giving HOME employees false information to avoid having to rent apartments to HOME's clients of color. Though Havens Realty did not prevent HOME from providing counseling, it undermined the effectiveness of that counseling and interfered with HOME's goal of finding homes for their clients. 455 U.S. at 379. Here, Open Democracy is not wholly prevented from carrying out registration drives, but HB 323 and the April 23 directive interfere with their goal of registering students and undermine the effectiveness of these drives.

their organizational missions and [t]hey diverted resources to combat that conduct").

In disputing standing, defendants invent new rules not found in the prevailing case law and ignore indisputable facts. Defendants incorrectly claim that Plaintiff has not expended more than its "ordinary expenditures" to combat HB 323 and attempt to import materiality and "involuntary" tests into the standing analysis. Neither *Alliance* nor the First Circuit imposes such requirements.[2] *See Milton*, 7 F.4th at 99. It is the "perceptible impairment," not the dollar amount of resources diverted, that establishes injury. *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props.*, 82 F.4th 345, 353 (5th Cir. 2023). And defendants' own citations do not stand for the proposition that resource diversion has to be "involuntary." The cases indicate only that the resources must be diverted in response to the challenged law, *Havens Realty Corp.*, 455 U.S. at 379, as Open Democracy has done.

Plaintiff has diverted significant human and financial resources to mitigate the consequences of HB 323 and the April 23 directive. Plaintiff's Proposed Findings of Fact, ¶¶ 128-30, 135-38, 140. As a result, it has fewer resources for core business activities. Further, HB 323 and the April 23 directive have directly interfered with Open Democracy's efforts to achieve a 100% registration rate amongst eligible 18-year-old New Hampshire residents. Those injuries are not hypothetical. Open

[2] Defendants claim that *Coal. for Humane Immigrant Rights v. Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 88 (D.D.C. 2025), cites *Alliance* for the proposition that an organization must be "subjected . . . to operational costs beyond those normally expended." It does not; the quoted language comes from *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995).

Democracy serves young voters who have student IDs but do not have other forms of identification. It is keenly aware of the burdens that its constituents now face and it is responding accordingly to help students navigate a burdensome system.

Nor is Open Democracy comparable to the advocacy organizations that lack standing in cases cited by defendants because they *only* advocate against or engage in general public education about the challenged law. *See Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 320 (5th Cir. 2025); *Coal. For Humane Immigr. Rts.*, 780 F. Supp. 3d at 88. While Open Democracy does do some advocacy, its injury arises from its specific efforts to help voters and the community alleviate the burden imposed by HB 323 and the April 23 directive. It is a voter outreach organization and service provider, both of which are regularly found to have organizational standing under similar circumstances. *New Hampshire Youth Movement v. Scanlan*, 833 F. Supp. 3d 93, 125 (D.N.H. 2026) ("*NHYM*") (collecting cases).

## II. Plaintiff is likely to succeed on its *Anderson-Burdick* claim.

"[T]he court must consider the [challenged] statute's broad application to all voters and its heavier burden on subsets of voters." *NHYM,* 833 F. Supp. 3d at 130.[3] Applying the appropriate sliding scale approach to the *Anderson-Burdick* test, it is clear that plaintiff meets its burden. In arguing otherwise, Defendants bypass the

[3] This is also consistent with Equal Protection case law. *Bullock v. Carter*, 05 U.S. 134, 142-49 (1972) (applying intermediate-like scrutiny to a facially neutral law that had a disparate impact on less affluent voters). *Bullock* applies a sliding scale and increased scrutiny when election statutes burden an identifiable class. *See also Mancuso v. Taft*, 476 F.2d 187, 193 (1st Cir. 1973) (applying *Bullock*). This analysis is proper for both Equal Protection and First/Fourteenth Amendment claims.

controlling ruling in *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (opinion of Stevens, J.), to rely instead on a non-controlling concurrence.[4]

Defendants also rely on cases rejecting challenges to voter ID laws, but plaintiff makes no such challenge. Plaintiff does not challenge RSA 659:13; it challenges the amendment of this provision by HB 323 (and of RSA 654:12 by the April 23 directive. Plaintiff does not argue here that it is unconstitutional to ask voters to show identification; but it is unconstitutional to prohibit voters from using a reliable and longstanding form of photo ID, where such a prohibition places a significant burden on a subset of voters and serves no legitimate or weighty interest. In *Crawford*, the Court made a fact-specific ruling that the plaintiffs did not show that an identifiable class was specially burdened by the challenged law, and that trips to the DMV in the context of Indiana's voting scheme did not unconstitutionally burden the voting population. 553 U.S. at 198, 200-03. It did not give states carte blanche to pass burdensome or discriminatory voter ID laws. *See Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (*Crawford* does not justify a voter ID law lacking "all the ameliorative provisions of the Indiana law").

Plaintiffs have demonstrated that they are likely to succeed on the merits of

[4] Defendants erroneously treat the Scalia concurrence in *Crawford* as controlling. It is not; Stevens' opinion is. *See Marks v. United States*, 430 U.S. 188, 193 (1977) (where there is no majority opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds"). This is the approach most courts take in analyzing *Crawford*, including the First Circuit. *See Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 31 n.6 (1st Cir. 2016); *see also Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (employing the Stevens' "sliding scale" approach); *Greater Birmingham Ministries v. Secretary of State*, 992 F.3d 1299, 1318 n. 31 (11th Cir. 2021) (collecting cases).

their claim that young voters are specifically burdened by the challenged law, particularly given New Hampshire's unforgiving voting regime. The two nonbinding district court cases that have upheld restrictions on student IDs did so in the context of much more accessible voting regimes and are not applicable here. *See March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1134 (D. Idaho 2024); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 754 (M.D. Tenn. 2015) ("*NSOC*"). Idaho allows early voting, I.C. § 34-1012, and one-stop, no-fee IDs at the DMV I.C. § 49-2444 (22). Tennessee allows early voting, Tenn. Code Ann. § 2-6-102, online and mail-in registration, Tenn. Code Ann. §§ 2-2-112; 2-2-115, one-stop, no-fee IDs, Tenn. Code Ann. § 55-50-336, and provisional ballots, Tenn. Code Ann. § 2-7-112(e). Neither case is persuasive in its *Anderson-Burdick* analysis; and neither is applicable to New Hampshire, which has "one of the strictest voting regimes in the country and, consequently, one of the highest 'costs of voting' in the country." NHYM, 833 F. Supp. 3d at 101.

The evidence in this case demonstrates that HB323 imposes a substantial burden on an identifiable class of voters, those between 18-24-years-of-ages, in the context of an unusually strict voting regime, justified by no weighty or legitimate state interest. Plaintiff is aware of no voter ID case involving student ID where a court did not accept that the burdens of revoking student ID fell on young voters. *See, e.g.*, *NSOC*, 155 F. Supp. 3d at 757 (rejecting a similar argument).

## III. Twenty-Sixth Amendment and Equal Protection Clause

Contrary to defendants' argument, plaintiff has established abridgement because HB 323 significantly burdens the right to vote of an identifiable age group: 18-24-year-olds. Plaintiff does not seek "special considerations" for young voters, but merely equal and fair treatment, which the Constitution requires. Plaintiff cites exemptions granted to people over age 65 not to suggest that being *denied* exemptions qualifies as abridgment, but rather to show that New Hampshire is willing to alleviate the burden of its voter ID laws for its voters over age 65, while increasing the burden on voting for young voters. Just as the Fifteenth and Nineteenth Amendments prevent voter discrimination against Black and women voters respectively, without asking for "special considerations," the Twenty-Sixth Amendment merely but categorically prohibits abridgement of young voters' vote.

The case cited by defendants, *Hagopian v. Dunlap*, 480 F. Supp. 3d 288, 295 (D. Me. 2020). is inapposite. There, the court rejected the plaintiff's expert report that claimed that ranked choice voting discriminated against older voters because they could not understand it. *Id.* Plaintiffs presented no other evidence of burden. *Id.* at 299. In contrast, here there is direct (and compelling) evidence that HB 323 creates disparate and significant burdens on 18-24-year-old voters.

Contrary to the defendants' argument, equal protection claims are not limited to "suspect classes." Although wealth is not a suspect class, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973), election statutes that burden less affluent voters trigger intermediate scrutiny. *Bullock v. Carter*, 405 U.S. 134, 142-43 (1972) (finding that candidate filing fees burdened the right to vote by discriminating against less affluent candidates and therefore, less affluent voters). Burdens on eligible voters

of a certain age—or burdens on students—are cognizable harms under the Equal Protection Clause. *See, e.g.*, *Luft v. Evers*, 963 F.3d 665, 677 (7th Cir. 2020) (requiring additional documentation only from voters presenting student IDs violated the Equal Protection Clause); *Bright v. Baesler*, 336 F. Supp. 527, 533 (E.D. Ky. 1971) (domicile-proof rules applicable only to students violated Equal Protection Clause).

### IV. *Purcell* Does Not Apply to This Motion For a Preliminary Injunction.

Under *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006), courts should not issue orders, "especially conflicting orders," close to an election where such orders "can themselves result in other confusion and consequent incentive to remain away from the polls." To determine if *Purcell* applies, a court must examine "the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring in the grant of application for stays). Here, the requested injunction will alleviate, rather than cause, confusion in the election, and will encourage and ensure, rather than disincentivize, voter participation.

*Purcell* does not apply where, as here, "the primary reason for applying that standard—risk of voter confusion—[is] lacking." *NHYM*, 833 F. Supp. At 149 (quoting *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *2 (11th Cir. Nov. 7, 2022)). New Hampshire voters have used student IDs to establish their identity since there has been a voter ID law; there has yet to be an election where student IDs were not accepted. An injunction will

preserve the status quo. *Cf. NHYM*, 833 F. Supp. At 149 ("there is no risk of confusion from an order reinstating QVAs to prove citizenship and CVAs to respond to voter challenges. Voters who are not sure whether they may use a QVA to register can still register using DPOC. New Hampshire voters have relied extensively on QVAs to prove citizenship in the past, and election officials already know how to administer them.").

The cases cited by Defendants are inapplicable. The requested injunctions implicated candidate registration, ballot printing, and redistricting and involved severe logistical problems and the potential for confusion that might undermine a person's understanding of where and for whom they could vote. *See, e.g.*, *Respect Maine PAC v. McKee*, 622 F.3d 13, 14-16 (1st Cir. 2010); *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring in the grant of application for stays); *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025) (finding that a redistricting decision "caus[ed] much confusion.").

No such confusion is likely here, where an injunction will preserve the status quo. *See Kim v. Hanlon*, 99 F.4th 140, 160 (3d Cir. 2024) (rejecting *Purcell* defense because the injunction would "reduce, if not eliminate voter confusion" caused by the challenged law). Denying the injunction will cause more harm to the burdened voter group by preventing them from voting with student IDs, while granting the injunction will cause no harm to any voter group. Indeed, denying the injunction, despite plaintiff's likelihood of success on the merits, will exacerbate, rather than alleviate, the harm cited by defendants–time and cost spent implementing HB 323–

by leaving defendants to continue to implement the new law over the course of one or more elections, only to have it struck down after trial.

The decision in *Count US IN v. Morales*, 172 F.4th 974, 976 (7th Cir. 2026), was wrongly decided and is, in any case, distinguishable. It characterized the district court's injunction as pertaining to "a matter of voter eligibility," *id.*, when it did no such thing; the injunction didn't change who was eligible to vote, it retained the status quo around the documentation that could be used to show eligibility. That is incorrect with respect to Indiana and is certainly incorrect with respect to HB 323 and the April 23 directive, which do not alter eligibility (only the manner of proving eligibility), and enjoining them would not cause confusion. Further, the Seventh Circuit failed to discuss, let alone find a basis for, voter confusion, which is the cornerstone of *Purcell* analysis.

Defendants claim that implementing the requested injunction is not feasible, but Secretary Scanlan already has demonstrated he can quickly communicate election law updates to election officials and make significant changes to election procedure, both with regard to HB 323 and with regard to *NHYM* and the state's pending appeal and request for stay. Plaintiff's Proposed Findings of Fact, ¶¶ 107-09.

Plaintiff did not unreasonably delay in bringing this suit. To argue otherwise, defendants cite inapplicable cases, in which the plaintiffs sought to enjoin longstanding law with no new arguments. *See McKee*, 622 F.3d at 16 (plaintiffs challenged campaign finance laws in place for over a decade on grounds available

for two years). Plaintiff brought this case four months after HB 323 was signed into law, just 70 days after it went into effect, before any elections took place under the new regime, and requests an injunction that will merely allow eligible voters to prove identity using a form of identification that has been accepted by every poll worker at every New Hampshire election since it first began requiring proof of ID at the polls. Given the complexities of voting rights litigation in New Hampshire, this was not an unreasonable delay and provides no basis to deny interim relief.

Further, regardless of defendants' assertions of delay, where, as here, an injunction will neither disrupt the election process nor confuse voters, *Purcell* is not grounds to deny relief. It is well within the district court's power to grant late-breaking injunctions, especially when fundamental constitutional rights are at stake. *We the People PAC v. Bellows*, 40 F.4th 1, 7, 25 (1st Cir. 2022) (district court did not err where it expedited injunction proceedings after plaintiffs filed on December 31 and required relief by a February 16 deadline).

## V. Laches is not Applicable.

A party asserting laches bears the burden of proof and must show "(1) that the plaintiff's delay in bringing its claim was unreasonable, and (2) that the delay resulted in prejudice to the defendant." *Concord Hosp., Inc. v. N.H. HHS*, 743 F. Supp. 3d 325, 353 (D.N.H. 2024) (citing *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989)). For largely the same reasons discussed above with respect to *Purcell,* defendants have not demonstrated that the motion is barred by laches. *See* Plaintiff's Request for Conclusions of Law, ¶¶ 119-28.

Dated: August 29, 2026

Respectfully submitted,

*/s/ Henry C. Quillen*
Henry C. Quillen (Bar No. 265420)
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851
hquillen@whatleykallas.com

*/s/ Courtney Hostetler*
Ben Horton (admitted *pro hac vice*)
John Bonifaz (admitted *pro hac vice*)
Ben Clements (admitted *pro hac vice*)
Courtney Hostetler (admitted *pro hac vice*)
FREE SPEECH FOR PEOPLE
28 S. Main Street, Suite 200
Sharon, MA 02067
Tel: (617) 244-0234
chostetler@freespeechforpeople.org
bhorton@ freespeechforpeople.org
bclements@freespeechforpeople.org
jbonifaz@freespeechforpeople.org

Michael Gardener (admitted *pro hac vice*)
Courtney Herndon (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 348-1642
msgardener@mintz.com

Yeilee Woo (admitted *pro hac vice*)
Sherwet H. Witherington (admitted *pro hac vice*)
Hannah Edge (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
919 Third Avenue

New York, New York 10022
Tel: (212) 692-8153; (212) 692-8188
ywoo@mintz.com
shwitherington@mintz.com
HMEdge@mintz.com

*Attorneys for Plaintiff*
*Coalition for Open Democracy*