UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Coalition for Open Democracy

v.

Civil No. 1:26-cv-00647-JL-TSM
Opinion No. 2026 DNH 119

David M. Scanlan, in his official capacity as
New Hampshire Secretary of State, et al.

**ORDER DENYING PRELIMINARY INJUNCTIVE RELIEF**

This order denies preliminary injunctive relief with respect to New Hampshire's upcoming September 8, 2026 primary elections.

In April 2026, the New Hampshire State Legislature passed HB 323, eliminating student ID cards as an acceptable form of identification for voter registration. The law went into effect in June 2026. On August 11, 2026, less than one month before the New Hampshire primary election on September 8, the plaintiff, Coalition for Open Democracy, filed its action against the State. Open Democracy moves for a preliminary injunction to prevent the State from enforcing HB 323, principally arguing that the law (1) unconstitutionally burdens the right to vote in violation of the First and Fourteenth Amendments and (2) intentionally discriminates against young voters in violation of the Twenty-Sixth Amendment. The court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 as it arises under the Constitution and laws of the United States.

After reviewing the parties' submissions and holding requested oral argument, the court denies the motion for a preliminary injunction to the extent it requests relief prior to the September 8 primary election. The *Purcell* doctrine dictates that the court refrain

from interfering in the State's election law on the eve of the election, with absentee voting already underway. *See Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 16 (1st Cir. 2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006)). Because the court bases its denial on *Purcell* considerations, it does not discuss the merits of the requested injunction.

## I. Background

Following its customary practice in preliminary injunction litigation, this court required counsel to jointly submit an agreed-to timeline and single agreed statement of facts on an expedited basis.[1] The facts set forth below are based on those filings and on evidence presented at the evidentiary hearing.

### A. Voting in New Hampshire before HB 323

New Hampshire administers voter registration locally through city and town clerks.[2] To register, a prospective voter must go to their local city or town clerk and show proof of identity, age, domicile, and citizenship.[3] Each voter qualification requires different (though sometimes overlapping) documentary proof.[4] On election day, a registered voter must separately present proof of identity to obtain a ballot.[5]

---

[1] Draft Joint Proposed Timeless (doc. no. 32); Single Statement of Agreed & Disputed Facts ("Joint Statement of Facts") (doc. no. 33).

[2] Single Statement of Agreed & Disputed Facts ("Joint Statement of Facts") (doc. no. 33) ¶ 4.

[3] *Id.* ¶ 5.

[4] *Id.* ¶ 8.

[5] *Id.* ¶ 6.

From 2012 (when New Hampshire's voter ID law was enacted) through June 2026 (when HB 323 took effect), student identification cards satisfied the identity requirement for both registering to vote and obtaining a ballot on election day.[6] To qualify, a student ID had to meet the same general standards as other forms of identification: it needed to (a) show the holder's name (substantially matching the voter registration record); (b) include a photograph of the voter; and (c) be presented within five years of its issuance or expiration date. *See* RSA 659:13(II)(a). Student IDs were only deemed valid if issued by specific institutions; namely, New Hampshire colleges, universities, or career schools; public or accredited nonpublic New Hampshire high schools; Dartmouth College; or University System/Community College System schools.[7]

Notably, New Hampshire never accepted student IDs to establish domicile or citizenship.[8] A student voter without a driver's license or passport could present a student ID for identity, along with separate documentation (e.g., a birth certificate for citizenship, a lease or utility bill for domicile) to complete registration.

**B. <u>Passage and rationale for HB 323</u>**

New Hampshire's governor signed HB 323 into law on April 3, 2026, and it took effect June 2, 2026.[9] The law amended RSA 659:13 by eliminating student ID cards as an acceptable form of identification for obtaining a ballot.[10] The law did not change the

---

[6] *Id.* ¶ 10.
[7] Joint Statement of Facts (doc. no. 33) ¶ 11.
[8] *Id.* ¶ 85.
[9] *Id.* ¶ 15.
[10] *Id.* ¶¶ 14, 17.

separate registration statute, RSA 654:12, or the criteria for establishing domicile or citizenship.[11]

New Hampshire has a state interest in ensuring elections are efficient, orderly, and secure.[12] The legislative record for HB 323 includes three stated rationales from supporters specific to that law, and thus far, counsel for the State have offered no others. First, lawmakers argued that student IDs are unreliable because students may hold onto them for long periods and they sometimes lack expiration dates.[13] Second, Representative Berry, one of the bill's co-sponsors, asserted that "[s]tudent IDs have no address verification," "citizenship check," or "security features."[14] In other words, New Hampshire schools do not issue Real ID-compliant identification cards, nor are they required by federal law to integrate security features into their cards.[15] Third, a companion Senate bill's sponsor, Senator Sullivan, stated she introduced HB 323 because constituents do not want out-of-state students living temporarily on campus to vote in New Hampshire elections.[16]

Opposition testimony at legislative hearings from, *inter alia*, the Hanover Town Clerk, a former Plymouth State University student, and the Durham Town Clerk argued the bill would effectively disenfranchise first-time voters, that student ID issuance involves rigorous verification processes, and that no fraud involving student IDs had ever

---

[11] *Id.* ¶ 34.
[12] *Id.* ¶¶ 108-109.
[13] *Id.* ¶ 78.
[14] *Id.* ¶ 85.
[15] *Id.* ¶ 117.
[16] *Id.* ¶ 81.

been documented.[17] Separately, the parties agree that a 2022 "Special Committee on Voter Confidence" convened by the Secretary of State took evidence at nine public hearings and found high public confidence in New Hampshire elections and no evidence of widespread voter fraud.[18] The Committee made no recommendation regarding student ID elimination specifically.[19]

## C. Practical effect of HB 323

With student IDs no longer accepted at polling places or voter registration sites, a voter (including a student) without a driver's license, passport, military ID, or other state/local government-issued photo ID must now obtain one of the following to vote: a driver's license (any state), a state-issued nondriver ID, a U.S. armed services ID, or a U.S. passport/passcard.[20] Moreover, the plaintiff asserts that HB 323 has several downstream effects:

***DMV access.*** The state-issued IDs that students without other forms of qualifying ID must now acquire to satisfy the updated identification requirements are only available from the DMV, which has 14 locations statewide (two with limited hours), all by appointment only, weekdays only, with no weekend availability.[21] Several large high schools in New Hampshire (Plymouth Regional, ConVal, Pinkerton, Littleton) are within a half-hour car drive and over an hour public transit ride from the nearest DMV.[22]

---

[17] *Id.* ¶¶ 41, 69-71.
[18] *Id.* ¶¶ 72-74.
[19] *Id.* ¶ 75.
[20] *Id.* ¶ 24.
[21] *Id.* ¶¶ 35, 36.
[22] *Id.* ¶ 40.

***Cost.*** State ID cards carry a $20 fee, waivable only through a voucher process that requires a separate trip to the town/city clerk (to swear an affidavit and prove domicile) before obtaining the card at the DMV, and then a return trip to the clerk to register. This means a student-voter affected by HB 323 must make up to three trips to two offices to avoid an additional cost as a result of the new law. At the hearing, the plaintiff also presented uncontested evidence suggesting that at least two DMVs are unable to process and/or issue the "voter identification" card (a non-driver's identification card marked with the language "for voter identification only" that is supposed to be available upon presentation of the voucher). *See* RSA 260:21(V)(a).

***Multiple-office burden.*** Students without qualifying ID may need to visit multiple offices with the same underlying documents (birth certificate, current student ID, etc.) that previously would have sufficed at the clerk's office alone. Notably, because HB 323 did not change the identity-verifying documents accepted by the DMV under New Hampshire law, a student can present his or her current student ID card at the DMV to establish identity and obtain a nondriver's picture identification card, which the student can then use to register to vote and obtain a ballot. In other words, a hypothetical voter without HB 323-conforming identity documentation could bring the same documents (including the now not-accepted student ID) required for voter registration prior to HB 323 first to the DMV to receive a state-issued identification card, and then present that newly-obtained card to the local town clerk to register to vote.[23]

---

[23] *Id.* ¶¶ 27-32.

***Impact on 18-to-24-year-old voters.*** In New Hampshire, the share of teenagers obtaining driver's licenses has declined by 28% between 2012–2022.[24] As of 2024, approximately 8,455 New Hampshire residents between the ages of 18 and 19 do not possess driver's licenses (25% of New Hampshire residents in that age group). The same is true of approximately 16,404 New Hampshire residents between the ages of 20 and 24 (18.7% of New Hampshire residents in that age group).[25] Meanwhile, voters 65 and older may use expired photo ID without regard to the normal five-year cutoff, and nursing home residents can have identity confirmed by a facility administrator without any ID card.[26] HB 323 did not alter these provisions.

**D. <u>Upcoming elections, deadlines, and implementation</u>**

As of the filing of this lawsuit, New Hampshire has scheduled two elections: the September 8, 2026 primary and the November 3, 2026 general election. The plaintiff filed its complaint and motion for preliminary injunction 130 days after the Governor signed HB 323 into law and 70 days after it took effect. Seven days remain between the date of this order and the primary election, and 63 days remain until the general election.

***Absentee ballot status for the primary.*** Under RSA 657:17-c, absentee voters must verify identify by (a) including a copy of qualifying photo ID with their application; (b) including a notarized signature with their application; or (c) presenting ID in person to a town or city clerk. The Secretary of State's Office ordered the September primary

---

[24] *Id.* ¶ 50.
[25] *Id.* ¶ 51.
[26] *Id.* ¶¶ 55-58.

absentee ballots from its printer on July 20-21, 2026 and sent the first batch of those ballots to local election officials by UPS overnight delivery on July 27.[27] The last jurisdiction received its absentee ballots for dissemination on August 18.[28] New Hampshire's Deputy Secretary of State testified that, as of August 28, 2026, the State had issued approximately 9,700 absentee ballots for the primary election, over 5,200 of which had been cast.

***State implementation of HB 323.*** The Secretary of State's Office has been communicating with the public and clerks about the change since before the law took effect, including via an April 23, 2026 email to NHVotes@sos.nh.gov that explained the new rule (the "April 23 directive").[29] Since the law's enactment in June, the office has updated the Election Procedure Manual, ballot clerk manuals, student voting guides, polling place posters, its website, and the statewide voter registration system, and has conducted social media outreach, radio ads, public speaking events, and in-person trainings for election officials to reflect the new identification requirements.[30]

## II. Standing

The State argues that Open Democracy lacks standing to pursue its claims. "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial

[27] *Id.* ¶ 104.
[28] *Id.*
[29] *Id.* ¶¶ 3, 118.
[30] *Id.* ¶¶ 96-97.

relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A showing "of future injury may suffice if the threatened injury is 'certainly impending,' or [if] there is a 'substantial risk' that the harm will occur." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (further quotations omitted)). "When an organization ... seeks to establish Article III standing, it may proceed in one of two ways: it may show that it has 'organizational standing' to sue on its own behalf, or it may demonstrate that it has 'associational standing' to sue on behalf of its members." *Mayor & City Council of Baltimore v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 738 F. Supp. 3d 1, 7 (D.D.C. 2024).

Here, Open Democracy asserts that it has organizational standing to challenge HB 323 and the April 23, 2026 directive. An organization may demonstrate such standing by showing "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitute[ing] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Merely expending funds to oppose a particular policy is not enough to establish organizational standing; rather, as in *Havens Realty*, the defendant's actions must have "directly affected and interfered with [the plaintiff's] core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

As in its recent challenge to New Hampshire's elimination of the qualified Voter Affidavit in *New Hampshire Youth Movement v. Scanlan*, 833 F.Supp.3d 93 (D.N.H. 2026) (Elliott, C.J.), Open Democracy derives its theory of standing largely from the

holdings in *Havens Realty Corporation* and *Alliance for Hippocratic Medicine*. In *New Hampshire Youth Movement*, Chief Judge Elliott found that Open Democracy had organizational standing to challenge the state's elimination of the qualified Voter Affidavit because the law at issue "perceptibly impair[ed]" Open Democracy's "core service" of helping high schools promote and run their voting registration drives. 833 F.Supp.3d at 125. Open Democracy asserts similar effects on its high school voting registration drives arising from the law at issue here, including that it has had to undertake a number of activities in response to HB 323—namely, modifying its toolkit, reworking sample letters and social media materials, retraining volunteers and partnering clerks, and expanding its poll-observer program—which has resulted in fewer available resources for other core activities like campaign finance research.[31]

In order to ensure the orderly and efficient administration of justice involving a similar challenge between the same parties litigating the ramifications of a closely related provision of state election law in this District Court, the court assumes without deciding that Open Democracy has standing to pursue its challenge to HB 323 and the April 23 directive based on Chief Judge Elliott's reasoning in *New Hampshire Youth Movement*. That order—including the issue of Open Democracy's organizational standing under *Havens Realty* and *Alliance for Hippocratic Medicine*—is presently on appeal before the First Circuit Court of Appeals.[32]

---

[31] Zink Decl. (doc. no. 2-2) ¶¶ 11-13, 17.

[32] The court is skeptical that the *additional* resources required to respond to HB 323 constitute such a severe resource drain on Open Democracy that it has been unable to carry out its core business activities. Testimony at the evidentiary hearing raised the possibility that the

## III. ***Purcell* doctrine**

"The Supreme Court… has offered a special caution about the perils of federal courts changing the rules on the eve of an election." *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 16 (1st Cir. 2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.")). Under the so-called *Purcell* doctrine, "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423 (2020).

"Only under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress is *Purcell* implicated." *Am. Encore v. Fontes*, 152 F.4th 1097, 1121 (9th Cir. 2025) (quotations omitted). Here, the parties agree that the Secretary of State distributed absentee ballots for the primary in late July, and that ballots were in the hands of all town clerks by August 18. The preliminary injunction hearing was held on August 31, eight days before the September 8 primary. That means primary voting is not merely imminent, but already in progress, under the new identification regime created by HB 323. Indeed, New Hampshire's Deputy Secretary of State testified that, as of August 28, 2026, New Hampshire voters

organization has had to divert funds and organize volunteers to assist high schoolers in obtaining new HB 323-compliant IDs, but it was not clear how many high schoolers it had assisted, how much funding had been diverted, or how systematic its diversion of volunteer time had been. Although not strictly necessary to show organizational standing, the court notes that Open Democracy did not produce evidence of an affected student voter who was receiving or would receive assistance from the organization to obtain the necessary identification.

have already cast approximately 5,200 of the 9,700 absentee ballots issued in connection with the primary election.

The plaintiff's assertion that an injunction would merely "preserve the status quo" misses the point. HB 323 is a duly enacted law of the State of New Hampshire that took effect on June 2, 2026, nearly three months before the primary and almost seven months before the general election. The "status quo" that *Purcell* protects is the set of rules under which voters and administrators are presently operating, i.e., RSA 659:13 as amended by HB 323, and not the regime that preceded HB 323's passage. *See Republican Nat'l Comm.*, 589 U.S. at 424 (*Purcell* protects against courts "alter[ing] the election rules" close to an election, without regard to which direction the change runs). HB 323 is therefore not a proposed change awaiting implementation; it *is* the current, operative election law, and has been for the entirety of this election cycle's absentee-voting and registration activity.

This is substantially similar to the fact pattern that led the Seventh Circuit Court of Appeals to stay a district court judgment holding an Indiana state law prohibiting the use of student IDs unconstitutional. *See Count US IN v. Morales*, 172 F.4th 974 (7th Cir. 2026). The district court in that case issued a preliminary injunction seven days after early voting in the primary began, and the Seventh Circuit stayed the injunction because "mid-stream relief on what amount to a matter of voter eligibility [is] a clear violation of *Purcell*." *Id*. at 976. So too here. Enjoining HB 323 now, mid-absentee voting, would create precisely the type of "conflicting orders" problem that *Purcell* warns against, with some primary voters having already relied on the updated ID rules while others voting

under the old ones. *See Purcell*, 549 U.S. at 4-5. Moreover, with only seven days from the date of this order and the primary, the operational window to redistribute guidance, retain poll workers, and re-educate voters before more ballots are cast is close to closing. This is the type of compressed timeline that *Purcell* was designed to guard against. *See Democratic Nat'l Comm. v. Wisconsin State Legislature*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring) ("That important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the [local] interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election.").

That compressed timeline, moreover, is the plaintiff's own making. The Governor signed HB 323 into law on April 3, 2026, and it took effect on June 2, 2026. The plaintiff waited 130 days after enactment and 70 days after the law took effect before filing suit and simultaneously demanding emergency relief, notwithstanding that they were fully aware its terms and the Secretary of State's ongoing implementation efforts. Any burden now associated with re-educating voters and administrators on a compressed timeline is a direct consequence of the plaintiff's litigation timing. A party may not manufacture an emergency through its own delay and then invoke the resulting time pressure as a reason a court should excuse that delay or discount the disruption an injunction would cause. *See Respect Me. PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010) (deeming "'the emergency'… largely one of [the plaintiff's] own making" where a plaintiff was aware of the relevant election-law requirements but waited to sue until shortly before an election).

The general election may be on different footing. At 63 days out, the November election has not yet reached the stage of active ballot distribution and voting in the way the primary has. The *Purcell* rationale of protecting voters and administrators who have already begun acting under one set of rules arguably has less force when the disputed rule would change before any ballot is actually cast. Indeed, a 56-plus-day runway is comparable to the lead time the Secretary of State's office itself used to implement HB 323 in the first place. This suggests the possibility of an orderly transition back to the previous voter identification laws is at least logistically feasible for that election, even if it would be difficult.[33]

## IV. <u>Conclusion</u>

For the reasons stated above, the motion for preliminary injunction[34] prior to the September 8 primary election is DENIED.

SO ORDERED.

Joseph N. Laplante
United States District Judge

Dated: September 1, 2026
cc: Counsel of Record

[33] Though the court here treats *Purcell* as an independent basis for denying preliminary relief, the same considerations bear directly on the balance-of-equities and public-interest factors, which merge where, as here, the injunction would run against state officials. *See Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

[34] Doc. no. 2.