**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| COALITION FOR OPEN DEMOCRACY,<br>*Plaintiff*,<br>v.<br>DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General,<br>*Defendants*. | Case No. 1:26-cv-00647-JL-TSM |

**DEFENDANTS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & RULINGS OF LAW**

Defendants New Hampshire Secretary of State David M. Scanlan and New Hampshire Attorney General John M. Formella, each in their official capacities, by and through counsel, the Office of the Attorney General, supplement their prior request that the Court find and rule according to the following facts and law, and deny Plaintiff Coalition for Open Democracy's Motion for Preliminary Injunction (ECF No. 2).

**SUPPLEMENTAL PROPOSED FINDINGS OF FACT**

On September 11, 2026, the parties jointly filed a Single Supplemental Timeline (ECF No. 45) and a Single Updated Statement of Agreed & Disputed Facts (ECF No. 45). Defendants incorporate the agreed facts asserted in these documents, as cited below ("Suppl. Prop. Findings"). Defendants also identify the testimonial or documentary evidence presented at the August 31, 2026 hearing ("Primary Elections P.I. Hearing") and the evidence that will be offered at the September 15, 2026 hearing ("General Election P.I. Hearing"), below.

## I. Facts Establishing the *Purcell* Principle's Bar to Open Democracy's Motion for Preliminary Injunction, as Applied to the November 2026 General Election

1. Governor Ayotte signed House Bill 323 ("HB 323") into law on April 3, 2026. Single Suppl. Timeline, ECF No. 45 at ¶ 2 (Sept. 11, 2026) ("Timeline")

2. HB 323 amended RSA 659:13, removing student IDs from the list of IDs that could be presented as a valid form of identification when obtaining a ballot. *Id.*

3. HB 323 went into effect on June 2, 2026. *Id.* ¶ 5.

### A. Facts Establishing the Secretary of State's Local Election Official Training and Guidance to Ensure Accessible, Uniform, and Accurate November 2026 General Election Administration

4. "Since HB 323's enactment, the Secretary of State's Office has produced and distributed the Election Procedure Manual, social media outreach, radio ads, statutorily mandated polling place posters, ballot clerk procedure manuals, and student voting guides, all reflecting current New Hampshire election law, including HB 323." Single Updated St. of Agreed & Disputed Facts, ECF No. 33 at ¶ 102 (Sept. 11, 2026) ("Single St.").

5. "Since HB 323's enactment, the Secretary of State's Office has implemented a change in SVRS, updated numerous sections of its website, conducted public speaking events, held election official retreats, and conducted in-person election official trainings across the state, all reflecting current New Hampshire election law, including HB 323." *Id.* ¶ 102.

6. Through testimonial and documentary evidence offered at the Primary Elections P.I. Hearing, Defendants showed that between April 3, 2026 and June 1, 2026, the Secretary's Office educated local election officials on HB 323's changes to voter identification requirements and prepared policies and procedures for implementing RSA 659:13's voter identification requirements. *See, e.g.*, Defs.' Exs. B, C, D, E. The education and communication included six retreats: two retreats each for clerks, supervisors of the checklist, and moderators, training

attendees regarding HB 323's changes specific to their roles in the election process. Tr. 122:19-123:20 (B. O'Donnell direct exam).

7. Through testimonial and documentary evidence offered at the Primary Elections P.I. Hearing, Defendants showed that the Secretary's Office has also educated local election officials in formal training sessions regarding HB 323's changes. Tr. 123:21-125:9 (B. O'Donnell direct exam). This required the development of numerous educational materials and deployment of new policies and procedures for implementing RSA 659:13's voter identification requirements. *See, e.g.*, Defs.' Exs. B, C, D, E, F, G, H, I, J, K, R, T.

8. The parties agree that "[b]etween August 18 and September 1, 2026, the Secretary of State's Office trained 1,077 local election officials through 14 training sessions across the state. Each training session educated attendees on how to verify voter identities, including HB 323's amendment repealing student IDs as permissible voter identification verification." Single St. ¶ 107.

9. Through testimonial and documentary evidence offered at the Primary Elections P.I. Hearing and likely touched upon again at the General Election P.I. Hearing, Defendants have shown that these training sessions represent the entirety of the Secretary of State Office's pre-election efforts to implement all election law changes prior to the September primary elections and the November general election. *See also id.* at ¶¶ 107-08; Defs.' Ex. T. The Office does not conduct in-person clerk, supervisor, and moderator pre-election administration training sessions between primary and general elections, so no training sessions are currently scheduled between now and the general election. *See id.* at ¶ 108.

**B. Facts Establishing that Reversing Course Would Very Likely Confuse Local Election Officials and Unreasonably Risk Inconsistent Application of Election Rules**

10. Communications between the Secretary's Office and local election officials rely on a local election officials' access to the Statewide Voter Registration System ("SVRS") or an accurate e-mail address maintained in the SVRS. Single St. ¶ 97. Only clerks and supervisors have SVRS access, and only clerks, supervisors, and moderators have e-mails stored in the SVRS. *Id.* ¶¶ 97-98, 106. "The Secretary of State's Office does not have direct or instantaneous contact with poll workers." *Id.* ¶ 99.

11. Should the Court issue an injunction requiring local election officials to accept student IDs as verification of a voter's identity, the Secretary of State must communicate that information to as many local election officials as possible. The Office must clearly explain a 180º reversal of five months of written guidance and in-person instruction.

12. There simply is not enough time or resources between now and the general election for election official re-training: "[I]n-person local election official training requires close coordination with the clerk's office in each municipality where training will be held to ensure access to a facility that is large enough to accommodate at least 100 trainees before the Office can schedule in-person training." *Id.* ¶ 104. Even leaving curriculum development and the time constraints of qualified trainers in the Secretary's Office aside, testimonial and documentary evidence to be offered at the General Election P.I. Hearing will show that re-training 1,100 clerks, supervisors, and moderators in time for the trainees to re-train other election officials is logistically impractical, if not impossible.

13. The Secretary's Office will attend the New Hampshire City & Town Clerks Association Conference on October 6-9, but the testimonial and documentary evidence to be offered at the General Election P.I. Hearing will show that this is not a comparable substitute for

five months of guidance and 1,000+ trained election officials. The Association's membership is restricted to clerks and deputy clerks, and only they or their qualified assistants may attend. *Id.* ¶ 126. Defendants will offer testimony that the typical conference size is 150-200 attendees. Supervisors, moderators, and poll workers may not attend the Association's event. *See id.* The testimony will show that the training sessions run by the Secretary's Office at the conference (3½ hours over two sessions) should provide instruction regarding election night procedures, including ballot reporting. But even if the Office risked foregoing that syllabus to update clerks on the Court's injunction and new identity verification procedures instead, the information would be received by a fraction of those trained in the post-HB 323 procedures. Consistent and faithful application of the Court's injunction would rely upon 200 attendees' diligent and accurate communication to supervisors, moderators, and poll workers—and the attendees would have less than one month to do it.

14. Through testimonial evidence to be offered at the General Election P.I. Hearing, Defendants will show that if the Court enjoins HB 323's changes, reverting to the pre-HB 323 SVRS fields before the November general election is impracticable. A third party database technology vendor made HB 323-related SVRS changes to the SVRS, and it requires pre-implementation testing.

15. Through testimonial and documentary evidence offered at the Primary Elections P.I. Hearing and will be offered at the General Election P.I. Hearing, Defendants have shown and will show that if the Court enjoins HB 323's changes, the Office must provide new written procedures for addressing post-injunction voter registration and ballot access in an unrealistically short timeframe. For example, Deputy Secretary O'Donnell testified that "[a]ll of the existing documents that we have issued, like the existing ballot clerk procedures that now have incorrect

materials, we would need to do our best to see if they can get them back if they haven't trained people that they'll update." Tr. 154:3-7 (B. O'Donnell cross-exam) (distinguishing between Secretary-trained election officials and ballot clerks). Training and communication regarding these changes cannot be done instantaneously because "the clerk, the moderator, and supervisors are elected[, but b]allot clerks are appointed inspectors of election by each party." *See id.* 154:10-12.

16. The logistical challenge here, is that the Secretary of State Office's SVRS announcement regarding this reversal of course and establishing new procedures would reach only clerks and supervisors. Single St. ¶¶ 97-98, 106. An e-mail blast would also reach moderators, but it would reach only those moderators whose information has been accurately updated in the SVRS. *Id.* ¶¶ 100-101.

17. Most poll workers are ***not*** clerks, supervisors, or moderators, so an e-mail blast would not reach most poll workers: "The SVRS does not have e-mail addresses for most poll workers (*e.g.*, ballot clerks, selectmen, greeters, and assistant election officials)." *Id.* ¶ 98. Should the Court issue an injunction, instructions regarding how poll workers must administer identity verification entirely relies upon effective communication and re-training of poll workers from clerks, supervisors, or moderators. *See id.* ¶¶ 98-99; Tr. 153:24-154:1 (B. O'Donnell cross-exam) ("Every one of those ballot clerks will need to be trained on the correct procedure for what is an acceptable ID."). Communication and education to poll workers cannot originate from the Secretary of State's Office. *See id.*

18. For these reasons, and as supported further by testimonial and documentary evidence to be offered at the General Election P.I. Hearing, Defendants have shown that an

injunction would create an unreasonably high risk of inconsistent application of rules in the November statewide general election.

### C. Facts Establishing the Secretary of State's Public Outreach and Education to Ensure Clear, Accessible, and Accurate Voter Understanding of the Rules Governing the November 2026 General Election

19. The Secretary of State's Office has posted on social media, broadcast public service announcements on radio, updated its website, and distributed student voting guides, to inform voters regarding New Hampshire voting requirements, including the changes implemented by the Office pursuant to HB 332. Single St. ¶ 102.

20. Defendants offered further details of the Office's public outreach through testimonial and documentary evidence offered at the Primary Elections P.I. Hearing, showing that between April 3, 2026 and June 1, 2026, the Secretary's Office engaged the public regarding HB 323's changes to voter identification requirements. *See, e.g.*, Defs.' Exs. D, E, J, K, L, M, N. Deputy Secretary Brendan A. O'Donnell, for example, testified that the Office distributed its April 23, 2026 press release to the 119 journalists on its mailing list, which represents about 40 news outlets. Tr. 125:19-126:7 (B. O'Donnell direct exam). Social media engagement included X, Instagram, and Facebook. *Id.* 126:8-16; Defs.' Ex. N (reflecting 10 social media posts). The Secretary's Office has about 1,750 X-followers, 450 Instagram-followers, and 6,200 Facebook followers. *Id.* 126:17-127:1.

21. The parties acknowledge that the Secretary's Office published and distributed a "Student Guide to Registering to Vote in NH" and a "Student Guide to Voting in NH" on April 23, 2026, announcing "new election resources for students who plan to register to vote in New Hampshire or vote in an upcoming election[.]" Single St. ¶¶ 3, 16. Deputy Secretary O'Donnell also testified regarding the substantial undertaking of changing the Secretary's website to reflect the changes, which included voter guides, updated election posters, and the

Election Procedure Manual, all of which reflected the changes to student IDs. Tr. 127:2-128:11 (B. O'Donnell direct exam).

22. Defendants offered testimonial and documentary evidence at the Primary Elections P.I. Hearing regarding the updated election posters, available on the Secretary's website. Poster No. 5, "Proof of Voter Identity Instructions," conspicuously emphasizes that: "******Student photo ID <u>CANNOT</u> be used to prove identity******". Defs.' Ex. H (emphasis in original). Likewise, Poster No. 9, "New Hampshire Voter ID Law," conspicuously emphasizes that: "**[****Student photo ID <u>CANNOT</u> be used to prove identity****]**". Defs.' Ex. I (emphasis in original). Deputy Secretary O'Donnell explained that these are called "purity of election posters," and New Hampshire law requires every polling place to post printed posters on election day. *See* Tr. 128:18-129:4 (B. O'Donnell direct exam).

23. At the Primary Elections P.I. Hearing, Deputy Secretary O'Donnell testified that the Secretary's Office printed the digital student voting guides "and reached out to public high school principals and colleges to offer it if they were interested[,]" and distributed them at election official training events and asked trainees to distribute them to schools in their areas. *See id.* 129:24-130:6.

24. Defendants offered the substance of the Secretary's radio broadcasts through documentary evidence at the Primary Elections P.I. Hearing. The third (of three) of the WMUR radio PSA scripts explained that "[r]egistered voters must show a qualifying photo ID at the polls to receive a ballot and vote. Student IDs are not accepted." Defs.' Ex. M; *see* Tr. 130:7-131:6 (B. O'Donnell direct exam).

25. The first (of three) of the Secretary's NHAB radio PSA scripts likewise explained that "[r]egistered voters need to prove their identity with a qualifying photo ID before they vote

on election day. Student ID cards cannot be used to prove identity." Defs.' Ex. L. "From the end of June through July, 51 NHAB member stations aired [the Secretary's] Voter Information messages 1,441 times[.]" Defs.' Ex. S. Although this does not indicate exactly how many times the third NHAB PSA was aired, it reflects substantial outreach educating the public regarding student IDs ahead of the September primaries and November general election.

26. Through testimonial and documentary evidence to be offered at the General Election P.I. Hearing, Defendants will show that these radio ads have continued to educate the public regarding New Hampshire's policy of accepting only government-issued picture identification as verification of a person's identity.

### D. Facts Establishing the Ongoing Administration of the September Primary Elections

27. New Hampshire held state primary elections on September 8, 2026. Timeline ¶ 9. The primaries did not end, however, when the last voter cast a ballot. *See* Single St. ¶ 117.

28. "Between September 9 and 17, 2026, Secretary of State's Office will complete its administration of the September primaries, as described in the Single Supplemental Timeline. *See* ECF No. 45, ¶¶ 10-18 (Sept. 11, 2026). This includes aggregating and reporting final statewide results for approximately 900 federal, state, and county offices, counting device audits and report, party nominee and vacancy management, administration and oversight of recounts, and Ballot Law Commission appeals. *See id.*" Single St. ¶ 117.

29. Through testimonial and documentary evidence to be offered at the General Election P.I. Hearing, Defendants will show that the Secretary's Office will conduct five recounts. Recounts will begin on September 14, 2026 and must be completed by September 17, 2026. Timeline ¶¶ 15, 18. The Ballot Law Commission will meet on September 17, 2026 to hear and decide objections or appeals regarding primary recount results, if any.

30. Through testimonial and documentary evidence to be offered at the General Election P.I. Hearing, Defendants will show that the Carroll County Treasurer recount will divert substantial resources from the Secretary's Office because it will require recounting all ballots from all Carroll County towns.

31. Through testimonial and documentary evidence offered at the Primary Elections P.I. Hearing, Defendants showed that the Secretary will not complete administration of the September primary elections until September 18, 2026. Tr. 140:1-9 (B. O'Donnell direct exam).

### E. Facts Establishing the Sequential and Interdependent Nature of Election Administration from the September Primary Elections Through the November General Election

32. New Hampshire's statewide general election will be held on November 3, 2025—just 50 days from the date of this filing. Timeline ¶ 31.

33. Through testimonial and documentary evidence offered at the Primary Elections P.I. Hearing, Defendants showed that reversing course on student IDs before the November general election is nearly impossible, as a practical matter. Deputy Secretary O'Donnell testified that the "September 8th and November elections are part of a single election year, so we treat all election years the same. So all the training and preparation of materials is for both elections simultaneously usually." Tr. 138:7-10 (B. O'Donnell direct exam).

34. Through testimonial and documentary evidence offered at the Primary Elections P.I. Hearing and will be offered at the General Election P.I. Hearing, Defendants will show that the Secretary of State Office's engagement in the post-primary and pre-general election processes are sequential and interdependent. *See, e.g.*, Tr. 138:7-139:8 (B. O'Donnell direct exam). For example, preparation of November ballots cannot begin until the winners of the primary elections have been conclusively determined. *Id.* (B. O'Donnell direct exam). Deputy

Secretary O'Donnell testified that "the names that go on the ballots cannot be decided until after the primary and any associated recounts." *Id.* 139:14-15.

35. Through testimonial and documentary evidence to be offered at the General Election P.I. Hearing, Defendants will show that interdependence requires all-hands level resources—even when both elections are administered under identical rules.

36. There are tight statutory and internal Secretary's Office operational deadlines associated with preparations for the general election. "The November general election requires 320 unique ballots. Each ballot needs to be created in multiple different styles, including sample, official election day, absentee, and federal office only." Single St. ¶ 120. UOCAVA ballots must be sent out by September 19, 2026. *Id.* ¶ 124. "By September 29, 2026, the Office will begin shipping all absentee ballot packages to town and city clerks." *Id.* ¶ 125. "By October 14, 2026, the Office plans to begin shipping all election day ballot packages to town and city clerks." *Id.* ¶ 127. New Hampshire law requires that the Secretary's Office complete delivery of all 320 unique November general election ballots to town and city clerks by October 27, 2026. *Id.* ¶ 128.

### F. Facts Establishing that Town and City Clerks Have Been Accepting November General Election Absentee Ballot Applications for the Past Four Months

37. Through testimonial and documentary evidence to be offered at the General Election P.I. Hearing, Defendants will show that town and city clerks have been receiving November general election absentee ballot applications since May 3, 2026.

38. Through testimonial and documentary evidence to be offered at the General Election P.I. Hearing, Defendants will show that since June 2, 2026, town and city clerks would not have accepted absentee ballot applications where the applicant proved his or her identity with only a student ID.

## II. Facts Establishing the State's Interest in HB 363

39. New Hampshire voters have been required to verify their identities with photo IDs since 2012. Timeline ¶ 1; Single St. ¶ 1.

40. HB 323 amended RSA 659:13 to eliminate student IDs as an exception to the principal requirements for photo identification to obtain a ballot. *See* Single St. ¶¶ 2, 7, 10-14.

41. "New Hampshire has a state interest in the efficient and orderly administration of elections." *Id.* ¶ 130.

42. "New Hampshire ballots are anonymous, and once an anonymous ballot is cast, it will be counted." *Id.* ¶ 131.

43. "If New Hampshire discovers that any ballot had been wrongfully cast, irrespective of the voter's intent, the ballot cannot be clawed back or discounted, and the election results cannot change." *Id.* ¶ 132.

44. "New Hampshire has a state interest in counting only the votes of eligible voters." *Id.* ¶ 133.

45. "New Hampshire has a state interest in preventing intentional and unintentional wrongful voting before it happens." *Id.* ¶ 134.

46. "New Hampshire has a state interest in regulating all phases of the electoral process, including ballot access." *Id.* ¶ 135.

47. "New Hampshire has a state interest in election integrity." *Id.* ¶ 136.

48. "New Hampshire has a state interest in high voter confidence in the integrity of New Hampshire's elections." *Id.* ¶ 137.

49. The minutes of a February 10, 2026 Senate Committee hearing on HB 323 reflect one state senator supporting HB 323 on the grounds that driver's licenses have "driver's licenses

have 'security features' that make them more reliable than student identification cards. He did not specify which 'security features.' HB 323 February 10 Hearing, at 5." Single St. ¶ 65.

50. "New Hampshire DMV-issued Real ID-compliant identification cards (driving and non-driving) are subject to federal statutory and regulatory requirements. Among other things, federal regulations require that 'States must include document security features on REAL ID driver's licenses and identification cards designed to deter forgery and counterfeiting, promote an adequate level of confidence in the authenticity of cards, and facilitate detection of fraudulent cards in accordance with this section.' 6 C.F.R. 37.15(a). 'REAL ID driver's licenses and identification cards must contain at least three levels of integrated security features that provide the maximum resistance to persons' efforts to—(1) Counterfeit, alter, simulate, or reproduce a genuine document; (2) Alter, delete, modify, mask, or tamper with data concerning the original or lawful card holder; (3) Substitute or alter the original or lawful card holder's photograph and/or signature by any means; and (4) Create a fraudulent document using components from legitimate driver's licenses or identification cards.' 6 C.F.R. 37.15(b)." *Id.* ¶ 138.

51. "New Hampshire schools do not issue Real ID-compliant identification cards, nor are they required by federal law to integrate security features into their cards." *Id.* ¶ 139.

**PROPOSED RULINGS OF LAW**

On August 26, 2026, Defendants filed an Objection (ECF No. 25) to Plaintiff's Motion for Preliminary Injunction (ECF No. 2). The Motion should be denied for the reasons stated in Defendants' Objection (ECF No. 25) and for the reasons set forth below ("Suppl. Prop. Rulings").

## I. Applicable Legal Standard

52. "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Rubygold Main Holdings, LLC v. Brian Gardner Carpentry, LLC*, No. 20-cv-1006-JL, 2021 U.S. Dist. LEXIS 12640, *12 (D.N.H. Jan. 22, 2021) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

53. As the movant, Open Democracy has the burden to establish a "clear and unequivocal" right to the requested injunction. *Nw. Bypass Grp. v. United States Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 36 (D.N.H. 2007) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)).

54. Accordingly, Open Democracy must clearly establish that: (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm absent extraordinary relief; (3) the balance of the equities favor the injunction; and (4) the injunction is in the public interest. *See CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020).

55. Since Open Democracy's requested injunction would issue against the New Hampshire Secretary of State and Attorney General in their official capacities, the balance-of-equities and public-interest factors merge. *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

56. The preliminary injunction factors are not equal in importance, as the "'[l]ikelihood of success is the main bearing wall' of this 'framework.'" *W Holding Co. v. AIG Ins. Co.*, 748 F.3d 377, 383 (1st Cir. 2014) (quoting *Ross Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).

57. If Open Democracy cannot establish that it is likely to succeed on the merits, the remaining factors are of little-to-no consequence. *See New Comm Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

## II. The *Purcell* Principle Bars Injunctive Relief

58. The Supreme Court's *Purcell* principle is controlling authority in determining whether the Court should issue the requested injunction. Here, *Purcell* bars awarding injunctive relief this close to a statewide general election.

59. The United States Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam); *Frank v. Walker*, 574 U. S. 929 (2014); *Veasey v. Perry*, 574 U.S. 951 (2014)).

60. "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4-5.

61. District courts should be circumspect and exercise judicial restraint when an election is near. *See Democratic Nat'l Comm. v. Wis. State Legis.*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring) ("[A]t every step, state and local officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting."); *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222, 1324 (N.D. Ga. 2022) ("[E]lections are complex and election calendars are finely calibrated processes, and significant upheaval and voter confusion can result if changes are made late in the process.").

62. The "important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *Id.* (collecting cases).

63. The Supreme Court's *Purcell* principle is grounded in equitable principles, but it also accounts for the practical limitations of time and resources. *See Purcell*, 549 U.S. at 4-5. Even where a state election law unconstitutionally burdens the fundamental right to vote, equitable balancing remains necessary in determining whether to enjoin its application. *See id.* The risks that a late change to election procedures could confuse voters or engender distrust the integrity of the election can disincentivize voting. *See id.* This is often a greater risk than allowing an unlawful statutory scheme to stay in place until the next election. *See id.* And an election draws closer, the risk of confusion and distrust increases. *See id.*

64. The Seventh Circuit's stay of a preliminary injunction in Indiana in April 2026 is instructive on *Purcell*'s proper application. For 20 years, Indiana accepted student IDs from state-run universities to prove identity when casting an in-person ballot. *Count Us In v. Morales*, 172 F.4th 974, 975 (7th Cir. 2026). In April 2025, Indiana prohibited student IDs for voter identity verification. *Id.* The plaintiff-organizations challenged the new law as an unconstitutional burden on the right to vote and unconstitutional age discrimination. *Id.* In February 2026, plaintiffs moved for a preliminary injunction, which the district court granted on April 14, but early voting had begun seven days earlier. *Id.* The court cited the Supreme Court's 2020 *Rep. Nat'l Comm.* per curiam decision and Justice Kavanaugh's 2022 *Merrill* concurrence warning federal courts against "tinkering with election laws" on the eve of an election. *See id.* at 976 (citations omitted). Ruling that the *Purcell* principle bars the injunction while an election is occurring, the court explained that it:

> view[ed] the risk of disruption to Indiana's primary election as very serious. In no uncertain terms, the district court's injunction will alter who can cast a ballot in this election. And this change—imposed unilaterally by a federal court—comes seven days after voting in the election has already begun.

*Id.* (citing *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring)).

The *Count U.S. In* decision is important and persuasive authority regarding the *Purcell* principle's application to Plaintiff's Motion. November general election absentee voting has not begun, but voters have been applying for absentee ballots for several months—some may have applied as early as May 3, 2026. RSA 657:6. Anyone who applied after June 2, 2026 was required to prove identity as required by RSA 659:13, as amended by HB 323. Moreover, UOCAVA voters will receive their ballots by ***this*** Saturday (five days from the date of this filing), and they may begin marking and submitting their ballots immediately upon receipt.

65. An injunction should not issue in this case. As evidenced in Prop. Findings Sec. I. above, enjoining the uniform application of New Hampshire's current verification of identity requirements would contravene the practical and equitable underpinnings of the *Purcell* principle.

## III. Open Democracy Has Not Clearly Established that Is Likely to Succeed on the Merits of Its Claims

66. Defendants incorporate the applicable legal standards articulated above, including Open Democracy's failure to satisfy its burden to establish a "clear and unequivocal" right to the requested injunction.

67. Open Democracy asserts four counts in its Complaint, each related to HB 323's amendment to RSA 659:13, II(a), which repealed student IDs as an exception to the principal requirements of photo identification to obtain a ballot. *See* ECF No. 1, ¶¶ 232-271.

68. Count I alleges that prohibiting a voter from verifying identity with a student photo ID to obtain a ballot or register to vote is an unjustifiable burden on the right to vote, which is prohibited by the First and Fourteenth Amendments. *See id.* ¶¶ 232-239.

69. Count II alleges that prohibiting a voter from verifying identity with a student photo ID to obtain a ballot or register to vote is discrimination on the basis of age, which is prohibited by the Twenty-Sixth Amendment. *See id.* ¶¶ 240-255.

70. Count III alleges that prohibiting a voter from verifying identity with a student photo ID to obtain a ballot or register to vote fails to guarantee equal protection under the law on the basis of age, which is prohibited by the Fourteenth Amendment. *See id.* ¶¶ 256-264.

71. Count IV alleges that the Secretary of State violated the separation of powers guaranteed by the New Hampshire Constitution by purportedly misinterpreting HB 323's application to RSA 654:12. *See id.* ¶¶ 265-271.

### A. Open Democracy Has Not Clearly Established that RSA 659:13 Is Facially Unconstitutional

72. Facial constitutional challenges require a plaintiff to demonstrate that "no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotations and citations omitted). Here, Open Democracy has not clearly established that RSA 659:13, as amended by HB 323, is invalid in all its applications.

73. "A facial challenge must fail where the statute has a plainly legitimate sweep." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) (quotations and citations omitted).

74. A court must not "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449-50 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

75. The Supreme Court disfavors facial challenges because they often rely upon speculation and barebone facts, they risk premature statutory interpretation, they may cause a

court to anticipate constitutional questions or to formulate broader constitutional rules than necessary, and they threaten to short-circuit the democratic process. *See id.* at 450-51 (collecting cases).

76. So, where a plaintiff asks a court to invalidate a state law in all its applications, a plaintiff "bear[s] a heavy burden of persuasion." *Crawford*, 553 U.S. at 200 (plurality).

77. Here, Open Democracy's heavy burden is to make a clear showing that RSA 659:13, II is unconstitutional in all its applications unless it permits student IDs as verification of identity to obtain a ballot or register to vote.

78. Open Democracy has not demonstrated that it is likely to succeed on Counts I, II, or III because there is a plainly legitimate sweep to voter ID requirements.

79. Time and again, federal courts find that minimal voting restrictions related to voter ID are not facially unconstitutional. *See, e.g.*, *March for our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128 (D. Idaho 2024); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749 (M.D. Tenn. 2015).

### B. Open Democracy Has Not Clearly Established that RSA 659:13, as Amended, Unjustifiably Burdens the Right to Vote (Count I)

80. Courts apply the *Anderson-Burdick* framework where a facial constitutional challenge alleges that a state law unduly burdens the right to vote. *Libertarian Party v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011). Here, the *Anderson-Burdick* framework tilts heavily on the side of the State's undisputed interest in effective and nondiscriminatory election administration by requiring verification of a voter's identity with government-issued identity cards.

81. The *Anderson-Burdick* framework requires weighing the character and magnitude of the burden to the state's justification for the burden. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). In other words, the level of scrutiny that must be applied to a challenged law

depends on the alleged burden created by that law. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality) (explaining that voters' purported burdens be justified by relevant and legitimate state interests "sufficiently weighty to justify the limitation"). So, not every election requirement is subject to strict scrutiny. *Burdick*, 504 U.S. at 433. "Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* at 434. Here, the Court should apply the rational basis test to RSA 659:13, as amended by HB 323. But even if the Court applied a higher level of scrutiny, Claim I fails nevertheless.

82. On its face, RSA 659:13 is a broadly applicable law that does not impose special burdens on any class of voter. It applies to all registering voters and all voters obtaining ballots. It is an evenhanded restriction to protect integrity and reliability of the electoral process itself. *See Crawford*, 553 U.S. at 189-90 (plurality).

83. Where a law is broadly applicable, the *Anderson-Burdick* analysis weighs the voting restriction as it purportedly burdens voters across the electorate. *See Crawford*, 553 U.S. at 206 (Scalia, J., concurring). Even if there is a subset of voters whose circumstantial burdens are greater than that typically experienced across the electorate, their idiosyncratic experiences should not be considered on the burden-side of the equation. *See id.* at 206.

84. Open Democracy's only identified voter-burden is *de minimis* and common among the electorate. Where voters experience an ordinary and widespread burden caused by a nondiscriminatory voting law, the burden cannot be severe, regardless of how the requirement may affect any single voter. *See id.* (citing *Clingman v. Beaver*, 544 U.S. 581, 590-91 (2005)).

85. As a matter of law, the State has an interest in regulating ballot access. *Perez-Guzman v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003) (citing *Storer v. Brown*, 415 U.S. 724, 730

(1974) ("Consequently, there is a strong state interest in regulating all phases of the electoral process, including ballot access."). Notwithstanding, the State's interest here has been agreed upon by the parties as reflected in the Single Updated Statement of Agreed & Disputed Facts. ECF No. 46, ¶¶ 129-139 (Sept. 11, 2026). As articulated in the Single Updated Statement and in Prop. Findings Sec. II. above, Defendants have established a substantial and important state interest that exceeds any plausible burden imposed by RSA 659:13, even if the law were subjected to greater scrutiny than rational basis.

### C. Open Democracy Has Not Clearly Established that RSA 659:13, as Amended, Unconstitutionally Discriminates (Counts II & III)

86. Open Democracy's Claims II and III are age discrimination claims asserting two different theories, a violation of the Twenty-Sixth Amendment and the equal protection clause of the Fourteenth Amendment. Open Democracy has not clearly established that either Claim is likely to succeed.

87. Regarding Count II's Twenty-Sixth Amendment claim, the First Circuit requires a Twenty-Sixth Amendment claim to set forth at least "***some*** direct evidence that the state has denied or abridged those voters' ability to vote to state a cognizable claim." *See Hagopian v. Dunlap*, 480 F. Supp. 3d 288, 299 (D. Me. 2020) (citing *Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364 (1st Cir. 1975)) (emphasis added).

88. Open Democracy has not provided any direct evidence to support its claim. It did not produce a single witness who suffered the discrimination of which it complains.

89. To be sure, it makes generalized statements about the age of most students or most people who probably used student IDs to register or cast ballots, but these allegations are too vague and hypothetical to support a facial constitutional challenge.

90. Regarding Count III's equal protection claim, RSA 659:13 does not classify voters by age. For the reasons stated above, the *Anderson-Burdick* framework would require a rational basis test for the validity of RSA 659:13. But even if the law classified by age, age is not a suspect classification. *Donahue v. City of Bos.*, 371 F.3d 7, 15 (1st Cir. 2004). So, even if Count III were a stand-alone age discrimination claim, it would still receive rational basis scrutiny. *See id.*

91. Open Democracy has not offered any evidence of a denial or abridgment of a right based on age, and the State's interest in regulating ballot access by requiring verification of identity through government-issued identity cards is manifest.

92. Moreover, the First Circuit has held that "states may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83, 145 L. Ed. 2d 522, 120 S. Ct. 631 (2000). In addition, a state may even rely on age as a proxy for other characteristics relevant to a state's legitimate interests, even if that reliance turns out to be misplaced. *See id.* at 84." *Id.* at 15-16.

93. Open Democracy cannot succeed on either Counts II or III.

### D. The Eleventh Amendment and *Pennhurst* Doctrine Categorically Bar Open Democracy's Claim that Secretary Scanlan Violated the New Hampshire Constitution (Count IV)

94. Open Democracy alleges that Secretary Scanlan—a constitutional officer of the state of New Hampshire—"issued a directive to local municipalities that HB 323 has amended RSA 654:12 (governing the registration process) as well as RSA 659:13 (governing the voting process) and student identification cards are no longer valid forms of identification for registering to vote." ECF No. 1, ¶ 268.

95. Court lacks subject matter jurisdiction to adjudicate Open Democracy's state law claim. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984).

96. "[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself." *Id.*

## IV. Open Democracy Has Not Clearly Established the Remaining Preliminary Injunction Factors, Which Are Closely Tied to the Merits

97. Defendants incorporate the proposed rulings in Prop. Rulings Sec. I above regarding the applicable legal standard, including Open Democracy's burden to establish a "clear and unequivocal" right to the requested injunction.

98. For the reasons described above, Open Democracy has not clearly established prejudice if the Court does not enjoin HB 323. Open Democracy cannot be prejudiced absent a preliminary injunction because it waited 130 days to challenge the law—it cannot now claim otherwise.

99. Also for the reasons described above, the equities and public interest favor the status quo ante. New Hampshire also has a strong interest in "regulating all phases of the electoral process, including ballot access." *See Perez-Guzman*, 346 F.3d at 238. Accordingly, the State would be substantially prejudiced if the Court compels it to unwind four months of implementation within the next 50 days, while finalizing the primary election results and preparing for the general election.

100. The public interest is best served by deny injunctive relief because a "ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Crawford*, 553 U.S. at 203 (plurality) (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006)) (quotations omitted).

Respectfully submitted,

DEFENDANTS DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: September 14, 2026

*/s/ Michael P. DeGrandis*

Matthew T. Broadhead, N.H. Bar No. 19808
Associate Attorney General
Michael P. DeGrandis, N.H. Bar No. 277332
Assistant Attorney General
James H. Holl, N.H. Bar No. 279633
Assistant Attorney General
matthew.t.broadhead@doj.nh.gov
michael.p.degrandis@doj.nh.gov
james.h.holl@doj.nh.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all parties of record through the Court's e-filing system.

*/s/ Michael P. DeGrandis*
Michael P. DeGrandis