**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **Coalition for Open Democracy,**<br><br>Plaintiff,<br><br>vs.<br><br>**David M. Scanlan, in his official capacity as New Hampshire Secretary of State and John Formella, in his official capacity as New Hampshire Attorney General,**<br><br>Defendants. | **Case No. 1:26-cv-00647-JL-TSM** |

**PLAINTIFF'S COMBINED PROPOSED SUPPLEMENTAL FINDINGS OF FACT AND RULINGS OF LAW**

# Table of Contents

**Page**

PLAINTIFF'S PROPOSED SUPPLEMENTAL FINDINGS OF FACT ..................... 1

I. New Hampshire's Election System in Context ............................................. 1

II. Proving Identity to Register to Vote and Obtain a Ballot in New Hampshire after HB 323. ........................................................................................... 3

III. The August 31, 2026 Hearing ..................................................................... 3

IV. Obtaining a Free Voter ID in New Hampshire ............................................ 6

V. Effects of HB 323 at the Primaries ............................................................... 8

VI. Preparations for the General Election ....................................................... 10

PLAINTIFF'S PROPOSED SUPPLEMENTAL RULINGS OF LAW ...................... 13

I. Legal Standard ............................................................................................ 13

II. Plaintiff Is Likely to Succeed on the Merits ............................................... 13

A. Count I: HB 323 and Secretary Scanlan's April 23 Directive are Unconstitutional Burdens on the Right to Vote. ............................................... 13

i. HB 323 and Secretary Scanlan's April 23 Directive Create Significant Burdens. ........................................................................... 14

ii. Banning the Use of Student IDs Furthers No Strong or Even Legitimate Interest. ......................................................................... 15

B. Count II: HB 323 Violates the Twenty-Sixth Amendment. ......................... 17

C. Count III: HB 323 Violates the Equal Protection Clause of the Fourteenth Amendment. ........................................................................................ 19

III. Balance of the Harms and the Public Interest Require Granting Injunctive Relief Against HB 323 and *Purcell* Provides No Basis to Deny It ............. 19

IV. Plaintiff Open Democracy has Suffered Injury from HB 323 and has Standing ........................................................................................................ 22

# PLAINTIFF'S PROPOSED SUPPLEMENTAL FINDINGS OF FACT[1]

## I. New Hampshire's Election System in Context

1. All states that are not exempt from the NVRA must allow registration at their state's motor vehicle agency, 52 U.S.C. § 20503(a)(1), by mail, 52 U.S.C. § 20503(a)(2), in "all offices in the State that provide public assistance," 52 U.S.C. § 20506(a)(2)(A), and in "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities," 52 U.S.C. § 20506(a)(2)(B). They must also allow provisional ballots. 52 U.S.C. § 15482. Thus, all states not exempt from the NVRA with voter ID laws have these policies lessening the burden created by that voter ID law. Voters in these states can register at their motor vehicle agency after receiving their ID card. Or they can register by mail or at a convenient location.

2. In contrast, New Hampshire lacks any of these policies, forcing eligible voters who lack driver's licenses to take multiple trips to different government offices.

3. Every other state exempt from the NVRA[2] allows no-fee identifications to be issued by the state's motor vehicle agency without requiring an initial, superfluous trip to the town or city clerk. I.C. § 49-2444 (22) (Idaho); N.D.C.C. § 39-

---

[1] These proposed facts supplement and incorporate the prior Proposed Findings of Fact. ECF no. 36.

[2] Those states are Idaho, Minnesota, Wisconsin, Wyoming, and North Dakota. U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2005-2006*, at 4 (2007), https://www.eac.gov/sites/default/files/eac_assets/1/28/EAC_NVRA%20Report_lowres.pdf. Minnesota does not have a voter ID law. Therefore, its election system is not relevant to this analysis.

06-06.1(4) (North Dakota). Wis. Stat. §§ 343.50(1)(c)(2); 343.165(8) (Wisconsin). Wyo. Stat. Ann. § 31-8-104 (Wyoming).

4. Similarly, all of these states, except North Dakota,[3] also allow no-excuses mail registration. I.C. § 34-410 (no excuses mail registration allowed in Idaho); I.C. § 34-409 (no excuses online registration allowed in Idaho); Wis. Stat. §630(4) (no excuses mail registration allowed in Wisconsin); Wyo. Stat. Ann. §§ 22-3-104(d); 22-3-117 (no-excuses mail registration allowing in Wyoming). This means that none of these states require a trip to the town clerk after receiving a free ID from the motor vehicle agency if a voter would prefer not to rely on election-day registration.

5. Additionally, North Dakota, Wisconsin, and Wyoming allow provisional ballots. N.D.C.C. § 16.1-01-04.1(5); Wis. Stat. § 6.97; Wyo. Stat. Ann. § 22-15-105. This allows eligible voters, like Ms. Baretto, to cast votes even if the state's machinery fails to operate on election day. Similarly, Idaho, North Dakota, and Wisconsin allow early voting; this increases the likelihood that eligible voters who may not have the required documents are not completely denied the right to vote. I.C. § 34-1012; N.D.C.C. § 16.1-07-15; Wis. Stat. § 6.855. Wyoming allows no-excuses absentee voting, allowing more flexibility to voters and requiring fewer trips. Wyo. Stat. Ann. § 22-9-102.

---

[3] North Dakota does not have a traditional voter registration system; instead, it has a "Central Voter File" that is updated when eligible voters vote for the first time and checked against when voters who have voted before vote. *See generally* S.D.C.C. §§ 16.1-02-01 to 16.1-02-16. There is no requirement or ability for a first-time voter to enter the file prior to an election.

**II. Proving Identity to Register to Vote and Obtain a Ballot in New Hampshire after HB 323.**

6. When registering to vote in New Hampshire, any driver's license "issued by any state or the federal government . . . [any] photo identification issued by the United States government . . . [any] "[p]hoto identification issued by local or state government . . . [a]ny other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be," is acceptable to prove identity. RSA 654:12(d).

7. When obtaining a ballot in New Hampshire a, "driver's license issued by any state or the federal government . . . a nondriver's identification card issued by the motor vehicles division, department, agency, or office of any other state" is acceptable to prove identity. RSA 659:13, II.

8. When obtaining a ballot in New Hampshire, "[i]f the voter does not have a valid photo identification . . . [a] moderator, clerk, supervisor, or selectman may verify a voter's identity if such moderator, clerk, supervisor, or selectman personally knows the voter," and fills out the required form. RSA 659:13, I(c).

**III. The August 31, 2026 Hearing**

9. Many of the municipalities in New Hampshire that have the largest portion of the electorate using Election Day Registration house institutions of higher education. August 31 Transcript, 20:25-21:16. (Testimony of Michael Herron).

10. The New Hampshire Attorney General's office has never prosecuted or even investigated a case of alleged voter fraud involving a fraudulently obtained

student ID since it has begun reporting on potential election law violations. August 31 Transcript, 41:13-42:6. (Testimony of Michael Herron).

11. Open Democracy's core project areas are "campaign finance reform, fair redistricting, and ensuring that every Granite Stater has the freedom to vote." August 31 Transcript, 59:15-17. (Testimony of Olivia Zink). Its "core project areas under voter education is a high school voter registration program, an age strong program . . . nonpartisan poll observers, [and] poll worker recruitment." *Id.* at 59:20-23.

12. Open Democracy has three full-time and four part-time employees. August 31 Transcript, 60:1-2 (Testimony of Olivia Zink). Open Democracy has over 200 volunteers. *Id.* at 60:16.

13. Open Democracy has had to modify trainings for its volunteers as a result of HB 323. August 31 Transcript, 61:7-14 (Testimony of Olivia Zink).

14. Open Democracy hosted twenty-one high school voter registration drives in 2026 prior to August 31, 2026. August 31 Transcript, 63:19-20 (Testimony of Olivia Zink).

15. Open Democracy has had to change its materials for these drives in response to HB 323. August 31 Transcript, 66:16-19 (Testimony of Olivia Zink).

16. As of August 31, Open Democracy had five high school registration drives planned for the fall but was scheduling additional drives. August 31 Transcript, 69:21-25 (Testimony of Olivia Zink).

17. Although New Hampshire high schools used to routinely host voter registration drives, the practice wound down. High School registration drives are not the norm in New Hampshire. August 31 Transcript, 68:17-69:2 (Testimony of Olivia Zink).

18. Open Democracy is working to bring voter registration drives back to high schools.

19. Open Democracy staff called the Concord DMV on August 19, 2026, and were told that the voucher program was not operational. August 31 Transcript, 71:4-6 (Testimony of Olivia Zink).

20. Olivia Zink spoke to a clerk at the Keene DMV after August 19 and before August 31, who informed Ms. Zink that there was no way for her to issue voter-only identification cards. August 31 Transcript, 71:6-11 (Testimony of Olivia Zink).

21. As a result of HB 323, Open Democracy will have to engage its volunteers to drive young voters to the clerk's office to obtain a voucher and to the DMV to obtain a free student ID. August 31 Transcript, 78:16-25 (Testimony of Olivia Zink). These volunteers will be pulled from Open Democracy's existing volunteer base. *Id.* at 79:11-14.

22. Open Democracy's staff does not typically spend time interacting with DMV offices or developing programs for transporting eligible voters to the DMV. August 31 Transcript, 76:5-11 (Testimony of Olivia Zink).

23. Open Democracy has had to change its fundraising priorities to attempt to raise money to pay for young voters' identification fees, rather than Open Democracy's core priorities. August 31 Transcript, 77:19-24 (Testimony of Olivia Zink).

24. Open Democracy's staff has not been able to review campaign finance reports or recruit as many election workers—elements of its core mission—because it has been "working with young people who need assistance in [sic] how to register." August 31 Transcript, 78:7-15 (Testimony of Olivia Zink).

25. The Secretary of State is committed to doing everything it can to comply with the proposed injunction. August 31 Transcript, 145:7-13 (Testimony of Brendan O'Donnell).

26. The SVRS allows the Secretary of State's office to contact "most of the state [election workers] with one email." August 31 Transcript, 187:6-10. (Testimony of Brendan O'Donnell).

## IV. Obtaining a Free Voter ID in New Hampshire

27. The DMV is required by statute to offer a nondriver's picture identification card to any resident who is 12 years of age or older and does not possess a driver's license. Exhibit 46, § 260:21(I).

28. The fee for that card is $20. Exhibit 46, § 260:21(V)(a). A person who requires a photo identification card only for voter identification purposes may obtain a voucher from his or her town or city clerk exempting the voter from the identification card fee. *Id.*

29. To obtain a waiver, the applicant must provide their name, domicile address, and mailing address, and then swear or affirm under penalty of law that (a) they require a photo identification for voting purposes, and (b) they do not possess a form of identification that meets the requirements of New Hampshire's election laws. Exhibit 46, § 260:21(V)(b). The clerk must swear or affirm that the person identified on the voucher has proof of domicile in the city or town. *Id.* An earlier version of the law required the person seeking a waiver to be listed on the voter checklist in that city or town proof of domicile in the city or town). *See* SB 660, *supra* ¶¶ 43, 45.

30. That person must then travel to the DMV and present, along with the standard non-driver ID application, the required identity and residency documentation, and the voucher at the DMV to obtain an identification card for voting purposes, marked "for voter identification only." Exhibit 46, RSA 260:21(V)(a); Exhibit 47, N.H. Admin. Code § Saf-C 1011.06.

31. As this court found in its order issued September 1, 2026, the uncontested evidence presented at the August 31st hearing was that at least two New Hampshire DMVs are unable to process and/or issue the "voter identification" card. As a result, voters only possessing a student ID and who go to those DMVs, will either have to pay $20 for a non-driver identification card or else be precluded from voting. *Coalition for Open Democracy v. Scanlan*, Order Denying Preliminary Injunctive Relief, ECF No. 43, at 6 (D.N.H. Sep. 1, 2026) ("Preliminary Injunction Order").

32. After the court's hearing on August 31, 2026, the DMV updated its website. The "Apply for your First Drivers License/Non Driver ID page under the "Non-Driver ID Card" tab of the DMV website now states, "Information about the Voter Identification Law of 2012 along with an Explanatory Document on how the Voter Identification law will be implemented can be found at the New Hampshire Secretary of State's website or by contacting the Secretary of State Elections Division," (hyperlinks in original text underlined)[4] and provides three links, two which are broken[5] and a third[6] simply directs the reader to the Secretary of State's webpage and does not provide any additional information regarding how voters can obtain an identification card for voting purposes only.

33. As indicated on Exhibit 42, on April 20, 2026, Open Democracy sent a DMV Right to Know Request to the New Hampshire DMV. On April 23, 2026, the New Hampshire DMV sent a response indicating that the DMV had not issued any "voter identification only" cards to anyone under the age of 20 in the State.

### V. Effects of HB 323 at the Primaries

34. During the September 8, 2026 primary, 18-year-old Tatiana Barreto, an eligible voter, was not allowed to vote because she did not have a form of identification other than her student ID. Election workers instructed her to go to City Hall to obtain a voucher and then go to the DMV to get the voter-only ID. She

---

[4] Exhibit 48, New Hampshire Division of Motor Vehicles, *Apply for your First Drivers License/Non Driver ID*, https://www.dmv.nh.gov/drivers-licensenon-driver-ids/apply-your-first-drivers-licensenon-driver-id (accessed Sep. 10, 2026).

[5] https://sos.nh.gov/elections/information/election-laws/voter-identification-law/; https://www.sos.nh.gov/elections/information/contact/.

[6] New Hampshire Secretary of State, https://www.sos.nh.gov/.

left the polling location, went to City Hall, obtained a voucher, and then went to the DMV where, despite waiting for more than three hours, was unable to obtain a voter-only ID.

35. The first DMV official with whom Ms. Barreto interacted did not recognize the voucher as valid. A supervisor eventually acknowledged that the voucher was valid, but warned her that they had run into issues in the past with printing temporary voter-only IDs. The DMV was not able to print Ms. Barreto's voter-only ID, either. After three hours of waiting, the DMV sent Ms. Barreto away and told her that they would call her when the ID was ready. They did not call her, and she was not able to cast a ballot.

36. Given the statistical evidence provided by Professor Herron describing the disproportionate number of young voters that lack identity-proving documentation after HB 323, Ms. Barreto's experience is but one example of numerous young voters being disenfranchised across the state. Furthermore, there will be a greater burden in the general election as there will be greater turnout and greater participation by young voters. Finally, the evidence and common sense indicates that a substantial number of young voters in Ms. Barreto's situation, but who had knowledge of HB 323, simply did not attempt to vote in the September 2026 primary and, absent the requested injunctive relief, will similarly not attempt to vote in the general election.

## VI. Preparations for the General Election

37. No absentee ballots for the general election will be sent from the Secretary of State's Office to the town and city clerks until September 29, 2026 at the earliest. Thereafter, absentee ballots will be mailed to applicants on a rolling basis, as applications may be accepted up to the day before the election.

38. Until and unless the town and city clerks receive final absentee ballot forms from the Secretary of State, the clerk has no absentee ballots to send to any voter and no voter can submit any absentee ballot.

39. No absentee ballots have been submitted by voters for the November 3, 2026 General Election.

40. Once a clerk receives and verifies a request for an absentee ballot, they must "without delay, personally deliver . . . or mail to the applicant the appropriate ballot and materials." Exhibit 50, § 657:15(I).

41. The deadline to request an absentee ballot by mail for the 2026 General Election is 12:00 p.m. the day before the election, November 2, 2026. The deadline to request and return an absentee ballot in person is 5:00 p.m. the day before the election, November 2, 2026. Exhibit 49. For the 2026 State General Election, voters could request an absentee ballot starting on May 3, 2026.

42. Uniformed and Overseas (UOCAVA) Voters are those who are 1) uniformed service members or 2) temporarily residing outside the United States. Exhibit 51, § 654:3.

43. Uniformed service members are issued military identification cards. Individuals who reside outside of the United States possess U.S. passports. Therefore, UOCAVA voters are highly unlikely to rely on student identification cards to identify themselves for purposes of obtaining a ballot.

44. In any case, UOCAVA voters are not required to show identification when requesting a ballot; they are required to either write in their driver's license number if they have one or the last four digits of their social security number if they do not. Exhibit 45, Federal Post Card Application.

45. UOCAVA voters may request absentee ballots using the Federal Post Card Application (FPCA) or through their local town/city clerks. Exhibit 52.

46. Clerks are required by federal law to send ballots at least 45 days before an election (September 19, 2026, for the upcoming General Election), to UOCAVA voters who have previously submitted a request for this election cycle. *Id.*

47. Defendants have admitted they will not begin preparing pre-election mail packages including election day materials such as statutory posters and instructions until October 5, 2026.

48. Defendants have admitted that they will hold an in-person training on October 6 through October 9, 2026, at the New Hampshire City and Town Clerk's Association Annual Conference in Nashua, New Hampshire. The event includes two election training sessions for clerks on Thursday, October 8 (11:00 a.m. to 12:00 p.m. and 1:30 p.m. to 4:00 p.m.).

49. The Coalition for Open Democracy is planning to organize a dozen voter registration drives at New Hampshire high schools before the general election.

## PLAINTIFF'S PROPOSED SUPPLEMENTAL RULINGS OF LAW[7]

### I. Legal Standard

1. To obtain a preliminary injunction, the movant must demonstrate that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities is in their favor; and (4) an injunction is in the public interest. *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024). Plaintiff satisfies that standard here.

### II. Plaintiff Is Likely to Succeed on the Merits

#### A. Count I: HB 323 and Secretary Scanlan's April 23 Directive are Unconstitutional Burdens on the Right to Vote.

2. "The First and Fourteenth Amendments prohibit states from placing burdens on citizens' rights to vote that are not reasonably justified by states' 'important regulatory interests.'" *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983), and citing *Burdick v. Takushi*, 504 U.S. 428, 430 (1992)).

3. Even "slight" burdens "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J. op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)); *NHYM*, 833 F. Supp. 3d at 130; *Count US IN v. Morales*, 832 F. Supp. 3d 857, 867 (S.D. Ind. 2025) ("*Count US IN II*").

---

[7] These proposed facts supplement and incorporate the prior Proposed Rulings of Law. ECF no. 36.

4. The analysis must consider the entire voting system, not just the challenged law. *NHYM*, 833 F. Supp. 3d at 129 (citing *Wood v. Meadows*, 207 F.3d 708, 711 (4th Cir. 2000); *Luft v. Evers*, 963 F.3d 665, 671-72 (7th Cir. 2020)).

5. "To determine the burden, the court must consider both the statute's broad application to all voters and its heavier burden on subsets of voters." *NHYM*, 833 F. Supp. 3d at 130; *see also Count US IN II*, 832 F. Supp. 3d at 865 (S.D. Ind. 2025) ("Under *Anderson-Burdick*, a facially neutral and nondiscriminatory electoral regulation may nonetheless warrant a higher degree of scrutiny when an identifiable 'class of voters' bears its effects").

**i. HB 323 and Secretary Scanlan's April 23 Directive Create Significant Burdens.**

6. Paying a fee to vote is a significant and unconstitutional burden on voters. *Crawford*, 553 U.S. at 198 ("The fact that most voters already possess a valid driver's license, or some other form of acceptable identification, would not save the statute under our reasoning in *Harper*, if the State required voters to pay a tax or a fee to obtain a new photo identification.").

7. Despite the statutory mandate of SB 660, there are still significant burdens and confusion concerning the voter-only ID cards such that they are functionally unavailable to many voters, especially for election-day registration. Plaintiff's Proposed Findings of Fact ("FOF"), ¶¶ 31-32, 34-35.

8. Even if the DMV were able to reliably issue free voter-only ID cards, New Hampshire's burdensome voucher system and generally burdensome registration and voting system sets it apart as a national outlier.

9. New Hampshire is unique in both providing no safeguards for voting found in other states exempt from the NVRA—such as mail-in registration, early voting, or provisional ballots—while instituting a unique and superfluous voucher system to obtain a free identification. FOF, ¶¶ 1-5.

10. The significant burden created by New Hampshire's aberrant system falls disproportionately on the 18-20 and 18-24-year-old voters that relied on student IDs prior to the passage of HB 323 and now must navigate a system that imposes significant burdens when it works as it should and is not currently working at all. FOF ¶ 9, Preliminary Injunction Order, ECF No. 43, at 7; Plaintiff's Proposed Findings of Fact, ECF No. 36, ¶¶ 57-58, 60-62.

**ii. Banning the Use of Student IDs Furthers No Strong or Even Legitimate Interest.**

11. The *Anderson-Burdick* regime requires the court to consider "the precise interests put forward by the State as justifications for the burden imposed" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Courts must look to the "legitimacy and strength" of the state's proffered interests as well as "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson,* 460 U.S. at 789. If the effect of a law on a legitimate interest is "marginal at best[,]" the interest is not given significant weight. *Gorbea*, 970 F.3d at 15.

12. HB 323 and the April 23 directive cannot be justified either by the purported interest in maintaining orderly elections or by the purported interest in combatting voter fraud. Student IDs have been used without incident since New

Hampshire first introduced a voter ID law in 2012 and defendants have failed to identify any instances of student IDs being used fraudulently. FOF, ¶¶ 34-35.

13. Defendants' claim that HB 323 is justified by fraud concerns is undermined by its own DMV rules and by Ms. Barreto's experience. Ms. Barreto, an eligible voter, had to go to multiple offices in order to obtain a voter-only ID, but would have been able to do so with the same documentation that would have enabled her to register to vote and cast a ballot prior to HB 323—if the DMV system was working, which it was not.

14. Forcing eligible voters to go to multiple government offices and officials, presenting the same documents, does not further any interest in combatting fraud.

15. Because of administrative issues, Ms. Baretto was not issued a voter-only ID and was unable to cast her vote—she was unable to exercise one of the most fundamental rights because of an arbitrary law that does nothing to further a legitimate government interest. This experience is illustrative, not exhaustive; thousands of young voters have already been disenfranchised by HB 323 and the April 23 directive and many more will be denied the right to vote in November absent this injunction. FOF, ¶ 36.

16. This experience and similar ones have done nothing to increase New Hampshire residents' confidence in the state's electoral system. They could only diminish it.

17. Because defendants fail to put forward legitimate or compelling interests and cannot explain how HB 323 furthers those alleged interests, plaintiff is likely to succeed on the merits of their claim that HB 323 and the April 23 directive violates the First and Fourteenth Amendments. This is true regardless of the level of scrutiny this Court applies to those interests.

**B. Count II: HB 323 Violates the Twenty-Sixth Amendment.**

18. The Twenty-Sixth Amendment to the United States Constitution guarantees that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by ay State on account of age."

19. A law violates the Twenty-Sixth Amendment where it imposes a condition that "not insignificant, disproportionately affects the voting rights of citizens specially protected by [the amendment], the burden must shift to the governmental unit to show how the statutory scheme effectuates, in the least drastic way, some compelling governmental objective." *Walgren v. Howes*, 482 F.2d 95, 102 (1st Cir. 1973).

20. For the reasons discussed above with regard to the *Anderson-Burdick* analysis, the conditions imposed by HB 323 satisfy the First Circuit's *Walgren* test. HB 323 and the April 23 directive impose a not insignificant burden on young students—those aged 18-20, and 18-24—that is not justified by any legitimate state interest.

21. Even under the different Twenty-Sixth Amendment analysis adopted by the Fourth Circuit, *see Grant v. Belangia*, __ F.4th __, No. 25-1413, 2026 WL

2409681 at *9, 12 (4th Cir. Aug. 18, 2026) (a state's voting laws must be "administered without discrimination based on a protected characteristic. . . plaintiffs must have the same access to the ballot provided to the favored group of voters") or the Seventh Circuit, *see Tully v. Okeson*, 78 F.4th 377, 386-87 (7th Cir. 2025) ("an 'abridgement' must involve the imposition of a 'material requirement'" or a "material burden on the exercise of the franchise"), HB 323 and the April 23 directive abridge young voters' (18-20 or 18-24) right to vote, are motivated by discriminatory animus, and are thus unconstitutional.

22. To the extent defendants now raise post-hoc justifications of HB 323, those are irrelevant to *Arlington Heights* analysis, which seeks to determine the legislature's actual motivation for the law. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 237 (4th Cir. 2016) ("post hoc rationalizations during litigation provide little evidence as to the actual motivations of the legislature") (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982)). Similarly, it cannot justify a law that abridges the right to vote on account of age. *Grant v. Belangia*, No. 25-1413, 2026 WL 2409681, at *11 (4th Cir. Aug. 18, 2026) ("Defendants invoke administrability and election integrity to justify the statute. Those are legitimate interests. But the Twenty-Sixth Amendment unconditionally removes age-based allocation of voting opportunity from the set of permissible means without consideration of the state's interests.").

23. Accordingly, under any possible test, whether it be the controlling standard established by the First Circuit in *Walgren,* the "abridgement" tests

applied in the Fourth and Seventh Circuits, or under *Arlington Heights*, plaintiff is likely to succeed on its Twenty-Sixth Amendment claim.

**C. Count III: HB 323 Violates the Equal Protection Clause of the Fourteenth Amendment.**

24. The Fourteenth Amendment guarantees equal protection of the laws, including "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (citations omitted).

25. For the reasons above, HB 323 and Secretary Scanlan's April 23 directive unconstitutionally burden young voters' (18-20 or 18-24 years of age) right to vote and fail to advance any legitimate state interest, or do so "by totally arbitrary means," *Bullock*, 405 U.S. at 144, and are therefore unconstitutional.

26. Accordingly, plaintiff is likely to succeed on its Fourteenth Amendment Equal Protection claim.

**III. Balance of the Harms and the Public Interest Require Granting Injunctive Relief Against HB 323 and *Purcell* Provides No Basis to Deny It**

27. The "balancing of the equities and analysis of the public interest . . . 'merge when the [g]overnment is the opposing party.'" *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Where, as here, the plaintiff is likely to prevail on a constitutional claim, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012) (citation omitted).

28. The public interest weighs in favor of granting an injunction because the public has a strong interest in exercising the "fundamental political right to vote." *Dunn*, 405 U.S. at 336; *see also N.H. Youth Movement v. Scanlan*, __ F.4th __, 2026 WL 2620381, at * 2 (denying motion to stay order enjoining HB 1569 on that basis that a stay would "potentially prevent some voters from participating in the electoral process") (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).

29. The "Purcell" principle does not counsel against or undermine the necessity of the preliminary injunction sought here.

30. *Purcell v.* Gonzalez*,* 549 U.S. 1 (2006), and the related case law require this court to examine "the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring in the grant of application for stays) (emphasis added). It is intended to be an application of equitable principles to ensure that federal courts do not cause harm to innocent bystanders, namely candidates and voters, with disruptive injunctions.

31. *Purcell*'s heightened standard is not appropriate, where, as here, "the primary reason for applying that standard—risk of voter confusion—[is] lacking." *NHYM*, 833 F. Supp. 3d at 150 (quoting *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *2 (11th Cir. Nov. 7, 2022)).

32. If this injunction were issued on September 16, 2026, defendants would have 48 days to implement the injunction. This, or an injunction issued that week, is comparable to the "lead time the Secretary of State's office itself used to

implement HB 323 in the first place." Preliminary Injunction Order, ECF no. 43, at 14.

33. Defendants have not even created the materials they will send to polling places for the general election and will not do so until early October. FOF, ¶ 46.Defendants will meet with town clerks and conduct trainings in October. FOF, ¶ 47.Defendants are fully capable of sending emails to the clerks when this injunction is issued.

34. Clerks and the public are already familiar with the use of student IDs for identification at the polls and re-implementing them will not cause confusion. *New Hampshire Youth Movement v. Scanlan*, 833 F. Supp. 3d 93, 150 (D.N.H. 2026) (making a similar point with regard to qualified voter affidavits).

35. Finally, unlike cases that challenge districting decision or ballot placement, this injunction will not necessitate the clerk's offices to implement and voters to negotiate a complicated, new election regimen, nor will it cause voters to be unsure who their eligible slate of candidates is to be or where they are to vote.

36. Given these facts, there is no *Purcell* issue because the potential of "confusion" is virtually non-existent and no voter will be placed in a disadvantaged position as a result of granting the injunction.

37. The ballot issues that concerned this court with regard to the primary election are not present here; the content and printing of the ballots are wholly unaffected by HB 323 or the April 23 directive. *Cf. Count US IN v. Morales*, 172 F.4th 974, 976 (7th Cir. 2026) (incorrectly holding that the fact that ballots were

being cast meant an injunction of a rule regarding documentation to prove eligibility violated the *Purcell* principle).

38. Defendants have admitted that ballots for the general election are not sent out until September 18, 2026 for UOCAVA voters and, at the earliest, September 29, 2026 for general absentee ballots. FOF, ¶¶ 37-41.

39. Finally, UOCOVA ballots are irrelevant to this analysis because overseas or uniformed voters, by definition, have access to military IDs and passports and therefore are not reliant on student IDs. FOF, ¶ 43.

40. Even if they were relevant, UOCOVA ballots and absentee ballots have been available upon request since May 3, 2026; that is, after HB 323 was passed on April 3, 2026, but before it went into effect on June 2, 2026. FOF, ¶ 41. Therefore, UOCAVA voters have already been subject to multiple voting regimes.

## IV. Plaintiff Open Democracy has Suffered Injury from HB 323 and has Standing

41. Organizational standing is proper when a challenged law "directly affect[s] and interfere[s] with [plaintiff's] core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*Alliance*").

42. This occurs when a challenged action or law "perceptibly impair[s]" that core business activity and there is a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

*43.* Under this standard, organizational standing is proper if "the challenged actions 'directly affected and interfered with [the plaintiff's] core business activities' beyond issue-advocacy." *League of Women Voters of Mass. v.*

*Trump*, __ F.4th __, 26-2029, 2026 WL 2662011, at *3 (1st Cir. Sep. 10, 2026) (quoting *Alliance*, 602 U.S. at 695); *Presidents' All. on Higher Educ. & Immigr. v. Noem*, 824 F. Supp. 3d 168, 188 (D. Mass. 2026) (the First Circuit's organizational standing test, that "'the challenged conduct frustrated [its] organizational mission' and it 'diverted resources to combat that conduct, as long as the harm was not to 'the organization's lobbying' or 'pure issue-advocacy' activities," was not altered by *Alliance*) (quoting *Town of Milton v. FAA*, 87 F.4th 91, 99 (1st Cir. 2023) and *Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021)) ("*PAHEI*"); *see also New Hampshire Youth Movement v. Scanlan*, __ F.4th __,No. 26-1740, 2026 WL 2620381, at *1 (1st Cir. Sept. 4, 2026) (denying defendants' motion for a stay in a separate case where defendants argued Open Democracy lacked standing to challenge a statute creating more stringent documentation requirements for voters).

44. The First Circuit recently clarified that voter outreach organizations whose voter registration activities are adversely affected by laws and regulations still have standing to challenge those laws after *Alliance*. A group of voter outreach organizations challenged "a new [federal] rule regulating voting by mail that could prevent millions of Americans from obtaining and returning their ballots for [the 2026 general election]." *LOWV of Mass.* 2026 WL 2662011, at *1. There, as here, the core services of the plaintiffs were "conducting voter-registration drives . . . and educating the public on how to vote." *Id.* at * 3; FOF, ¶ 11. There, as here, an unlawful regulation caused confusion and forced the organizations to update

resources, recruit additional volunteers, and "pause, delay, or otherwise scale back planned activities." *Id.*; FOF, ¶¶ 13, 15, 19-24.

45. The defendants there—as do the defendants here—"attempt[ed] to cast the [plaintiffs'] activities as 'merely engaging in public advocacy and public education regarding government action.'" *LOWV of Mass.*, 2026 WL 2662011, at *4. But the First Circuit rejected this argument, reasoning that the organizations were not advocating *against* the rule, as the plaintiffs in *Alliance* were, but instead were "engaging in education . . . in light of the Final Rule . . . Appellee organizations' efforts to counsel their members and the public on how to vote under the Final Rule are no more 'issue advocacy' than were the "counseling and referral services for low- and moderate-income homeseekers" in *Havens Realty*. *Id.* (emphasis in original). Because the voter outreach organizations showed their core missions had been impaired and they had diverted resources, they established standing. *Id.*

46. This is consistent with the holdings of other circuits, which regularly find that voter outreach organizations have organizational standing to challenge laws and actions that interfere with their mission of registering eligible voters. *Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*, 180 F.4th 1266, 1275 (10th Cir. 2026) (organizational standing is proper where voter outreach organizations' outreach efforts were negatively impacted); *Get Loud Ark. v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026); *Nairne v. Landry*, 151 F.4th 666, 682 (5th Cir. 2025) (same); *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390,

394, 397 (4th Cir. 2024) (same); *Common Cause Indiana v. Lawson*, 937 F.3d 944, 953 (7th Cir. 2019) (collecting cases).

47. Similarly, the First Circuit did not find that there was any requirement that the injury had to cripple an organization such that it was unable to carry out its core business activities. *LOWV of Mass.*, 2026 WL 2662011, at *3. This is consistent with *Havens*; there, the organizational plaintiff, HOME, identified its core business as "the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." 455 U.S. at 367. The defendant, Havens Realty, "owned and operated two apartment complexes" in the community that HOME served. *Id.* There was no allegation that Havens owned all or even most of the housing units, such that HOME would be unable to continue operating its counseling services or cease to investigate and refer discrimination complaints based on Havens' racist policies. There was no allegation that the drain on resources had to be so significant that it wholly prevented or wholly frustrated the plaintiff from undertaking its core activities. The Supreme Court found standing proper because the challenged action or law "perceptibly *impaired*" HOME's core business activity and there was a "consequent drain on the organization's resources." *Id.* at 379 (emphasis added). That standard was affirmed in *Alliance*, which did not impose any materiality threshold, 602 U.S. at 395, and *LOWV of Mass.*, 2026 WL 2662011, at *3-*4.

48. Similarly, although Open Democracy can still run voter registration drives, fewer students will be able to register at those drives, and it will take Open

Democracy longer to help those students who lack or do not carry an acceptable form of ID, even though those students have student IDs. FOF, ¶¶ 13, 15, 19-24.

49. Open Democracy also has been forced to divert its fundraising priorities to pay for identification card fees for young voters rather than fund its other core missions. *See, e.g.*, *Just City, Inc. v. Bronner*, No. 2:24-CV-02540-TLP-TMP, 2026 WL 2447997, at *8 (W.D. Tenn. Aug. 20, 2026) (conducting additional fundraising and changing fundraising goals constituted diversion of resources sufficient to confer standing). FOF, ¶ 23. Further, the organization's work focuses on the voters most burdened by the challenged law—young voters, those between the ages of 18-20 and 18-24—and thus its core mission has been severely affected. FOF, ¶¶ 11-12, 14, 16-18.

50. The relevant inquiry is not whether the plaintiff organization's undertaken activities or resource diversion are "involuntary." The relevant inquiry is whether the organization's alleged injury arises solely as a result of its advocacy against a challenged law—which, as established by *Alliance*, does not confer standing—or whether the organization diverted resources or were otherwise "perceptibly impaired" in carrying out its core business activity because of the law's effect. *Havens Realty*, 455 U.S. at 379; *PAHEI*, 824 F. Supp. 3d at 188 (rejecting a proposed interpretation of *Alliance* that would read in an extratextual "voluntariness" requirement into the organizational standing analysis).

51. The plaintiff in *Havens* was not forced to divert its resources; it could have merely continued to offer its same counseling to clients, made less effective by

the defendants' illegal actions. It is the fact that its services were impaired by the defendants' illegal actions, and there was a "consequent drain on the organization's resources," that formed the basis for the organization's standing. *Id.* at 379. Similarly, in *LOWV of Mass.*, voter outreach organizations could have simply offered inaccurate information or less effective voter outreach—their "choice" to pursue their core mission does not deprive them of standing. 2026 WL 2662011, at *4.

52. Open Democracy has established that HB 323 and the April 23 directive perceptibly impair its core mission of registering young voters, that its core mission consists neither of issue advocacy nor general education, but the provision of services to eligible voters, and that it has diverted resources to attempt to compensate for the harms caused by the defendants' actions. FOF, ¶¶ 11-12, 14, 16-18. Thus, it has established standing.

Dated: September 14, 2026

Respectfully submitted,

*/s/ Henry C. Quillen*
Henry C. Quillen (Bar No. 265420)
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851
hquillen@whatleykallas.com

*/s/ Benjamin Horton*
Benjamin Horton (admitted *pro hac vice*)
John Bonifaz (admitted *pro hac vice*)
Ben Clements (admitted *pro hac vice*)
Courtney Hostetler (admitted *pro hac vice*)
FREE SPEECH FOR PEOPLE

28 S. Main Street, Suite 200
Sharon, MA 02067
Tel: (617) 244-0234
chostetler@freespeechforpeople.org
bhorton@ freespeechforpeople.org
bclements@freespeechforpeople.org
jbonifaz@freespeechforpeople.org

Michael Gardener (admitted *pro hac vice*)
Courtney Herndon (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 348-1642
msgardener@mintz.com
cherndon@mintz.com

Yeilee Woo (admitted *pro hac vice*)
Sherwet H. Witherington (admitted *pro hac vice*)
Hannah Edge (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
919 Third Avenue
New York, New York 10022
Tel: (212) 692-8153; (212) 692-8188
ywoo@mintz.com
shwitherington@mintz.com

*Attorneys for Plaintiff*
*Coalition for Open Democracy*

611737651v.1