**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **Coalition for Open Democracy,** | ) | |
| Plaintiff, | ) | |
| vs. | ) | **Case No. 1:26-cv-00647-JL-TSM** |
| **David M. Scanlan, in his official capacity as New Hampshire Secretary of State and John Formella, in his official capacity as New Hampshire Attorney General,** | ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED PROPOSED FINDINGS OF FACT AND RULINGS OF LAW - CORRECTED**

## Table of Contents

**Page**

PLAINTIFF'S PROPOSED FINDINGS OF FACT .................... 1

I. Voting in New Hampshire Prior to HB 323 .................... 1

II. HB 323 .................... 3

III. The Impact of HB 323 .................... 5

IV. Legislative Consideration of HB 323 and Background .................... 14

V. Actions of the Secretary of State's Office .................... 22

VI. Open Democracy .................... 23

VII. Lawsuit & Elections Calendar .................... 27

PLAINTIFF'S PROPOSED RULINGS OF LAW .................... 29

I. Legal Standard .................... 29

II. Plaintiff Is Likely to Succeed on the Merits .................... 29

A. Count I: HB 323 and Secretary Scanlan's April 23 Directive are Unconstitutional Burdens on the Right to Vote. .................... 29

i. Obtaining State-Issued IDs is a Significant Burden that Disproportionately Impacts Young Voters. .................... 32

ii. Banning the Use of Student IDs Furthers No Strong or Even Legitimate Interest. .................... 35

B. Count II: HB 323 Violates The Twenty-Sixth Amendment. .................... 39

C. Count III: HB 323 Violates the Equal Protection Clause of the Fourteenth Amendment. .................... 48

III. PLAINTIFF WILL BE IRREPARABLY HARMED IN THE ABSENCE OF PRELIMINARY RELIEF .................... 50

IV. BALANCE OF HARMS AND THE PUBLIC INTEREST REQUIRE GRANTING INJUNCTIVE RELIEF AGAINST HB 323 AND PURCELL PROVIDES NO BASIS TO DENY IT .................... 52

V. PLAINTIFF OPEN DEMOCRACY HAS SUFFERED INJURY FROM HB 323 AND HAS STANDING .................... 60

VI. LACHES IS NOT APPLICABLE. .................... 64

VII. NO NEED FOR A BOND .................... 67

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

### I. Voting in New Hampshire Prior to HB 323

1. Since the introduction of New Hampshire's voter ID law in 2012, up until the passage of HB 323, a period of 14 years, many students were able to register to vote and obtain a ballot using student identification cards to establish identity. Exhibit 39, RSA 659:13; Exhibit 41, Declaration of Michael C. Herron in Support of Motion for Preliminary Injunction ("Herron Decl.") ¶ 18.

2. Effective June 2, 2026, HB 323 amended RSA 659:13, II, a provision of New Hampshire's election code that is titled, "Obtaining a Ballot." Exhibit 41, Herron Decl. ¶¶ 1, 3.

3. On April 23, 2026, the Secretary of State's Office sent an NHVotes@sos.nh.gov email titled, "Subject: Informational Flyers - Voting for Students in NH." It stated: "Following the passage of HB 323, effective 6/2, student IDs can no longer be used to register to vote or obtain a ballot on election day." Exhibit 41, Herron Decl. ¶ 1, n.1, Appx. A.

4. In New Hampshire, voting registration is run locally by cities and towns. RSA 654:8.

5. Depending on timing and circumstance, to register to vote, a prospective voter must go to their local city or town clerk and present proof of identity, age, domicile, and citizenship. Exhibit 38, RSA 654:12; RSA 654:7-a; RSA 654:7-B.

6. On election day, a registered voter must present proof of identity to obtain a ballot. Exhibit 39, RSA 659:13; Exhibit 41, Herron Decl. ¶ 17.

7. Voters may establish their identity under New Hampshire law with a driver's license from any state, a passport, or any photo identification issued by federal, state, or local governments. Exhibit 39, RSA 659:13(II)(a). HB 323 did not amend these options for voter identity verification. Exhibit 41, Herron Decl. ¶ 23.

8. Each voter qualification—identity, age, domicile, and citizenship—has different, though sometimes overlapping, documentation requirements.

9. Prospective voters in New Hampshire can establish their identity under New Hampshire law with a driver's license from any state or the federal government, a passport, any photo identification issued by federal, state, or local government, or "[a]ny evidence that reasonably establishes that it is more likely than not that the person is who they claim to be." Exhibit 38, RSA 654:12(d)(4).

10. Prior to HB 323, student identification cards were acceptable forms of identification to register to vote and obtain a ballot, subject to specific requirements. Exhibit 41, Herron Decl. ¶ 21. All forms of identification, including student-identification cards prior to HB 323, must "show the name of the individual to whom the identification was issued, and the name shall substantially conform to the name in the individual's voter registration record; it also shall show a photograph of the individual to whom the identification was issued," must have an expiration or issue date, and be presented within five years of either date. Exhibit 39, RSA 659:13(II)(a).

11. Also, prior to HB 323, prospective voters could only establish their identity with student identification cards if the IDs were issued by "(i) A college,

university, or career school in New Hampshire and approved to operate or licensed to operate in New Hampshire. (ii) A public high school in New Hampshire. (iii) A nonpublic high school in New Hampshire accredited by a private school accrediting agency that is recognized by the department of education. (iv) Dartmouth College. (v) A college or university operated by the university system of New Hampshire or the community college system of New Hampshire." Exhibit 37, 2026 New Hampshire Laws Ch. 20 (H.B. 323) (quoted text stricken by H.B. 323); Exhibit 41, Herron Decl. ¶ 21-22.

12. Before HB 323, a student voter in New Hampshire seeking to register to vote without a driver's license or passport could go to their town or city clerk, present proof of age, citizenship, and domicile, and present their student identification as proof of their identity. Exhibit 38, RSA 654:12(d)(4).

13. Similarly, on election day, a student voter without a driver's license or passport could obtain a ballot by presenting their student identification card.

## II. HB 323

14. HB 323 amends RSA 659:13 by eliminating student identification cards as a valid form of proving identity to obtain a ballot. Exhibit 41, Herron Decl. ¶ 23.

15. On April 3, 2026, Governor Kelly Ayotte signed HB 323 into law. The law went into effect on June 2, 2026.

16. On April 23, 2026, the Secretary of State's Office issued a press release stating that "[e]ffective June 2, 2026, student IDs cannot be used as proof of ID when registering to vote, requesting an absentee ballot, or checking in to vote in an

election." Exhibit 24, Press Release, Secretary of State of New Hampshire, Secretary of State Shares Election Resources for New Hampshire Students (April 23, 2026), https://mm.nh.gov/files/uploads/sos/docs/4-23-26-student-flyer-press-release.pdf); Exhibit 41, Herron Decl. ¶ 1, n.1, Appx. A. It also described "new election resources for students who plan to register to vote in New Hampshire or vote in an upcoming election." *Id.*

17. HB 323 did not amend RSA 654:12(d), which sets forth "presumptive evidence of the identity of an applicant sufficient to satisfy the identity requirement" when registering to vote pursuant to RSA 654:12.

18. After HB 323, student voters without driver's licenses or passports will have to present state-issued identification cards to be able to register to vote and to obtain a ballot. Exhibit 41, Herron Decl. ¶ 23.

19. RSA 659:13(a), as amended by HB 323, now lists as valid forms of identification for purposes of obtaining a ballot a "driver's license issued by any state or the federal government," a state-issued identification card (from any state), a "United States armed services identification card" and a "United States passport or passcard." Exhibit 41, Herron Decl. ¶ 23.

20. For purposes of registering to vote, RSA 654:12(d) lists "[p]hoto identification issued by local or state government" or "[a]ny other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be, including verification of the person's identity by the moderator or another election official" as acceptable ways to prove identity.

21. Young voters that attend Open Democracy's high-school voter registration drives can register at their high schools. Exhibit 43, Declaration of C. Olivia Zink in Support of the Open Democracy Plaintiff's Motion for Preliminary Injunction ("Zink Decl.")), ¶¶ 6, 8-9.

## III. The Impact of HB 323

22. Obtaining a first-time New Hampshire driver's license requires hours of driving time, passing a written exam and often completing a driver's education course.

23. The cited source indicates that the number of young people who do not get their driver's licenses is rising, and the average age at which people get their driver's license is trending upward.[1]

24. Passports cost $65 to $165 and include a processing period.[2]

25. In a separate but recent case, this Court found that "approximately 38% of U.S.-born eligible New Hampshire voters do not possess a passport." *NHYM*, 2026 WL 1500857, at *6, and "only approximately 11% of eligible voters in New Hampshire who possess a passport . . . carry those documents with them regularly." *Id.*

[1] Exhibit 26, Sara Chernikoff, *Gen Z is less likely to have a driver's license. Here's why*. USA TODAY (May 17, 2024), https://www.usatoday.com/story/graphics/2024/05/17/gen-z-less-likely-get-drivers-license/73678202007/.

[2] Exhibit 30, United States Department of State, *Apply for Your Adult Passport*, https://travel.state.gov/content/travel/en/passports/need-passport/apply-in-person.html.

26. For student voters without a driver's license, passport, or military ID, in order to be able to register to vote as a result of HB 323, they will now need to obtain a state or local-issued identification card. Exhibit 38, RSA 260:21; RSA 654:12(d)(3). Alternatively, they can present "[a]ny other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be, including verification of the person's identity by the moderator or another election official." Exhibit 38, RSA 654:12(d)(4).

27. For student voters without a driver's license, passport, or military ID, in order to obtain a ballot as a result of HB 323, they will now need to obtain a state- or local-issued identification card that meets the requirements set forth in RSA 659:13, II.

28. State-issued identification cards issued under RSA 260:21 may be used to prove identity both when registering to vote, RSA 654:12(I)(d)(3), and obtaining a ballot, RSA 659:13(II)(a)(2).

29. State-issued identification cards are issued by the New Hampshire Department of Motor Vehicles ("DMV"). RSA 260:21.

30. HB 323 prohibits student voters from continuing to use their student IDs to establish identity when seeking to vote. At the same time, the student can present their student ID to establish identity in order to obtain other forms of identification, including state-issued ID cards, that under HB 323 remain eligible for use as proof of identification to register to vote and obtain a ballot.

31. Before HB 323, to register to vote with their local town clerk, a student voter could present a student ID to establish identity, a birth certificate to establish citizenship, and proof of domicile.

32. After HB 323, that student voter may no longer use his or her student ID to establish identification when registering to vote.

33. A student voter can go to the DMV, present a birth certificate and student ID and present proof of residency—such as lease or rental agreements, tax bills, or notarized statements by parents and guardians—and receive a state-issued identification card.

34. The student voter must bring those very same documents first to the DMV, receive a state-issued identification card, then present that card, which he or she obtained by using a student ID, to the local town clerk to register to vote.

35. As a result of HB 323, students lacking an accepted form of identification must go to multiple offices with the same documents – including their student IDs – to register to vote.

36. State-issued identification cards are only issued by the DMV. The DMV has fourteen locations throughout the entire state that issue identification cards, two of which (Coleridge and North Haverhill) have limited hours. All locations are only available by appointment.

37. According to the source cited below, branches with regular hours operate, depending on the branch, from 8:00 a.m. to 4:30 p.m. or 8:15 a.m. to 4:15 p.m., Monday to Friday, with the Raymond office offering extended hours on

Tuesday and Thursday to 5:00 p.m. The other offices do not list their hours and do not have regular hours. No office is open on weekends.[3]

38. As a result of HB 323, students who do not already possess RSA 659:13, II-compliant identification, must obtain that documentation by going to a DMV to obtain a state-issued form of ID in order to be able to register and obtain a ballot. New Hampshire has only fourteen DMV locations.

39. Many DMV locations are inaccessible by public transportation.

40. Student voters with disabilities preventing them from driving both have no reason to obtain a driver's license and are likely to encounter greater difficulty obtaining transportation to the DMV for a state-issued identification card.

41. Several large high schools in New Hampshire have no DMV within a half-hour car drive and are over an hour public transit ride away. These schools include Plymouth Regional High School, Convale High School, Pinkerton High School, and Littleton High School.

42. Tracy Walsh, the Hanover Town Clerk who oversees elections in Hanover, testified that: i) Dartmouth does not allow freshmen or sophomores to have cars on campus; ii) the closest DMV location to Dartmouth College is thirty miles from the campus, in Newport, New Hampshire, and iii) there is no consistent mode of public transport from Dartmouth College to Newport, New Hampshire. Exhibit 9, HB 323, requiring the presentation of a government-issued photographic

---

[3] Exhibit 19, New Hampshire Division of Motor Vehicles, *Hours and Locations*, https://www.dmv.nh.gov/hours-and-locations.

means of identification in order to vote before the Senate Election Law and Municipal Affairs Committee, 2026 Leg., at 2-3 (N.H. February 10, 2026) ("HB 323 February 10 Hearing"), https://gc.nh.gov/bill_Status/pdf.aspx?id=15266&q=HearingRpt.

43. State issued identification cards are subject to a $20 fee except for those over the age of sixty-five who turn in their driver's license to the DMV. RSA 260:21(V)(a). However, individuals can obtain a voucher from their local town or city clerk's office exempting them from the $20 fee if they present proof of domicile and swear or affirm that they do not possess qualified photo identification and require it for voting identification purposes. RSA 260:21(V)(b). As of April 20, 2026, no New Hampshire citizens under the age of twenty had received a free "voter ID" pursuant to RSA 260:21. Letter from Jennifer L. Bailey, Assistant Director of New Hampshire Division of Motor Vehicles, to Olivia Zink, Executive Director of Open Democracy (April 20, 2026) (on file with Olivia Zink).

44. SB 660, which amends the voucher process, became operative on August 18, 2026.

45. Students needing to obtain a voucher that would also exempt them from this fee must first go to their town or city clerk's office, present proof of domicile, and swear that they lack other forms of identification.

46. The would-be student voter must then present the voucher at the DMV when applying for a state-issued identification card to waive the fee. RSA 260:21(V)(b); SB 660. That voter must then return to the clerk to register to vote.

47. The voucher system could require voters to make three trips to two different offices to register to vote without paying a fee.

48. Accordingly, in order to comply with RSA 659:13, II's identity verification requirements for obtaining a ballot, a student who could have opted to use his or her student ID prior to HB 323, must now verify identity with a state or federal driver's license, a state or local identity card, a U.S. armed services ID, passport, or passcard, or acquire one of these forms of identification. If the student chooses to acquire a DMV-issued ID instead, the student must either pay the fee or use the voucher system process by visiting the three offices referenced above.

49. College students who leave their out-of-state driver's licenses or passports at home will not qualify for the voucher system.

50. Studies have shown that voting is habit-forming, and people who vote are more likely to continue to do so than those who have not taken that first step,[4] and less likely to vote if they are prevented from voting.[5]

51. This Court, in a separate but recent case, citing Dr. Mayer's expert testimony, has found that laws placing unnecessary burdens on voting lowers

---

[4] Exhibit 3, Alexander Coppock & Donald P. Green, *Is Voting Habit Forming? New Evidence from Experiments and Regression Discontinuities*, 60 American J. of Pol. Sci. 1044, 1046 (2016) ("The overall pattern [of the data] leaves little doubt that voting is habit forming."), https://alexandercoppock.com/coppock_green_2016.pdf.

[5] Exhibit 16, Michael G. Miller et al, *Restrictive Mail Voting Rules Burden Minority Voters: Evidence From Texas*, 27–28 (Working Paper, Brennan Center, 2024), https://www.brennancenter.org/sites/default/files/2024-03/Miller%20-%20Texas_Rejections.pdf.

confidence in elections as "voters who have a frustrating experience at the polls, people who try to vote and can't, that they are less—they are more likely to report low confidence in election outcomes." *NHYM*, 2026 WL 1500857, at *18.

52. This Court has found that this concern is even greater when burdens are placed on first-time voters, as it could undermine their confidence in elections for the rest of their lives.[6]

53. Additionally, in his declaration, Professor Michael Herron describes that "the calculus of voting posits that an individual's decision to turn out and vote in an election should be understood as reflecting a comparison between the costs and benefits of this action. Attributed to Downs (1957) and Riker and Ordeshook (1968), per the calculus of voting an individual will turn out to vote if the benefits of doing so outweigh the costs, and will not vote otherwise." Exhibit 41, Herron Decl. ¶ 38.

54. Li et al. (2018) create a state-level index of the cost of voting. This index incorporates aspects of voter registration (*e.g.*, whether online registration is available), ballot casting (*e.g.,* whether early voting is available), and required voter identification (*e.g.*, whether photographic identification is required to vote), among other things. Exhibit 41, Herron Decl. ¶ 48.

55. New Hampshire had the second highest cost of voting among states in the country. Exhibit 41, Herron Decl. ¶ 51.

[6] *Id.*

56. As of July 2023, approximately 15.6% of eighteen-year-olds in New Hampshire were registered to vote. This is below the national average for eighteen-year-old registration. Exhibit 43, Zink Decl., ¶ 10.

57. Between 2012 and 2022, there was a 28% decrease in teenagers applying for and earning their driver's licenses in New Hampshire.[7]

58. According to the U.S. Department of Transportation, as of 2024, there were 24,496 New Hampshire residents with driver's licenses between ages 18 and 19, and 71,424 with driver's licenses between ages 20 and 24. By comparison, the U.S. Census Bureau reports that in 2024 there were 32,951 New Hampshire residents between the ages 18 and 19, and 87,828 between 20 and 24.

59. Younger eligible New Hampshire voters, defined as those between the ages of 18-20, lack "have statistically significantly lower voting documentation possession rates than eligible voters who are not young." Exhibit 41, Herron Decl. ¶ 86. Approximately 6.56%, voting eligible New Hampshire citizens between the ages of 18-24 lack eligible documentation; this amounts to approximately 7,747 citizens. Exhibit 41, Herron Decl. ¶¶ 93-94.

60. The laws regulating the voter registration and ballot processes, RSA 654:12, RSA 659:13, contain some exemptions for older voters.

[7] Exhibit 26, Sara Cernikoff, *Gen Z is less likely to have a driver's license. Here's why*, USA Today (May 17, 2024), https://www.usatoday.com/story/graphics/2024/05/17/gen-z-less-likely-get-drivers-license/73678202007/.

61. For example, in order to register to vote, residents of nursing homes can have their identity confirmed “by the administrator of the facility” without presenting identification cards of any kind. Exhibit 38, RSA 654:12(I)(d).

62. The expiration rules of RSA 659:13(II)(a) do not apply to voters over age sixty-five; they can use long-expired driver’s licenses and other forms of identification to confirm their identity at the polls.

63. People over age sixty-five who turn in their driver’s licenses are not subject to a fee when applying for a state-issued identification card, RSA 260:21(V)(a), and do not have to go through the voucher process to obtain a fee waiver.

64. New Hampshire does not offer registration at the DMV, at any public office that provide public assistance or services to people with disabilities, or via mail, except mail-in registration for voters with a bona fide excuse, such as disability.

65. This Court has found that New Hampshire’s election system is “designed to rely intensely on election day registration.” *NHYM*, 2026 WL 1500857, at *31.

66. In a separate but recent case, this Court has found that because New Hampshire relies on election day registration, voters who do not or cannot utilize same-day registration are necessarily compelled to navigate a system with one of the highest “costs of voting” in the country. *NHYM*, 2026 WL 1500857, at *31.

67. New Hampshire does not offer provisional ballots.

## IV. Legislative Consideration of HB 323 and Background

68. In the two general presidential elections in 2016 and 2020, New Hampshire had the third highest turn-out percentage in the country; more than 1.5 million ballots were cast between the two elections.[8]

69. Shortly after the 2020 election, then-Governor Christopher Sununu stated that, "[h]ere in New Hampshire our elections are secure, accurate, and reliable—there is no question about it."[9]

70. In 2024, more than 60% of eligible New Hampshire residents cast votes in the general election, a higher turnout than in the prior two presidential elections. There was no reported fraud or disruption.[10]

71. In an opinion issued on May 28, 2026, after a bench trial in *New Hampshire Youth Movement v. Scanlan*, Judge Samantha D. Elliot found that the defendants, who are the same defendants named in this Complaint, "agreed that

---

[8] Exhibit 17, N.H. Secretary of State, Voter Turnout Ranking of States: 1996 – 2020 (April 19, 2021), https://www.sos.nh.gov/sites/g/files/ehbemt561/files/documents/2022-04/voter-turnout-charts-4-19-21.pdf.

[9] Exhibit 23, Press Release, Governor Chris Sununu, Governor Chris Sununu Statement Following Certification of 2020 Election Results (Dec. 20, 2020), https://www.governor.nh.gov/news-and-media/governor-chris-sununu-statement-following-certification-2020-election-results.

[10] Exhibit 28, Tom Jarvis, *Record Voter Turnout and Smooth Operations Define New Hampshire's 2024 Election*, N.H. Bar Ass'n (2024), https://www.nhbar.org/record-voter-turnout-and-smooth-operations-define-new-hampshires-2024-election/.

instances of voter fraud are 'miniscule' and virtually non-existent in [New Hampshire.]" 2026 WL 1500857, at *17.

72. In that opinion, the Court found that:

- "Wrongful voting, meaning unqualified voters intentionally or unintentionally casting ballots, is extremely rare in New Hampshire," and that only forty-seven cases could be identified between 1998 and 2024, a period in which 8.3 million votes were cast. 2026 WL 1500857, at *17;
- Noncitizen voting "is essentially non-existent," with *at most* 26 instances in New Hampshire between 1998 and 2024, *id.*;
- "Voter fraud, meaning unqualified voters intentionally casting ballots while knowing that they are not entitled to vote, is even rarer in New Hampshire[.]" *Id.*

73. Tracy Walsh, the Hanover Town Clerk who oversees elections in Hanover, testified before the New Hampshire legislature to oppose HB 323. She also testified that the Town Clerk's Association opposed HB 323. Exhibit 9, HB 323 February 10 Hearing, at 2.

74. The Town Clerk's Association is made up of clerks who run elections in towns and cities throughout New Hampshire. RSA 654:8.

75. Ms. Walsh testified that the bill will disenfranchise voters, especially first-time voters. Exhibit 9, HB 323 February 10 Hearing, at 2.

76. The legislative history contains no evidence that any student IDs were fraudulently or negligently issued by any school in New Hampshire. During the debates on HB 323, no one identified any instance of any voter using a student identification card to vote fraudulently or improperly.

77. At the legislative hearing, Senator Gray claimed that driver's licenses have "security features" that make them more reliable than student identification cards. He did not specify which "security features." Exhibit 9, HB 323 February 10 Hearing, at 5.

78. New Hampshire accepts passports to prove identity, RSA 659:13(II)(a)(4), even though they only need to be renewed every ten years,[11] and under New Hampshire law can be used to prove identity for up to five years after they expire. Exhibit 39, RSA 659:13(II)(a).

79. Accordingly, after HB 323, a thirty-two-year-old voter can use an expired passport they obtained when they were eighteen to prove their identity, but a current student cannot use their current student identification card to prove their identity.

80. The legislative history does not include any evidence that schools do not properly verify student identity before issuing a student ID.

[11] Exhibit 31, United States Department of State, *Frequently Asked Questions about Passport Services*, https://travel.state.gov/content/travel/en/passports/passport-help/faqs.html.

81. Tracey Walsh explained that Dartmouth College verifies a student's identity before issuing student identification. Exhibit 9, HB 323 February 10 Hearing, at 3.

82. Grace Murray, a former student at Plymouth State University, testified to the New Hampshire Senate in opposition to HB 323 that when she lost her ID, she had to provide her name, student number, proof of enrollment, and proof of campus residency to receive a replacement. *Id.* at 6.

83. Rachel Deane, the Town Clerk of Durham, testified in opposition to SB 223, a companion bill to HB 323 in the Senate that also would have eliminated student identification cards when obtaining a ballot. She explained that Durham, where UNH is located, frequently sees student identification cards used during elections and registration and that they are a secure form of identification that are only issued after a stringent identification process. Exhibit 33, Senate Election Law and Municipal Affairs Committee, 2026 Leg., at 5-6 (N.H. February 11, 2026) ("SB 223 February 11 Hearing"), https://gc.nh.gov/bill_Status/pdf.aspx?id=15266&q=HearingRpt.

84. Ms. Deane testified that Durham has never had any claims about fraudulent student identification cards. *Id.* at 6.

85. According to the source cited below, in 2022, Secretary Scanlan organized a "Special Committee on Voter Confidence."[12]

86. That Committee took evidence from across the state at nine different public hearings and took continuous input from the public. *Id*.

87. That Committee found that New Hampshire voters generally have high confidence in New Hampshire elections and that there is no evidence of widespread voter fraud. *Id*.

88. As part of its recommendations, the Committee did not suggest that public confidence or security would be increased by additional voter identification requirements, or by eliminating student identification cards as a valid form of identification. *Id*.

89. According to the source cited below, that report was adopted by all but one member of the committee. The argument presented by the lone dissenting member was that "out of state" students should not be voting and only "permanent New Hampshire residents" should be allowed to vote.[13]

---

[12] Exhibit 27, Special Committee on Voter Confidence, *Report of the Special Committee on Voter Confidence*, (Dec. 22, 2025), https://www.sos.nh.gov/sites/g/files/ehbemt561/files/2022-12/final-report.pdf.

[13] Exhibit 12, Ken Eyring, *Special Committee on Voter Confidence Report*, 3, 4, 5, 10 (Jan. 5, 2023), https://www.sos.nh.gov/sites/g/files/ehbemt561/files/documents/2023-01/final-report-by-ke-remediated.pdf.

90. According to the source cited below, these reports, posted on the Secretary of State's website, were accessible to legislators prior to passage of HB 323.[14]

91. According to the legislative history, in legislative debates on HB 323, lawmakers argued that student identification cards are unreliable because they are often held onto for long periods of time and may not have expiration dates.[15]

92. If any student identification card ever lacked an expiration date, it never constituted a valid form of identification under the pre-HB 323 regime. Exhibit 39, RSA 659:13(II)(a).

93. To the extent any student identification card was held on to for more than five years after its expiration date, again, they were not valid forms of identification under the pre-HB 323 regime, RSA 659:13(II)(a). Moreover, all forms of identification cards—including passports and driver's licenses—are authorized for use to prove identification at the polls in New Hampshire for up to five years after their expiration date.

94. During testimony on SB 223, the prime sponsor, Senator Sullivan stated that she was introducing this bill to bar college students from voting because "constituents have been clear that they do not want out of state residents who live

---

[14] Exhibit 21, New Hampshire Secretary of State, *Special Committee on Voter Confidence*, https://www.sos.nh.gov/elections/special-committee-voter-confidence.

[15] Exhibit 7, Ethan Dewitt, *NH bill to bar student ID cards to prove voter identity heads to Ayotte's desk*, Valley News (March 8, 2026), https://vnews.com/2026/03/08/nh-senate-republicans-pass-student-id-bill/.

temporarily on college campuses to vote in our elections." Exhibit 33, SB 223 Hearing, at 1.

95. Senator Sullivan stated that college students whose parents live in other states should be disqualified from voting in New Hampshire and should instead vote absentee in their parents' home state. *Id.* at 1-2.

96. During the debate on HB 323, lawmakers repeatedly referenced the registration process, Exhibit 9, HB 323 February 10 Hearing, at 2, 3, even though HB 323 only amended RSA 659:13, which sets out the process of obtaining a ballot. *Compare* Exhibit 39, RSA 659:13 (setting out the requirements to obtain a ballot), *with* Exhibit 38, RSA 654:12 (setting out the requirements to register to vote).

97. Representative Berry, a co-sponsor of the bill, claimed that "[s]tudent IDs have no address verification. No citizenship check. No security features."[16]

98. Proof of identity and proof of domicile are separate components of the voter registration process in New Hampshire and student identification cards were never used to establish domicile or citizenship.

99. Some forms of photo identification can be used to prove both identity and domicile; some cannot. The fact that some forms of photo identity do not establish domicile has never before rendered that form of identification unusable for the purpose of proving identity.

---

[16] Exhibit 7, Ethan Dewitt, *NH bill to bar student ID cards to prove voter identity heads to Ayotte's desk*, Valley News (March 8, 2026), https://vnews.com/2026/03/08/nh-senate-republicans-pass-student-id-bill/.

100. Under New Hampshire law, student IDs without addresses have never been a valid way to establish domicile.

101. Out-of-state driver's licenses and passports do not establish current domicile either, but they are still a valid way to establish identity after HB 323. *Compare* Exhibit 38, RSA 654:12(I)(c) (only New Hampshire driver's licenses or federal identification cards with current addresses—which passports lack—are valid to establish domicile), *with* Exhibit 38, RSA 654:12(I)(d)(1) (a driver's license from any state may establish identity); Exhibit 38, RSA 654:12(I)(d)(2) (a passport may establish identity).

102. New Hampshire driver's licenses may contain an inaccurate domicile; for example, if someone moved within the state before expiration of the driver's license, it will contain the wrong address.

103. The voter will need to establish proof of current domicile if they want to register and vote in their new voting district, but it does not render the driver's license unusable as a form of identification.

104. Under New Hampshire law, student identification cards have never been a valid way to establish citizenship. Nor have driver's licenses, which nevertheless are still a valid way to establish identity. *Compare* Exhibit 38, RSA 654:12(I)(a) (driver's licenses, including from New Hampshire, do not establish citizenship), *with* Exhibit 38, RSA 654:12(I)(d) (a driver's license from any state may establish identity); *see also* Exhibit 39, RSA 659:13(a)(1) (a driver's license from any state may establish identity).

105. According to the legislative history, in debates on the bill, Senator Lang stated that voters could get free voter identification cards from their town clerk. Exhibit 9, HB 323 February 10 Hearing, at 5.

106. In fact, as noted, student voters can only receive state-issued identification cards from the DMV and can only receive them for free if they can and do complete the voucher process discussed *supra*.

**V. Actions of the Secretary of State's Office**

107. On May 29, 2026, the day after the ruling in *NHYM*, Secretary Scanlan's office issued an email to all clerks explaining that qualified voter affidavits would be available for the fall election for the purposes of proving citizenship. *NHYM*, 26-cv-00291, ECF no. 189-1 (D.N.H. July 6, 2026).

108. On June 19, 2026, Secretary Scanlan's office sent out another email, explaining that the pending appeal of the decision in *NHYM* would not affect the qualified affidavit rule, again in effect as a result of the decision in *NHYM*, until and unless a stay of that ruling was granted. *NHYM*, 26-cv-00291, ECF no. 189-2 (D.N.H. July 6, 2026).

109. On August 5, 2026, defendants in the *NHYM* litigation, who are the same defendants in this case, moved to stay the injunction issued in *NHYM*. This action by the defendants, if it were to be granted, would change a voter documentation rule that has been in place since May 29, 2026 for the fall election and which, according to the notice sent to the clerks on May 29, the clerks have been instructed they must follow.

## VI. Open Democracy

110. Open Democracy's mission is to bring about and safeguard political equality for the people of New Hampshire. Exhibit 43, Zink Decl., ¶ 2.

111. Open Democracy believes that an open, accountable, and trusted democratic government "of, by, and for the people," with an electoral system that allows eligible citizens to vote and have their vote counted, is essential to the organization's mission. Exhibit 43, Zink Decl., ¶ 2.

112. To accomplish its mission, Open Democracy provides a variety of services that educate prospective voters about the registration and voting processes, and assists them to register and vote. Exhibit 43, Zink Decl., ¶ 3.

113. Plaintiff Open Democracy focuses its efforts on groups who historically have lower voter turnout, including young voters and low-income voters. Exhibit 43, Zink Decl., ¶ 4.

114. Open Democracy engages with prospective voters across New Hampshire, plans and hosts events and programming for its constituencies, develops and prints voter educational materials, and trains its volunteers on New Hampshire's voting rules. Exhibit 43, Zink Decl., ¶ 5.

115. One of Open Democracy's core services is providing assistance to eligible young people in exercising their voting rights and achieve 100% voter registration by eligible 18-year-olds in New Hampshire. Exhibit 43, Zink Decl., ¶ 6.

116. Open Democracy employs Sam Cassin full time as a High School Voter Registration Coordinator. Mr. Cassin's primary job is to help organize and run high

school voter registration drives across New Hampshire, which occur every year. Exhibit 43, Zink Decl., ¶ 6.

117. The drives are usually student-led, and Open Democracy works with students to bring the Supervisors of the Checklist, elected officials responsible for the functions of registering voters and correcting the checklist of qualified voters in New Hampshire, to these schools to register eligible high school students. Exhibit 43, Zink Decl., ¶ 8.

118. While Open Democracy aims to create self-sustaining drives that are rooted in local traditions—such as making voter registration part of the official graduation process along with obtaining gowns and turning in old library books—the majority of drives change significantly year-to-year, requiring significant effort on the part of Open Democracy to ensure they run smoothly.

119. Only an estimated 8.5 percent of 18-year-olds were registered to vote in New Hampshire as of June, 2022, which is substantially lower than in peer states. Exhibit 43, Zink Decl., ¶ 7.

120. In part because of voter registration drives led by Open Democracy in the 2022-2023 school year, by July 2023, approximately 15.6% of eighteen-year-olds in New Hampshire were registered to vote. Exhibit 43, Zink Decl., ¶ 10.

121. Though Open Democracy succeeded in registering a number of students, this is still below the national average for eighteen-year-olds. *Id.*

122. In 2024, Open Democracy helped students lead forty-one registration drives. Exhibit 43, Zink Decl., ¶ 9.

123. In the spring of 2026, Open Democracy helped students lead twenty-two voter registration drives. *Id.*

124. Before HB 323 and the April 23 directive took effect, students could use their student identification cards to establish their identity when registering to vote and obtaining a ballot so long as the card otherwise complied with New Hampshire's election laws.

125. Under HB 323 and the April 23 directive, students seeking to register to vote or to obtain a ballot may not rely on their student identification cards to establish their identity.

126. Instead, they must present a driver's license, a state-issued identification card, a passport, or an armed services identification card.

127. Students who only had student identification cards were turned away even before HB 323 went into effect.

128. In response to HB 323, Open Democracy has had to change the materials it provides voting registration drive leaders. Exhibit 43, Zink Decl., ¶ 12.

129. Open Democracy must reeducate all of its existing partners, including local high schoolers, partnering adults, and local clerks. *Id.*, ¶¶ 12-13.

130. As a result, it has been more difficult for Open Democracy to complete its core mission of registering young voters because it has diverted time and resources to revising its materials and educating existing partners. Exhibit 43, Zink Decl., ¶ 20.

131. Open Democracy cannot help students without a driver's license obtain a driver's license, given the requirements of driving hours, passing a written exam, as well as the functional requirement of driver's education, which can cost up to $1,100. Exhibit 43, Zink Decl., ¶ 14.

132. Although Open Democracy is organizing drives to raise funds to help students without a driver's license obtain a passport, given the fee, waiting period, specific photo requirements, and their own scarce resources, it is not a viable option at scale. Exhibit 43, Zink Decl., ¶ 16.

133. Instead, HB 323 and Secretary Scanlan's April 23 directive is forcing Open Democracy to focus its efforts on helping young voters obtain state-issued identification cards from the DMV. Exhibit 43, Zink Decl., ¶ 17.

134. As discussed above, young voters without driver's licenses or passports are eligible for a voucher from their local town or city clerk that allows them to waive the $20 fee for a state identification card.

135. Not all local clerks are aware of the voucher system. Open Democracy has educated voters on how to obtain a voucher from their local clerk, only for the local clerks to turn the voters away on the belief that such vouchers do not exist. As a result, Open Democracy is also expending time and resources to educate local clerks about the voucher system, as well. Exhibit 43, Zink Decl., ¶ 19.

136. In addition, Open Democracy is fundraising to pay the $20 fee for young voters so that they do not have to go through the onerous voucher system. *Id.*

137. Open Democracy is reaching out to local organizations that work with people with disabilities to help young students with disabilities obtain the identification they will need to register to vote.

138. Open Democracy will be forced to redirect and expend significant resources to address the law's effect on this core service. Exhibit 43, Zink Decl., ¶ 20.

139. Many of Open Democracy's registration drives occur in close proximity to elections, when there would not be sufficient time for these students to obtain a driver's license, passport, or a state-issued identification card.

140. Mitigating the harm of HB 323 on the provision of these services would necessarily draw resources away from Open Democracy's work involving other organizational priorities, including its advocacy for campaign finance reforms and efforts to secure fair districting maps. Exhibit 43, Zink Decl., ¶ 20.

## VII. Lawsuit & Elections Calendar

141. New Hampshire will hold its September 8, 2026 primaries eight days after the currently scheduled hearing on Open Democracy's Motion for Preliminary Injunction.

142. New Hampshire will hold its November 3, 2026 general election 64 days after the currently scheduled hearing on Open Democracy's Motion for Preliminary Injunction.

143. Open Democracy filed its Complaint and Motion for Preliminary Injunction 130 days after Governor Ayotte signed HB 323 into law.

144. Open Democracy filed its Complaint and Motion for Preliminary Injunction 70 days after HB 323 went into effect.

## PLAINTIFF'S PROPOSED RULINGS OF LAW

### I. Legal Standard

1. To obtain a preliminary injunction, the movant must demonstrate that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities is in their favor; and (4) an injunction is in the public interest. *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024). Plaintiff satisfies that standard here.

### II. Plaintiff Is Likely to Succeed on the Merits

#### A. Count I: HB 323 and Secretary Scanlan's April 23 Directive are Unconstitutional Burdens on the Right to Vote.

2. "The First and Fourteenth Amendments prohibit states from placing burdens on citizens' rights to vote that are not reasonably justified by states' 'important regulatory interests.'" *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983), and citing *Burdick v. Takushi*, 504 U.S. 428, 430 (1992)).

3. "[A]ny alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).

4. The "careful and meticulous" scrutinization mandated by the Supreme Court is governed by the *Anderson-Burdick* standard, which requires the court to "weigh 'the character and magnitude of the asserted injury to the'" voters' right "against 'the precise interests put forward by the State as justifications for the

burden imposed . . . .'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *N.H. Youth Movement v. Scanlan*, 833 F. Supp. 3d 93, 129 (D.N.H. 2026) ("*NHYM*").

5. The level of scrutiny applied is on a sliding scale; the greater the burden on the First and Fourteenth Amendment rights to vote, the stricter the scrutiny. *Burdick*, 504 U.S. at 434.

6. Under this regime, laws "that are not reasonably justified by states' important regulatory interests" are unconstitutional, *Common Cause R.I. v.* Gorbea, 970 F.3d 11, 14 (1st Cir. 2020) (per curiam) (citations omitted), and even "slight" burdens "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J. op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)); *NHYM*, 833 F. Supp. 3d at 130; *Count US IN v. Morales*, 832 F. Supp. 3d 857, 867 (S.D. Ind. 2025) ("*Count US IN II*").

7. The analysis must consider the entire voting system, not just the challenged law. *NHYM*, 833 F. Supp. 3d at 129 (citing *Wood v. Meadows*, 207 F.3d 708, 711 (4th Cir. 2000); *Luft v. Evers*, 963 F.3d 665, 671-72 (7th Cir. 2020)).

8. "To determine the burden, the court must consider both the statute's broad application to all voters and its heavier burden on subsets of voters." *NHYM*, 833 F. Supp. 3d at 130; *see also Count US IN II*, 832 F. Supp. 3d at 865 (S.D. Ind. 2025) ("Under *Anderson-Burdick*, a facially neutral and nondiscriminatory electoral

regulation may nonetheless warrant a higher degree of scrutiny when an identifiable 'class of voters' bears its effects").

9. This analysis of subsets of voters is established in Justice Stevens' opinion in *Crawford*, 553 U.S. at 198-99, which is the controlling opinion in that case. *See Marks v. United States*, 430 U.S. 188, 193 (1977) (when there is no majority opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds,").

10. The First Circuit adopted the same test employed in Justice Stevens' *Crawford* opinion. *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 31 n.6 (1st Cir. 2016); *see also Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (in an *Anderson-Burdick* case, while not citing *Crawford*, employing the "sliding scale" approach used by the Stevens opinion and the dissenters). Other circuits similarly take Justice Stevens' approach. *See Greater Birmingham Ministries v. Secretary of State*, 992 F.3d 1299, 1318 n. 31 (11th Cir. 2021) (collecting cases); *Brakebill v. Jaeger*, 932 F.3d 671, 677 (8th Cir. 2019); *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 387 (9th Cir. 2016); *Frank v. Walker*, 819 F.3d 384, 386–87 (7th Cir. 2016); *Lee v. Virginia State Bd. of Elections*, 843 F.3d 592, 598 (4th Cir. 2016); *cf. Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 306 (3d Cir. 2025) (quoting Justice Scalia's concurrence but also drawing on the "slight . . . burden" language from Justice Stevens' opinion).[17]

---

[17] This is also consistent with Equal Protection case law. *Bullock v. Carter*, 405 U.S. 134, 142-49 (1972) (applying something like intermediate scrutiny where a facially neutral law had a disparate impact on less affluent voters, ultimately

#### i. Obtaining State-Issued IDs is a Significant Burden that Disproportionately Impacts Young Voters.

11. New Hampshire students ages 18-24 are far less likely than older voters to have driver's licenses or passports. Plaintiff's Proposed Findings of Fact ("FOF"), ¶¶ 57-58. By suddenly excluding student IDs from the list of photo IDs that can be used to prove identity for the purpose of registering to vote and obtaining a ballot, FOF, ¶ 14—where such student IDs have been used without incident ever since the state first enacted a voter ID law in 2012, FOF, ¶ 1—New Hampshire has placed at least a significant, if not severe, burden on the right of eligible young people to vote. This is even more so where this identifiable class of voter will face significant burdens in obtaining the now more limited acceptable form of identification. *Cf. NHYM*, 833 F. Supp. 3d at 130 ("the court must consider both the statute's broad application to all voters and its heavier burden on subsets of voters.").

12. That disproportionate impact is pronounced, particularly when compared to the privilege New Hampshire gives to older voters who lack a current driver's license. FOF, ¶ 60. These voters have a *broader* set of acceptable forms of ID than other voters. For example, voters over age sixty-five can present as proof of identity driver's licenses that are expired by more than five years, FOF, ¶ 62, RSA

---

finding it unconstitutional). Although plaintiff argues the burden here is significant, *Bullock* establishes a sliding scale approach and increased scrutiny when an election statute burdens an identifiable class. *Bullock* has never been overruled. *See also Mancuso v. Taft*, 476 F.2d 187, 193 (1st Cir. 1973) (applying *Bullock*). Whether characterized as an Equal Protection Claim or a combined First and Fourteenth Amendment claim, this type of analysis is proper.

659:13, and residents of nursing homes do not need a photo ID at all to register to vote, FOF, ¶ 61, RSA 654:12(I)(d)(4).

13. New Hampshire's legislature, recognizing that voters over age sixty-five may have less access to many forms of photo ID, created an expansive list of means by which these voters can prove ID. FOF, ¶¶ 60-63. At the same time and in contrast, young voters, who also have less access to many forms of photo ID, have been stripped of the ability to rely on a form of photo ID that many young people in fact do have and worked flawlessly since the inception of the state's enactment of a voter ID law.

14. The alternative—using another form of ID—does not relieve the unconstitutional burden that this law and directive impose on young voters. Young voters are far less likely to have the still-accepted forms of ID, including a driver's license, passport, military ID, or state-issued ID card than older voters, and have fewer means to obtain such identification.

15. As has been found, the burden of obtaining a state-issued ID for the purpose of voting is significant.

16. Laws that require certain voters to take additional time to register or to vote "will deter certain voters from registering and voting entirely." *NHYM*, 833 F. Supp. 3d at 116.

17. The burden is particularly severe given the context of New Hampshire's whole voting system. *See NHYM*, 833 F. Supp. 3d at 129 (*Anderson-Burdick* analysis must consider the entire voting system).

18. These burdens are occurring in "one of the strictest voting regimes in the country[,]" even *before* HB 323 was passed. *NHYM*, 833 F. Supp. 3d at 101.

19. Specifically, "New Hampshire has severely restricted mail-in voting, has no in-person, early voting, has severely restricted mail-in or online voter registration, and does not permit "automatic voter registration, third-party registration or third-party voter registration drives, or voter registration at offices of the state's Division of Motor Vehicles." *Id.* New Hampshire does not allow provisional ballots. *Id.*, FOF, ¶ 67. Voters who relied on their student IDs to register to vote will be turned away from the ballot in September and November with no recourse. Despite being eligible voters, they will lose their right to vote.

20. New Hampshire is allowed to maintain this strict system in part because it offers same-day voter registration, which exempts New Hampshire from certain obligations under federal election law. FOF, ¶¶ 65-66; *NHYM*, 833 F. Supp. 3d at 101 (citing 52 U.S.C § 20503(b)(1)).

21. HB 323 effectively denies election-day registration to the thousands of young student voters who have reliable, non-expired photo ID (their student IDs).

22. The analysis of *Anderson-Burdick* claims necessarily are fact-specific and must be considered within the context of the state's whole voting system. *See Veasey v. Abbot*, 830 F.3d 216, 239 (5th Cir. 2016) (defendants cannot rely on *Crawford* to justify a voter ID law under the *Anderson-Burdick* standard when the state "took out all the ameliorative provisions of the Indiana law" at issue in that litigation).

23. Defendants cite inapposite rulings, in which the exclusion of student IDs were upheld only in states that provide significantly broader access to voters, including young voters. *See, e.g.*, *March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1134 (D. Idaho 2024); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 754 (M.D. Tenn. 2015) ("*NSOC*"). Idaho allows early voting, I.C. § 34-1012, and no-fee identifications at the DMV I.C. § 49-2444 (22); not the onerous and arbitrary voucher system used by New Hampshire. Tennessee allows early voting, Tenn. Code Ann. § 2-6-102, online and mail-in registration, Tenn. Code Ann. §§ 2-2-112; 2-2-115, no-fee identification at the DMV, Tenn. Code Ann. § 55-50-336, and provisional ballots, Tenn. Code Ann. § 2-7-112(e).

**ii. Banning the Use of Student IDs Furthers No Strong or Even Legitimate Interest.**

24. The *Anderson-Burdick* regime requires the court to consider "the precise interests put forward by the State as justifications for the burden imposed" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Courts must look to the "legitimacy and strength" of the state's proffered interests as well as "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson,* 460 U.S. at 789. If the effect of a law on a legitimate interest is "marginal at best[,]" the interest is not given significant weight. *Gorbea*, 970 F.3d at 15.

25. None of the alleged state interests asserted by the legislature during the legislative debates or by defendants in its brief have sufficient legitimacy or strength to justify the burdens imposed by HB 323 and Secretary Scanlan's April 23 directive. FOF, ¶¶ 76, 80-91.

26. The "state interest in regulating all phases of the electoral process, including ballot access"—raised by defendants in their brief—is inapplicable to the facts of this case. *Perez-Guzman v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003). The state's interest in regulating ballot access pertains to the placement of political parties and candidates *on* the ballot; and the interest was not merely regulation for its own sake, but rather because the power to regulate elections, particularly ballot access, "keeps the democratic process from disintegrating into chaos." *Id.* at 238-39. No such chaos is threatened by student IDs, which have been used without incident since New Hampshire first introduced a voter ID law in 2012.

27. Nor does the legislature's original purported interest—namely, the fear of fraud—justify the burden imposed on voters. Defendants, who were the same defendants in *NHYM*, recently admitted in that case that voter fraud is "'miniscule' and virtually non-existent in [New Hampshire]." *NHYM*, 833 F. Supp. 3d at 116.

28. When HB 323 was pending in the legislature, no evidence was presented that student IDs are used for voter fraud or that they are less reliable than other forms of ID. FOF, ¶¶ 76, 80-91. Consequently, supposed fraud cannot provide a legitimate (let alone "weighty") basis for the law or directive and do not warrant the burdens imposed on the right of students to vote as a matter of law.

29. Student IDs have been used since 2012 to prove identity when obtaining a ballot and when registering to vote, and the defendants have not presented a single credible instance in which a student ID was improperly issued or ever used fraudulently to vote.

30. Defendants have not presented any evidence that student IDs are used for voter fraud or that they are less reliable than other forms of ID.

31. Further, because student IDs can still be used to prove identity for the purpose of obtaining the state-issued IDs that are accepted during the voter registration process or at the polls, FOF, ¶¶ 30-31, 33, HB 323 and the April 23 directive erect a barrier to voting that does not in fact guard against any even theoretical fraud.

32. Defendants have failed to show that removing student IDs from the list of photo IDs that can be used to register to vote or to obtain a ballot, as they were permitted to be used since 2012, advances any legitimate interest. *Count US IN II*, 832 F. Supp. 3d. at 867 ("general fraud concerns" cannot justify "the elimination of a form of photo ID [(student IDs)] that has been accepted for 20 years and otherwise complies with the voter ID law's neutral requirements.").

33. HB 323 and the Secretary's directive erect serious barriers on young people's ability to vote without addressing any actual threat of fraud and without resolving the alleged problem it purportedly is intended to resolve. Defendants' citations to cases upholding the constitutionality of voter ID laws generally are inapplicable to this analysis; plaintiff challenges HB 323, not the entirety of RSA 659:13.

34. Nor, to the extent they raise it, does the state's interest in voter confidence provide a legitimate (let alone "weighty") basis for either HB 323 or the April 23 directive. New Hampshire residents' confidence in the integrity of the

state's elections prior to HB 323 is already very high, as confirmed by the Defendant Secretary's Special Committee on Voter Confidence, *NYHM*, 2026 WL 1500857, at *17, which in addition made no recommendation to eliminate student IDs, and defendants have not produced any evidence suggesting that banning student IDs would somehow increase it. In fact, plaintiff has introduced evidence that prohibiting students from using their student IDs to vote in fact *decreases* confidence in elections. FOF, ¶¶ 50-56.

35. Moreover, the legislature and the defendants cannot repeatedly advance baseless claims of fraud to justify bills that suppress young voters' access to the polls, and then assert that these bills become constitutional because some of their constituents believe the baseless claims and have may have less confidence in elections as a result.

36. Therefore, maintaining or increasing voter confidence in elections does not provide a legitimate, let alone a weighty, basis for the law; and does not justify the burden that HB 323 and Secretary Scanlan's April 23 directive place on voters.

37. Courts must look to the "legitimacy and strength" of the state's proffered interests as well as "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson,* 460 U.S. at 789; *cf. Gorbea,* 970 F.3d at 15 (if the effect of a law on a legitimate interest is "marginal at best[,]" the interest is not given significant weight.

38. HB 323 and Secretary Scanlan's April 23 directive significantly impose a burden on the right to vote, both individually and collectively, that is not justified

by any evidence of a sufficiently weighty legitimate state interest, much less one that is "necessary." Accordingly, plaintiff is likely to succeed on the merits of their claim that the statute violates the First and Fourteenth Amendments.

### B. Count II: HB 323 Violates The Twenty-Sixth Amendment.

39. The Twenty-Sixth Amendment to the United States Constitution guarantees that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by ay State on account of age."

40. Under the Twenty-Sixth Amendment, "if a condition, not insignificant, disproportionately affects the voting rights of citizens specially protected by [the amendment], the burden must shift to the governmental unit to show how the statutory scheme effectuates, in the least drastic way, some compelling governmental objective." *Walgren v. Howes*, 482 F.2d 95, 102 (1st Cir. 1973).

41. Banning the use of student IDs, as discussed above, is a significant burden that disproportionately affects young voters, particularly those between eighteen and twenty-four, and heaviest and most significant on voters aged eighteen to twenty. FOF, ¶ 59. The conditions imposed by HB 323 and Secretary Scanlan's April 23 directive are at the very least "not insignificant," and therefore trigger strict scrutiny under *Walgren*. Young voters are far less likely than other eligible voters to have the still-accepted forms of ID, including a driver's license, passport, military ID, or state-issued ID card than older voters, and have fewer means to obtain such identification. FOF, ¶¶ 26-27, 35-49.

42. Because, as discussed above, HB 323 and the April 23 directive fail to advance any legitimate interest weighty enough to justify the burden they place on the ability of young voters to vote, it necessarily fails strict scrutiny.

43. Defendants presented no evidence that New Hampshire elections have experienced any significant amount of fraud; and no evidence that anyone has improperly obtained a student ID or used a student ID to fraudulently vote in New Hampshire. FOF, ¶¶ 76, 80-91.

44. Further, removing student IDs that meet all the qualifications required of other forms of accepted ID would not prevent even defendants' hypothetical fraud claims, because these student IDs can be used, in conjunction with other documents that must also be presented by eligible voters in order to register to vote, to obtain other forms of voter ID that can still be used to prove ID for the purpose of registering to vote and obtaining a ballot. FOF, ¶¶ 30-31, 33.

45. Moreover, as found, neither HB 323 nor Secretary Scanlan's April 23 directive has been shown to increase confidence in elections, which is already high, and will instead be undermined by the elimination of student IDs. Finally, even if increasing voter confidence were a legitimate goal, neither the HB 323 nor the directive is the "least drastic" solution to advancing those interests.

46. Furthermore, the legislature and the defendants cannot repeatedly advance baseless claims of fraud to justify bills that suppress young voters' access to the polls, and then assert that these bills become constitutional because some of

their constituents believe the baseless claims and have may have less confidence in elections as a result.

47. The tests for analyzing Twenty-Sixth amendment claims adopted by the Fourth Circuit, *see Grant v. Belangia*, __ F.4th __, No. 25-1413, 2026 WL 2409681 at *9, 12 (4th Cir. Aug. 18, 2026) (a state's voting laws must be "administered without discrimination based on a protected characteristic. . . plaintiffs must have the same access to the ballot provided to the favored group of voters") or the Seventh Circuit, *see Tully v. Okeson*, 78 F.4th 377, 386-87 (7th Cir. 2025) ("an 'abridgement' must involve the imposition of a 'material requirement'" or a "material burden on the exercise of the franchise"), are inconsistent with the law established by the First Circuit in *Walgren.* 482 F.2d at 102 (if a non-insignificant condition disproportionately affects citizens specially protected by the Twenty-Sixth Amendment, then the statutory scheme is constitutional only if the government can show that it effects a "compelling government objective" in "the least drastic way"). Accordingly, those tests have no application in this case.

48. Notwithstanding the foregoing, even applying either the Fourth Circuit or Seventh Circuit tests, the plaintiffs are still likely to succeed on the merits of this claim.

49. Under the test as applied in the Fourth Circuit, an "abridgement" of the right to vote under the Twenty-Sixth Amendment occurs where a challenged law "make[s] it harder for voters [of a certain age] to vote as compared to voters [of a different age]." *Grant*, 2026 WL 2409681, at *9.

50. As has been found, HB 323 makes it more difficult for young voters to register to vote and obtain a ballot than older voters, and young voters have less need of other forms of still-accepted forms of photo ID, and less access to and fewer resources to enable them to obtain these other forms of photo ID when compared to other eligible voter age groups.

51. Further, the only other eligible voter age group that may face similar limitations in accessing some forms of photo ID are voters over age sixty-five. New Hampshire has given these voters a *broader* set of acceptable forms of ID than other voters (for example, voters over age sixty-five can present driver's licenses that are expired by more than five years as proof of identity, RSA 659:13, and residents of nursing homes do not need a photo ID at all to register to vote, RSA 654:12(I)(d)(4)). FOF, ¶¶ 60-62.

52. As found, having recognized that voters over age sixty-five may have less access to many forms of photo ID, New Hampshire created an expansive list of means by which these voters can prove ID. But young voters, who also have less access to many forms of photo ID, have now been stripped of the ability to rely on a form of photo ID that many young people do have.

53. Accordingly, plaintiff has established an "abridgement" of the ability of young people to vote as suggested by *Grant*.

54. Further, under the interpretation of the Twenty-Sixth Amendment applied in the Seventh Circuit, an "abridgement" of the right to vote under the Twenty-Sixth Amendment occurs when there is a "material requirement" on the

right to vote or when voters are worse off as a result. *Tully v. Okeson*, 78 F.4th 377, 386-87 (7th Cir. 2023); *Count US IN II*, 832 F. Supp. 3d. at 869-70.

55. Under either of these tests, HB 323 and the Secretary's directive violate the Twenty-Sixth Amendment. Young voters are worse off than they had been prior to the passage of HB 323 in terms of being able to establish their identity so as to register to vote and to obtain a ballot to cast their vote. And HB 323 imposes a material requirement on young voters. Instead of being able to use their readily available student IDs, they must bear the expense and burdens of obtaining different ID—which, as noted, they can obtain only by paying a fee and/or making unnecessary and multiple trips to various government agencies that have few offices, limited hours, and (in the case of the DMV) operate by appointment only and are often not readily accessible. Additionally, because, as found, HB 323 requires a trip to the DMV to obtain the ID and then another trip to the town or city clerk to register and vote, young voters are effectively precluded from engaging in same day registration and voting, the predominant process in New Hampshire.

56. Because HB 323 and the April 23 directive directly and adversely impacts voters aged 18-21 more than any other class of voters and the state has no state interest weighty enough to justify it, it violates the Twenty-Sixth Amendment under *Walgren*; plaintiff need not make any further showing of discriminatory animus.

57. But even if this court were to apply the *Arlington Heights* standard for assessing intentional racial discrimination claims to plaintiff's Twenty-Sixth

Amendment claim, plaintiffs are still likely to succeed. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) (in a lawsuit asserting racial discrimination in a housing development scheme, establishing the standards for determining whether plaintiffs have demonstrated that defendants acted with racially discriminatory intent or purpose); *see also Grant*, 2026 WL 2409681, at *10 n.8 (The Fourth Circuit has suggested that *Arlington Heights* would apply to a facially neutral law challenged under the Twenty-Sixth Amendment).

58. In considering whether the abridgment is the result of discriminatory animus, a court will consider disparate impact, historical background, and legislative history. *Arlington Heights*, 429 U.S. at 266-68. All three elements are satisfied here.

59. First, as found, HB 323 and Secretary Scanlan's April 23 directive, individually and jointly, impose a "stark" and disparate burden on voting on young voters. *Anderson ex rel. Dowd v. Boston*, 375 F.3d 71, 89 (1st Cir. 2004).

60. Second, the legislative history reveals that the purported justifications for HB 323—combatting voter fraud and encouraging confidence in elections—were pretextual. FOF, ¶¶ 68-106; *Cf. Id.* at 85-88 (considering the goals of the legislators in applying *Arlington Heights*). As found, New Hampshire voters are already confident in their elections and New Hampshire legislatures had access to the Secretary's Commission on Voter Confidence making findings to that effect. FOF, ¶¶ 85-90. The legislature produced or considered *no* evidence of voter fraud, let alone student ID-driven voter fraud, nor any evidence that student IDs were less reliable

than other forms of identification. Indeed, those same student IDs can be used to obtain the still-accepted form of voter IDs. To the contrary, legislators heard testimony that student IDs were in fact reliable. FOF, ¶¶ 76-84.

61. During debates, legislators repeatedly misstated New Hampshire law to justify HB 323. FOF, ¶¶ 96-106. Several legislators referenced concerns about proving domicile and citizenship, even though student IDs could not and had never been used to prove domicile or citizenship. *Id.* Some legislators claimed that student IDs lacked expiration dates. *Id.* Those cards—if they exist—would not have been valid forms of identification even prior to HB 323. *Id.* Some legislators referenced the registration process, even though HB 323 did not amend the registration process. *Id.*

62. Third, and finally, HB 323 is not the first time that a legislature has raised pretextual concerns about domicile or fraud to try to justify laws that suppress younger voters. *Cf. Anderson ex rel. Dowd*, 375 F.3d at 83-85 (considering the history of segregation in applying *Arlington Heights* in the school context).

63. There is an unfortunate national tradition of using pretextual concerns about domicile to discriminate against young voters. *United States v. State of Texas*, 445 F. Supp. 1245, 1260–61 (S.D. Tex. 1978), *summarily affirmed*, *Symm v. United States*, 439 U.S. 1105 (1979) (a registrar's practice of refusing to register the vast majority of students to vote on the grounds students could not generally establish domicile violated the Twenty-Sixth Amendment); *Sloane v. Smith*, 351 F. Supp. 1299, 1305 (M.D. Pa. 1972) (holding that county procedures that used special

rules for proving domicile only applicable to students violated the Twenty-Sixth Amendment); *Jolicoeur v. Mihaly*, 5 Cal. 3d 565, 575, 488 P.2d 1, 7 (1971) (holding that a policy of considering the domicile of an unmarried person under twenty-one to be the domicile of their parents violated the Twenty-Sixth Amendment); *see also Bright v. Baesler*, 336 F. Supp. 527, 533 (E.D. Ky. 1971) (holding that special rules for proving domicile only applicable to students violated the Equal Protection Clause).

64. New Hampshire likewise has a history of attempting to use domicile regulations to disenfranchise young voters. For example, in 2013, New Hampshire enacted SB 318, which required residents to acknowledge on voter registration forms that they were bound by state residency requirements to register vehicles and apply for state driver's licenses, which placed a burden on college students coming to New Hampshire from other states. The New Hampshire Supreme Court permanently enjoined SB 318 in *Guare v. New Hampshire*, 167 N.H. 658, 669 (2015). In 2017, the state enacted SB 3, requiring persons registering to vote to present documentary evidence of their intent to be domiciled in New Hampshire. The Superior Court enjoined that law as well, finding that it "impacts certain voters more than others," including college students, rendering it in violation of the New Hampshire Equal Protection Clause. *League of Women Voters of N.H. v. Gardner*, No. 226-2017-CV- 00433, 2020 N.H. Super. LEXIS 39, at *74 (N.H. Super. Apr. 8, 2020). The New Hampshire Supreme Court affirmed the injunction, concluding that SB3 "imposes unreasonable burdens on the right to vote" without being

substantially related to an important governmental objective." *N.H. Democratic Party v. Sec'y of State*, 174 N.H. 312, 321, 332 (2021). In 2024, the state passed HB 1569, eliminating the use of a qualified voter affidavit to prove citizenship when voting. When the statute was challenged, this Court found that the affidavit was disproportionately used by younger voters. *NHYM*, 833 F. Supp. 3d at 134. New Hampshire then passed HB 464, establishing prior voter registration as proof of citizenship. Older voters were thus spared from having to produce documentation of citizenship, while first-time voters, who are overwhelmingly young, were compelled to produce documentation. *Id.* at 135. HB 1569 was permanently enjoined this year, where this Court found that "HB 1569's elimination of the [affidavit] . . . is an unjustifiable burden on the right to vote in violation of the First and Fourteenth Amendments." *Id.* at 140.

65. In this case, several factors demonstrate that the legislature acted with discriminatory animus and intentionally sought to disenfranchise young persons: (a) both in New Hampshire and across the country, there is a long history of legislatures seeking to evade the requirements of the Twenty-Sixth Amendment by passing laws that burden and disenfranchise young voters; (b) the legislature passed the law without receiving any evidence of student ID voter fraud; (c) the legislature advanced an incoherent and pretextual focus on claims that student IDs provide insufficient basis for establishing domicile, even though the law in fact excluded student IDs from the list of documents accepted for proof of *identity*, not domicile, and indeed student IDs—like passports—typically do not contain a

student's address and therefore would not be used to establish domicile; and (d) Neither HB 323 nor the April 23 would address possible student ID fraud, if it were a legitimate concern, because still-accepted forms of ID can be obtained by producing the student ID as proof of identity along with other documents that are also required for purposes of registering to vote.

66. For the same reasons, Secretary Scanlan's April 23 directive was also issued with discriminatory animus for the purpose of disenfranchising young voters.

67. Accordingly, under any possible test, whether it be the controlling standard established by the First Circuit in *Walgren,* the "abridgement" tests applied in the Fourth and Seventh Circuits, or under *Arlington Heights*, plaintiff is likely to succeed on its Twenty-Sixth Amendment claim.

### C. Count III: HB 323 Violates the Equal Protection Clause of the Fourteenth Amendment.

68. The Fourteenth Amendment guarantees equal protection of the laws, including "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (citations omitted).

69. Equal protection claims are not limited to "suspect classes." Although wealth is not a suspect class, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973), election statues that burden less affluent voters triggers intermediate scrutiny. *Bullock v. Carter*, 405 U.S. 134, 142-43 (1972) (finding that candidate filing fees burdened the right to vote by discriminating against less affluent candidates and therefore, less affluent voters).

70. The Fourth Circuit's recent Equal Protection ruling—that an age-based voting restriction cannot sustain an equal protection claim because age is not a suspect class—is unpersuasive. *Grant*, 2026 WL 2409681, at *12; *see also Donahue v. City of Bos.*, 371 F.3d 7, 15-16 (1st Cir. 2004) (discussing age discrimination outside of the election context).

71. Having set a voting age, burdens on voters of a certain age are cognizable harms under the Equal Protection Clause. *See, e.g.*, *Luft v. Evers*, 963 F.3d 665, 677 (7th Cir. 2020) (requiring additional documentation from students who present student IDs violated the Equal Protection Clause); *Bright v. Baesler*, 336 F. Supp. 527, 533 (E.D. Ky. 1971) (special rules for proving domicile only applicable to students violated the Equal Protection Clause). This includes burdens that indirectly restrict a class of voters. *See Bullock*, 405 U.S. at 142-43.

72. HB 323 discriminates against young voters by invalidating a form of identification—student IDs—disproportionately used by 18-24 year olds without any evidence that student IDs are unreliable or vulnerable to fraud and knowing that voters over the age of 24 would not be similarly burdened as they have greater access to other forms of identification that the statute deems acceptable but are not as accessible to young voters.

73. By making driver's licenses, passports, and state-issued identification cards the primary form of identification and eliminating the use of student IDs, HB 323 disadvantages young voters and favors older voters who either are far more likely to possess such means of identification; or who are eligible for exemptions

that New Hampshire makes available to voters over a certain age but denies to younger voters.

74. New Hampshire has two groups of voters who are least likely to have or be able to obtain unexpired government ID; although the state has provided one such group—namely, voters over age sixty-five—with an expanded set of accepted means by which they may prove their identity for the purpose of voting, the state has, with HB 323 and the April 23 directive, prohibited the other group—namely, young voters—from using the form of reliable ID that is most commonly and readily accessible to them. Because of these burdens, HB 323 and Secretary Scanlan's April 23 directive must be "closely scrutinized and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." *Bullock*, 405 U.S. at 144.

75. For the reasons above, HB 323 and Secretary Scanlan's April 23 directive fail to advance any legitimate state interest, or do so "by totally arbitrary means," *Bullock*, 405 U.S. at 144, and are therefore unconstitutional.

76. Accordingly, plaintiff is likely to succeed on its Fourteenth Amendment Equal Protection claim.

## III. PLAINTIFF WILL BE IRREPARABLY HARMED IN THE ABSENCE OF PRELIMINARY RELIEF

77. "'[V]oting is of the most fundamental significance under our constitutional structure.' As such, courts routinely find that restrictions on the right to vote constitute irreparable harm. . . . 'As has been held by numerous other courts, a violation of the right to vote is presumptively an irreparable harm. Because an

individual cannot vote after an election has passed, it is clear that the wrongful disenfranchisement of a registered voter would cause irreparable harm without an adequate remedy at law.'" *Count US IN v. Morales,* 830 F. Supp. 3d 753, 774 (S.D. Ind. 2026) ("*Count US IN I*") (internal citations omitted). Simply put, "[a] restriction on the fundamental right to vote . . . constitutes irreparable injury." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012) ("Because we conclude that plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well.") (citations omitted).

78. This is especially true in New Hampshire, which does not have provisional ballots. FOF, ¶ 67. If a clerk determines that a voter does not have an acceptable form of photo identification, then that voter cannot vote provisionally and then cure or dispute the alleged defect later. They will be wholly and entirely denied the opportunity to cast their ballot.

79. Young voters who are unable to secure a new form of ID—whether because they cannot obtain a waiver, cannot afford the $20 fee for a state-issued ID, or do not have ready access to a DMV or the ability to get to both the clerk's office and the DMV for election day registration and voting—will be wholly barred from voting, an irreparable harm. For many voters, this means losing their first opportunity to cast a ballot; and increasing the likelihood that they become habitual non-voters. FOF, ¶ 50.

80. This analysis holds true for plaintiff, whose interest is in protecting the constitutional rights of others. *Cf. Husted*, 697 F.3d at 436 (same analysis applies where sole plaintiff is a voting rights organization). If the injunction is not granted, plaintiff's goal of registering as many eligible voters and ensuring as many eligible voters participate in the 2026 elections as possible will be irreversibly thwarted, and their goal of increasing the percentage of registered 18-year-olds will stall and be undermined.

81. Without relief, plaintiff will have to continue diverting scant resources toward trying to assist eligible potential young voters in overcoming the burdens imposed upon them by HB 323 and Secretary Scanlan's April 23 directive; and they will have fewer human, financial, and time resources to complete its core missions, including both its goal of registering young voters and its effort to collect, analyze, and share with the public campaign finance data so that the public can stay informed about candidates and their donors. FOF, ¶¶ 128-30, 138, 140. These resources cannot be recouped, and the damage to their core mission cannot be mitigated by later-granted relief.

## IV. BALANCE OF HARMS AND THE PUBLIC INTEREST REQUIRE GRANTING INJUNCTIVE RELIEF AGAINST HB 323 AND PURCELL PROVIDES NO BASIS TO DENY IT

82. The "balancing of the equities and analysis of the public interest . . . 'merge when the [g]overnment is the opposing party.'" *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Where, as here, the plaintiff is likely to prevail on a constitutional claim, "the balance of harms normally favors granting preliminary injunctive relief because the public

interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012) (citation omitted).

83. The public interest weighs in favor of granting an injunction because the public has a strong interest in exercising the" fundamental political right to vote." *Dunn*, 405 U.S. at 336.

84. The "Purcell" principle does not counsel against or undermine the necessity of the preliminary injunction sought here.

85. *Purcell v.* Gonzalez*,* 549 U.S. 1 (2006), and the related case law require this court to examine "the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring in the grant of application for stays) (emphasis added). It is intended to be an application of equitable principles to ensure that federal courts do not cause harm to innocent bystanders, namely candidates and voters, with disruptive injunctions.

86. *Purcell*'s heightened standard is not appropriate, where, as here, "the primary reason for applying that standard—risk of voter confusion—[is] lacking." *NHYM*, 833 F. Supp. 3d at 150 (quoting *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *2 (11th Cir. Nov. 7, 2022)).

87. There is no risk of voter confusion presented by a grant of a preliminary injunction. Use of student IDs to establish identity has been the practice in New Hampshire ever since there has been a voter ID law in the state.

FOF, ¶ 1. There has yet to be any election where student IDs have not been accepted. Accordingly, an injunction preventing implementation of HB 323 barring the use of student IDs will preserve the status quo. *NHYM*, 833 F. Supp. 3d at 150 (making a similar point with regard to qualified voter affidavits). Indeed, it will decrease confusion caused by HB 323 among young voters who attempt to identify themselves with their student ID. *Cf. Kim v. Hanlon,* 99 F.4th 140, 160 (3d Cir. 2024) (affirming a preliminary injunction and rejecting a *Purcell* defense because while "[t]he focus of the Purcell principle . . . is on avoiding election issues that could lead to voter confusion shortly before an election," the injunction would in fact "reduce, if not eliminate voter confusion" caused by the challenged law).

88. This is not a situation where an injunction will necessitate the clerk's offices to implement and voters to negotiate a complicated, new election regimen. It will necessitate an email—akin to the April 23 directive—and enable clerks, election volunteers, and voters to apply the same voter ID rules that they have been applying since New Hampshire's 2012 voter ID law went into effect; and ensure that young voters who show up to vote with the expectation of proving their identity using their student IDs will be able to do so.

89. Nor, as a practical matter, can there be any real-world harm resulting from a preliminary injunction. Voters who do not wish to rely on a student ID to establish identity will not be affected. Those who wish to continue to use their student ID to exercise their fundamental right to vote will be permitted to continue to do so. Those who do not learn for some reason of the stay of implementation of

HB 323 and do not vote because they do not have another form of ID and mistakenly believe they cannot continue to use their student ID will be no worse off as a result of the injunction than they were before it.

90. Conversely, denying the injunction will cause more harm to that voter group by preventing, not just some, but all, of them from voting with their student IDs, while granting the injunction will cause no harm to any other voter group.

91. This is *not* a case where at a late date very close to the election a candidate is to be added or dropped or a voting district is to be redrawn, so that voters cannot be sure who their eligible slate of candidates is to be or where they are to vote.

92. In sum, there is no *Purcell* issue because the potential of "confusion" is virtually non-existent and no voter will be placed in a disadvantaged position as a result of granting the injunction.

93. For the same reasons, the fact that so-called "mail-in balloting" is already in process does not present any basis for negating injunctive relief. New Hampshire does not allow no-excuses mail-in voting, permits "absentee ballot" voting only under narrow circumstances, and requires applicants to submit a photo ID meeting the requirements of RSA 659:13, II(a). Enabling applicants to now submit student ID as proof of identity will not confuse the process or the applicants. Those who have already obtained their absentee ballots will not be affected either way. Those who were unable to obtain an absentee ballot because of HB 323 and the April 23 directive would now at least have some remaining window left in which to

obtain an absentee ballot. If some voters are not able to obtain a ballot in this manner, they are not any worse off than they were prior to the injunction. On the whole, an injunction would still clarify the process and ensure that eligible voters have an opportunity to secure and case their absentee ballot using the forms of ID in their possession. No other voter group will be unfairly harmed by allowing students to obtain an absentee ballot following the grant of an injunction.

94. The voting process can only benefit from the issuance of the injunction, as more people will be able to exercise their fundamental right of franchise without causing any harm or disruption to the election process.

95. Whether or not defendants have undertaken to advertise or train on the new law is of limited relevance, particularly since defendants undertake advertisements and training on new laws consistently around every election; this court is not ordering them to undo every action they took between June and August; it is ordering them to take reasonable steps to inform clerks and the electorate as possible of the change, which may necessitate little more than an email and a withdrawal of announcements that tell students that they can no longer vote if they only have their student IDs.

96. Further, the purported harm defendants claim to have suffered by implementing the HB323 over the last several months, would not be addressed or ameliorated by denying the preliminary injunction. To the contrary, because the plaintiff is likely to succeed on the merits of its claims, denying the preliminary injunction will only extend and exacerbate that asserted harm by leading the

defendants to continue implementing the law until it is ultimately struck down. The longer this case continues without interim relief, the more work defendants will have to do to re-educate town clerks, volunteers, and voters once permanent relief is granted. Thus far, *no* elections have taken place under the new and unconstitutional rule; if an injunction is granted now, town clerks will be able to accept student IDs as proof of identity as they have done in all elections since New Hampshire's voter ID law went into effect; and will not have to turn away any voters from the polls for only having a student ID as proof of identity. The work not just for defendants but for town clerks and other election officials increases if the preliminary injunction is denied, the unconstitutional law goes into effect, they are forced to turn away eligible voters during both the registration and voting process for at least one election cycle, only for the law later to be held unconstitutional and permanently enjoined.

*97.* Cases involving significant change to the administration of elections, or involve last-minute challenges to well-established election laws, are inapplicable here.

*98.* For example, challenges to laws that regulate candidates create different and more serious logistical problems. Candidates must register months before an election, *see, e.g.*, RSA 655:14, and need time to pitch themselves to voters. *See, e.g.*, *Respect Maine PAC v. McKee*, 622 F.3d 13, 14-16 (1st Cir. 2010) (affirming a district court's refusal to grant a preliminary injunction enjoining a law that

provided matching funds for candidates that participated in the challenged program, finding it would have caused confusion and harm to "all candidates").

99. Similarly, an injunction that merely allows election officials to accept student ID as they have always done is distinct from redistricting cases, which similarly require some lead time to ensure that all voters and candidates know where they are voting and running for office. *Merrill*, 142 S. Ct. at 880 ("individuals and entities now do not know who will be running against whom . . . Filing deadlines need to be met, but candidates cannot be sure what district they need to file for . . . some potential candidates do not even know which district they live in.") (Kavanaugh, J., concurring in the grant of application for stays).

100. Instead, even if voters who have other forms of valid IDs were "confused" by voters using student IDs to vote—and it is not clear why they would be, or why that confusion could not be easily rectified—that confusion is not the type of harm *Purcell* is concerned with because it would not affect or undermine the ability of that voter to cast his or her own ballot.

101. The Seventh Circuit's decision in *Count US IN v. Morales*, 172 F.4th 974, 976 (7th Cir. 2026), is distinguishable, was wrongly decided, and is unpersuasive. The Seventh Circuit characterized the district court's injunction barring enforcement of Indiana's Senate Bill 10 and allowing student IDs to be used in the upcoming election as "midstream relief on what amounts to a matter of *voter eligibility*," and therefore held it was a "clear violation of *Purcell*." *Id.* (emphasis added).

102. That was incorrect with respect to Indiana and is certainly incorrect with respect to HB323 and Secretary Scanlan's April 23 directive. HB 323 and the Secretary's directive do not change who is eligible to vote; they change the means by which eligible voters *prove* their eligibility. By the same token, plaintiff's proposed preliminary injunction does not alter eligibility to vote, rendering the Seventh Circuit's analysis inapplicable here.

103. The Seventh Circuit's decision is also unpersuasive and inapplicable here because it failed to cite or discuss any evidence of voter confusion to support invocation of *Purcell*.

104. In this case, defendants have failed to demonstrate a risk of voter confusion. Returning to the status quo—which has been in place for all elections since New Hampshire implemented its 2012 voter ID law—will not prejudice the defendants, nor cause prejudicial confusion to election officials or to voters; and will indeed reduce confusion created by HB 323 and the April 23 directive. Therefore, the concerns that animate the Purcell principle are not applicable to plaintiff's proposed injunction.

105. Furthermore, it is well within this court's power to grant late-breaking injunctions, especially when fundamental constitutional rights are at stake. *We the People PAC v. Bellows*, 40 F.4th 1, 7, 25 (1st Cir. 2022) (ruling that the district court did not err where it created an expedited preliminary injunction process after plaintiffs filed on December 31 and required relief prior to a February 16 deadline). While the injunction will not completely cure the harms caused by HB 323 and the

April 23 directive, it will limit them with no significant cost and no risk of harmful confusion to either voters or candidates.

## V. PLAINTIFF OPEN DEMOCRACY HAS SUFFERED INJURY FROM HB 323 AND HAS STANDING

106. Organizational standing is proper when a challenged law "directly affect[s] and interfere[s] with [plaintiff's] core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

107. This occurs when a challenged action or law "perceptibly impair[s]" that core business activity and there is a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982),

108. Under this standard, organizational standing is proper when "the challenged conduct frustrated [plaintiff's] organizational missions and [t]hey diverted resources to combat that conduct." *Town of Milton v. FAA*, 87 F.4th 91, 99 (1st Cir. 2023).

109. Courts will not find organizational standing where the organization merely expends resources to support, oppose, or generally educate the public about a law. *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 320 (5th Cir. 2025) (organization lacked standing where it diverted resources to advocate against regulation and educate the public about its effects); *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (organization lacked standing where it diverted resources to for "prelitigation" costs and advocacy); *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (organization lacked standing where it diverted resources to "inquir[e] into the operation and consequences of interstate handgun transfer provisions"); *Coal.*

*for Humane Immigrant Rights v. Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 88 (D.D.C. 2025) (organization lacked standing when alleged harm was requirement was to "educate its members" about law). However, these cases are inapplicable when the plaintiff, as here, is not only engaged in issue advocacy and general education.

110. Applying those standards, this Court recently held, in a separate case, that plaintiff Open Democracy suffers injury when New Hampshire burdens voters, especially young voters, in the exercise of their right to vote, and because such injury would be redressed by the judicial relief sought here, it has standing to challenge the constitutionality of those restrictive actions of the state. *NHYM*, 833 F. Supp. 3d at 125-26.

111. Open Democracy's organizational mission includes campaign finance reform; ensuring that every eligible New Hampshire adult has ability to vote; and fair redistricting. FOF, ¶¶ 110-13, 133. To accomplish its voting rights goals, Open Democracy conducts voter registration activities, has a high school voter registration program, and carries out voter education. FOF, ¶¶ 110; *NHYM*, 833 F. Supp. 3d at 125-26.

112. Part of its mission is to achieve a 100% of voter registration by eligible eighteen-year-olds in the state, a mission it works toward by hosting high school registration drives, employing a high school voter registration coordinator, and hiring summer interns to support this work. FOF, ¶¶ 115-18. It created a tool kit

including sample letters to parents, sample letters to town clerks and social media posts. FOF, ¶ 116.

113. All of these activities are compromised by HB 323 and Secretary Scanlan's April 23 directive. It has had to divert its resources toward revising these materials and developing new materials that will help students and election officers navigate the newly burdensome voting system; and toward helping students who are eligible to vote but lack an acceptable form of identification and the means to get such a form of identification. Plaintiff is fundraising to help voters pay fees associated with obtaining identification, FOF, ¶¶ 128-29, and is working to educate town clerks and DMV officials about a voucher system that is virtually never used, *id.* ¶¶ 43, 135. Both its full-time high school registration coordinator and its summer interns have had to take on new and different obligations to alleviate the burden that HB 323 and the April 23 directive has placed on the voters they serve.

114. Open Democracy has standing to challenge HB 323 and Secretary Scanlan's April 23 directive because they force the organization to divert its resources away from its mission and core activities. FOF, ¶¶ 128-30; s*ee also NHYM*, 833 F. Supp. 3d at 125-26; *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 57-58 (D.D.C. 2025) (holding voting rights organization has organizational standing to challenge executive order forcing plaintiffs "to update educational information" and "invest additional resources in training their staff and volunteers"); *E.Q. v. U.S. Dep't of Homeland Sec.*, No. 25-CV-791, 2026 WL 946181, at *12 (D.D.C. Apr. 8, 2026) (standing found where

change in rules compel plaintiff to reconfigure their programming and representation).

115. Open Democracy has had to divert money and human resources toward combatting the effect of HB 323 and the April 23 directive on voters in the communities it serves, leaving fewer resources for its other programs. FOF, ¶ 140. HB 323 and the April 23 directive are also directly undermining its mission to help high school students register to vote. *Id.*

116. Though Open Democracy can still run voter registration drives, fewer students will be able to register at those drives, and it will take Open Democracy longer to help those students who lack or do not carry an acceptable form of ID, even though those students have student IDs. The facts are comparable to *Havens*, in which plaintiffs had standing even though they continued to offer counseling services to potential homeowners and renters, because defendants' conduct undermined the effectiveness of that counseling and interfered in the plaintiff's ability to actually find homes for their clients. 455 U.S. at 379.

117. Plaintiff has also established that there is a significant population of 18-24-year-olds who lack access to driver's licenses, passports, and military IDs, FOF, ¶ 59, but who have student IDs. Open Democracy has previously organized and supported registration drives at schools in which students presented student IDs to register to vote; now, they cannot. Plaintiff has already begun helping individual young eligible voters that are burdened by HB 323. FOF, ¶¶ 132-33, 136-38.

118. Finally, prospective relief is available. Indeed, defendants' own actions prove as much: they have successfully complied with the prospective relief this court ordered in *NHYM*, 833 F. Supp. 3d at 150, and qualified voter affidavits have been allowed to prove citizenship in registration in New Hampshire for the last several months.

## VI. LACHES IS NOT APPLICABLE.

119. Defendants have not demonstrated that the preliminary injunction motion is barred by laches. A party asserting laches must show that "(1) that the plaintiff's delay in bringing its claim was unreasonable, and (2) that the delay resulted in prejudice to the defendant." *Concord Hosp., Inc. v. N.H. HHS*, 743 F. Supp. 3d 325, 353 (D.N.H. 2024) (citing *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989)).

120. Laches is an affirmative defense and the defendant bears the burden of proof. *Id.*

121. Defendants cite no case in which laches has been applied to bar a preliminary injunction in a voting rights case.

122. Instead, defendants rely on cases denying preliminary relief under a balance of harms analysis in markedly different circumstances than this case. Specifically, defendants rely on cases in which the challenged laws had been in place for extensive periods of time, including through multiple election cycles, and the plaintiffs presented no new grounds to challenge the laws. *See Respect Maine PAC*, 622 F.3d at 16 (in which plaintiffs challenged independent expenditure reporting, a campaign contribution limit, and a matching public funds scheme that

had been in place for over a decade and the grounds for challenge were available for two years); *Colon-Marrero v. Conty-Perez*, 703 F.3d 134, 138-39 (1st Cir. 2012) (plaintiff challenged her removal from the voter roll and sought to "disrupt long-standing election procedures" to reactive the registrations of 200,000 voters on the eve of an election years after her removal). In both cases, the courts declined to grant preliminary injunction because the "emergency [was] largely one of [plaintiff's] own making." *Respect Maine PAC*, 622 F.3d at 16 *and* the injunctions would cause significant confusion.

123. In contrast, Plaintiff brought this case 70 days after HB 323 went into effect, just months after it was signed into law, before any elections took place under the new regime, FOF, ¶¶ 141-44, and requests an injunction that will merely allow eligible voters to prove identity using a form of identification that has been accepted by every poll worker at every New Hampshire election since it first began requiring proof of ID at the polls. Given the complexities of voting rights litigation in New Hampshire, plaintiff did not unreasonably delay its litigation, and an injunction will neither disrupt the election process nor confuse voters. Because there was no unreasonable delay, laches is inapplicable.

124. Furthermore, as evidenced by the defendants' own conduct in this and other matters concerning fast-moving election policies, granting an injunction would not be prejudicial, while denying preliminary relief will only extend the purported harm.

125. The April 23 directive was issued via a single email sent to election clerks, FOF, ¶ 16; the directive can be rescinded in the same manner. That cannot be prejudicial.

126. Moreover, the feasibility of relief is made apparent by Secretary Scanlan's own inconsistent conduct with regard to the injunction issued in another voting case, *NYHM*. On May 29, 2026, the day after the ruling in *NHYM*, Secretary Scanlan issued an email to all clerks explaining that qualified voter affidavits now would be available for the fall election in light of the injunction. FOF, ¶ 107. Indeed, on June 19, 2026, Secretary Scanlan's office sent out another email, explaining that the pending appeal would *not* affect the rule until and unless a stay was granted. FOF, ¶ 108. Nothing prevents Secretary Scanlan from doing the same here.

127. Accordingly, since May of this year (which is even *earlier* than the June effective date of HB 323) the rule in effect with regard to the upcoming elections with respect to an important election process – the use of qualified voter affidavits – has been that such affidavits may be used. Indeed, the defendant Secretary sent extensive notification of this fact to all the clerks in New Hampshire. Notwithstanding that fact, in the continuing litigation under *NYHM* now pending before the First Circuit, defendants moved on August 5, 2026, to stay the injunction issued by this Court on May 28, 2026, so that it could *change voter documentation rules* in time for the November election. FOF, ¶ 109. Defendants did not move for an expedited schedule or otherwise explain how they would reissue posters, re-purchase radio advertisements, etc., to change the required rule in time. Thus, in

that instance defendants did not suggest that changing the voting rules in effect close to the election—which rules were broadly published to the city and town clerks—would or should adversely impact the elections such that the change being sought by the defendant should not be made. There is no reason why the change sought by the Secretary in that case is permissible, while the constitutional infirmity sought to be corrected by the injunction sought here should be negated.

128. Finally, as discussed above with respect to Purcell, denying the injunction where the plaintiffs have established a likelihood of success on the merits would not eliminate the harm asserted by defendants – time and resources spent implementing HB323 – but would extend it and exacerbate it by leaving defendants to continue implementing HB323 through one or more election cycles until it is ultimately struck down. For this additional reason, defendants' laches argument fails.

## VII. NO NEED FOR A BOND

129. "A district court has 'substantial discretion to dictate the terms of an injunction bond.'" *HCC Specialty Underwriters, Inc. v. Woodbury*, 289 F. Supp. 3d 303, 330 (D.N.H. 2018) (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991)). In non-commercial cases, such as this one, the Court considers the financial hardship a bond requirement would impose on the applicant, the risk of loss or damages an injunction would impose on defendants, or whether the suit is to enforce important federal rights or public interests. *See Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982),

*rev'd on other grounds*, 467 U.S. 526 (1984). All of these factors weigh against issuing a bond. Plaintiff is a non-profit organization that would experience significant financial hardship and there is no risk of loss or damages on defendants without a bond. Moreover, this case seeks to enforce the constitutional right to vote and enjoin the government from imposing significant burdens on a targeted group of voters in New Hampshire. Therefore, no bond is necessary.

Dated: September 17, 2026

Respectfully submitted,

*/s/ Henry C. Quillen*
Henry C. Quillen (Bar No. 265420)
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851
hquillen@whatleykallas.com

*/s/ Benjamin Horton*
Benjamin Horton (admitted *pro hac vice*)
John Bonifaz (admitted *pro hac vice*)
Ben Clements (admitted *pro hac vice*)
Courtney Hostetler (admitted *pro hac vice*)
FREE SPEECH FOR PEOPLE
28 S. Main Street, Suite 200
Sharon, MA 02067
Tel: (617) 244-0234
chostetler@freespeechforpeople.org
bhorton@ freespeechforpeople.org
bclements@freespeechforpeople.org
jbonifaz@freespeechforpeople.org

Michael Gardener (admitted *pro hac vice*)
Courtney Herndon (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111

Tel: (617) 348-1642
msgardener@mintz.com
cherndon@mintz.com

Yeilee Woo (admitted *pro hac vice*)
Sherwet H. Witherington (admitted *pro hac vice*)
Hannah Edge (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
919 Third Avenue
New York, New York 10022
Tel: (212) 692-8153; (212) 692-8188
ywoo@mintz.com
shwitherington@mintz.com

*Attorneys for Plaintiff Coalition for Open Democracy*