UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Coalition for Open Democracy

v.

Civil No. 1:26-cv-00647-JL-TSM
Opinion No. 2026 DNH 145

David M. Scanlan, in his official capacity as
New Hampshire Secretary of State, et al.

**ORDER GRANTING PARTIAL PRELIMINARY INJUNCTIVE RELIEF**

This order grants limited preliminary injunctive relief with respect to New Hampshire's upcoming general election. It does not find a likelihood, at this preliminary stage, that New Hampshire's recent amendment to its voter identification statute, RSA 659:13 ("HB 323"), will be proven unconstitutional. It does find, however, that the plaintiff, Coalition for Open Democracy, is likely to succeed in challenging a related directive from the Secretary of State that reaches further than the statute itself.

In April 2026, the New Hampshire Legislature passed HB 323, eliminating student ID cards as an expressly valid form of identification for the purposes of obtaining a ballot. Later that month, the Secretary of State's office issued a press release (the "April Directive") advising that "student IDs cannot be used as proof of ID when registering to vote, requesting an absentee ballot, or checking in to vote in an election," i.e., for any purpose at all.[1] That prohibition also covers the catch-all provision of RSA 654:12(d)(4), which allows any voter to establish identity through other reasonably reliable evidence

[1] Pl.'s Consolidated Exs. at p. 355 (Apr. 2026 Press Release).

and which, as the State has conceded in this litigation, applies to both obtaining a ballot and registering to vote.

The law went into effect in June 2026. On August 11, 2026, less than one month before the New Hampshire primary election on September 8, the plaintiff filed this action against the State challenging the constitutionality of both HB 323 and the April Directive. The plaintiff moves for a preliminary injunction to enjoin the State from enforcing either the statute or the April Directive on the grounds that both (1) disproportionately burden young persons' right to vote in violation of the First and Fourteenth Amendments and (2) intentionally discriminate against young voters in violation of the Twenty-Sixth Amendment. The court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 as it arises under the Constitution and laws of the United States.

After reviewing the parties' submissions and holding two evidentiary hearings, the court grants the motion in part and denies it in part. The motion is denied with respect to HB 323 itself. While the parties differ regarding the constitutionality of RSA 659:13 as amended by HB 323 (and reasonable minds may differ as well), the plaintiff has not demonstrated, at this preliminary stage, a likelihood of success in its challenge to the statute, now providing that a student ID is no longer, on its own, expressly valid identification to obtain a ballot.

But the motion is granted with respect to the April Directive. While HB 323 only removed student IDs from the forms of identification that are expressly valid, the April Directive went further, barring election officials from considering student IDs even as evidence under the safety-valve provision that permits a voter without qualifying photo

identification to establish identity by other means. The State has offered no independent justification for that broader prohibition. Under the Supreme Court's standard for evaluating voting regulations, even a minimal burden on the right to vote must be justified by the State's interests, and the State has identified no interest served by the April Directive beyond those already served by HB 323. The April Directive therefore likely cannot withstand scrutiny under the First, Fourteenth, and Twenty-Sixth Amendments. The court accordingly enjoins enforcement of the April Directive to the extent it prohibits or discourages election officials from considering student IDs as evidence of voter identity under RSA 654:12(d)(4) and RSA 659:13(c)(1) and (3), and orders the Secretary of State to issue revised guidance for the November 2026 general election.

## I. <u>Legal Standard</u>

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The party seeking [an injunction] bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009) (citing *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 158 (1st Cir. 2004)).

## II. Background

Following its customary practice in preliminary injunction litigation, the court required counsel to jointly submit, on an expedited basis, an agreed-upon timeline and a single statement of agreed and disputed facts.[2] After conducting an evidentiary hearing, the court denied the plaintiff's motion for a preliminary injunction insofar as it sought relief with respect to the September 8, 2026 primary election.[3] The court determined, however, that the evidentiary record was insufficiently developed to resolve the plaintiff's remaining request for preliminary injunctive relief with respect to the general election and issued a procedural order directing the parties to supplement the record.[4] The parties submitted a supplemental timeline and updated statement of facts, and the court convened a second evidentiary hearing, and then an additional day of oral argument.[5] The factual findings that follow are based on the parties' factual submissions and the evidence presented at both evidentiary hearings.

### A. Voting practice in New Hampshire before HB 323

Registering to vote and obtaining a ballot in New Hampshire are governed by N.H. RSA 654:12, "Determining Qualifications of Applicant," and N.H. RSA 659:13, "Obtaining a Ballot," respectively. The New Hampshire legislature amended multiple

[2] *See* Draft Joint Proposed Timeline (doc. no. 32); Single Statement of Agreed & Disputed Facts ("Joint Statement of Facts") (doc. no. 33).

[3] Order Denying Mot. Prelim. Inj. (doc. no. 43).

[4] Post-Primary Election Procedural Order (doc. no. 44).

[5] *See* Single Suppl. Timeline (doc. no. 45); Joint Single Updated Statement of Agreed and Disputed Facts (doc. no. 46); Def.'s Request for Findings of Facts and Rulings of Law (doc. no. 48); Pl.'s Combined Proposed Findings of Fact and Rulings of Law (doc. no. 58).

aspects of both statutes in 2026,[6] although the plaintiff challenges only one amendment to RSA 659:13 in this litigation; namely, HB 323, eliminating student identification cards from the list of expressly valid forms of identification for the purposes of "obtaining a ballot" under RSA 659:13(II)(a).

***Registering to vote.*** New Hampshire administers voter registration locally through city and town clerks.[7] Prospective voters may register before an election or on the day of the election at their polling place.[8] To register before an election, a prospective voter must generally go to their local city or town clerk and show proof of identity, age, domicile, and citizenship.[9] Each voter qualification requires different (though sometimes overlapping) documentary proof.[10] Under RSA 654:12, when registering to vote, "whether… before election day or on election day,"[11] prospective voters can establish their identity under New Hampshire law with:

> (1) Photo driver's license issued by any state or the federal government.
> (2) United States passport, armed services identification, or other photo identification issued by the United States government.
> (3) Photo identification issued by local or state government.
> (4) Any other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be.

RSA 654:12(I)(d).

---

[6] *See* HB 317 (2026); HB 323 (2026).
[7] Joint Statement of Facts (doc. no. 46) ¶¶ 4-5; RSA 654:12(I).
[8] *Id.* ¶ 5.
[9] *Id.* ¶ 5.
[10] *Id.* ¶ 8.
[11] RSA 654:12(I).

Prior to September 8, 2026, a prospective voter could also establish identity for voter registration through "verification by the moderator or another election official." RSA 654:12(I)(d)(4). HB 317, passed in July 2026, removed this clause from RSA 654:12, governing voter registration, and added it to RSA 659:13, governing obtaining a ballot, meaning that effective September 8, 2026, prospective voters can no longer register based on identity verification by a moderator or other election official.[12]

***Obtaining a ballot (voting).*** On election day, a prospective voter may register to vote at the polling place, but, like all other voters, must separately present proof of identity to obtain a ballot.[13] The statute provides multiple methods for proving identity to obtain a ballot. First, a registered voter may present "valid photo identification," to a ballot clerk, who then checks the voter's name off the checklist of registered voters and gives the voter a ballot. RSA 659:13(I)(b), (II)(a). If the voter does not have a form of "valid photo identification" under the statute, the ballot clerk directs the voter to the supervisor of the checklist, who will "review the voter's qualifications and determine if the voter's identity can be verified." RSA 659:13(I)(c). The supervisor of the checklist may use various methods to attempt to verify the voter's identity, including by applying RSA 654:12's catch-all, "safety valve" provision allowing the voter's identity to be verified by "[a]ny other evidence that reasonably establishes that it is more likely than not

---

[12] *See id.* ¶ 19.
[13] *Id.* ¶¶ 5, 6.

that the person is who they claim to be."[14] If the supervisor determines that the voter's qualifications have been established, the voter is allowed to vote. RSA 659:13(I)(c).

***Student IDs.*** From 2012 (when New Hampshire's voter ID law was enacted) through June 2026 (when HB 323 took effect), a prospective voter could present any of the following forms of identification for the purposes of obtaining a ballot: (1) a driver's license issued by any state or the federal government; (2) an identification or non-driver's identification card issued by the motor vehicles division, department, agency, or office of any state; (3) a U.S. armed services identification card; (4) a U.S. passport or passcard; or (5) a valid student identification card, issued by New Hampshire colleges, universities, or career schools; public or accredited nonpublic New Hampshire high schools; Dartmouth College; or University System/Community College System schools.[15] All photo identification cards, including student IDs, were required to (a) show the holder's name (substantially matching the voter registration record); (b) include a photograph of the voter; and (c) be presented within five years of its issuance or expiration date.[16]

The state thus accepted student identification cards to satisfy the identity requirement for *registering to vote* both before and on election day, and for *obtaining a ballot* on election day.[17] According to the parties' stipulation, student IDs have

[14] *See* Defs.' R. Suppl. (doc. no. 60) at 2-3 (Secretary of State's admission that "RSA 654:12 and RSA 659:13 do not materially differ. The Secretary of State's office has consistently interpreted RSA 654:12 and RSA 659:13 in harmony. So, RSA 654:12, I(d)'s provision permitting "[a]ny other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be[,]" is the same process set forth in RSA 659:13.").

[15] Pl.'s Consolidated Exs. at 295-96 (Prior version of RSA 659:13).

[16] *Id.*

[17] Joint Statement of Facts (doc. no. 46) ¶¶ 12-13 ("Before HB 323, a student voter in New Hampshire seeking to register to vote without a driver's license or passport could go to their town or city clerk, present proof of age, citizenship, and domicile, and present their student

historically been accepted for the purposes of *voter registration* under RSA 654:12(d)(4)'s catch-all provision (*i.e.*, the provision providing that "presumptive evidence" of the voter's identity includes "any other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be"),[18] while the student IDs were accepted for the purposes of *obtaining a ballot* under RSA 659:13(II)(a) because they are expressly listed among the forms of "valid identification" under that statute.[19]

Notably, New Hampshire never accepted student IDs to establish domicile or citizenship.[20] A student voter without a driver's license or passport could present a student ID for identity, along with separate documentation (*e.g.*, a birth certificate for citizenship, a lease or utility bill for domicile) to complete registration.[21]

---

identification as proof of their identity. RSA 654:12(d)(4). Similarly, on election day, a student voter without a driver's license or passport could obtain a ballot by presenting their student identification card.")

[18] *See id.* at ¶ 12.

[19] *Id.* at ¶ 13. The court recognizes that the state's position that it interprets the two statutes "in harmony," *see* Defs.' R. Suppl. (doc. no. 60) at 2-3, could allow for another understanding; namely that the explicit inclusion of student IDs in RSA 659:13 meant that they were understood to also be valid under RSA 654:12, effectively adding a "gloss" to the meaning of RSA 654:12. *See also* Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 172. Leaving aside its inconsistencies with several recognized cannons of statutory interpretation, the court rejects this interpretation for three reasons. First, apart from the Deputy Secretary's testimony, the State has not argued nor articulated this position in this litigation. Second, as the Deputy Secretary later conceded, *see id*. at 173, the plain language of the statute independently permits the use of student IDs such that no gloss is required. *See* RSA 654:12(d)(4) ("presumptive evidence" of identity includes "evidence that reasonably establishes that it is more likely than not that the person is who they claim to be."). Third, the parties stipulated that RSA 654:12(d)(4) itself authorizes registering with a student ID, not through a gloss drawn from the inclusion of student IDs in RSA 659:13.

[20] Joint Statement of Facts (doc. no. 46) at ¶ 85.

[21] *Id.* ¶ 30.

**B. Passage and rationale for HB 323**

New Hampshire's governor signed HB 323 into law on April 3, 2026, and it took effect June 2, 2026.[22] The law amended RSA 659:13, not by affirmatively prohibiting acceptance of student IDs at polling stations, but by removing student ID cards as a form of expressly "valid identification" for obtaining a ballot under RSA 659:13(II)(a).[23] The law did not change the separate registration statute, RSA 654:12, or the criteria for establishing domicile or citizenship.[24]

In this litigation, the state asserts that HB 323 is supported by its generalized interests in election efficiency and integrity, including, *inter alia*, counting only the votes of eligible voters, preventing intentional and unintentional wrongful voting before it happens, and "regulating all phases of the electoral process, including ballot access."[25] When HB 323 was pending before the New Hampshire legislature, supporters articulated three rationales specific to that proposed law. First, lawmakers argued that student IDs are unreliable because students may hold onto them for long periods and they sometimes lack expiration dates.[26] Second, Representative Berry, one of the bill's co-sponsors, asserted that "[s]tudent IDs have no address verification," "citizenship check," or

---

[22] *Id.* ¶ 15.

[23] *Id.* ¶¶ 14, 17.

[24] *Id.* ¶¶ 17, 30-31. The legislature also amended RSA 654:12, the voter registration statute, in 2026, through the passage of HB 317. As discussed above, HB 317 amended RSA 654:12(I)(d)(4) by removing the clause allowing a prospective voter to register to vote by having their identity "verif[ied] by the moderator or another election official" from the voter registration statute and adding it instead to RSA 659:13, the "obtaining a ballot" statute. The petitioners do not challenge HB 317. Otherwise RSA 654:12(I)(d)(4), the provision allowing as presumptive evidence of a prospective voter's identity "any other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be," is unchanged.

[25] Joint Statement of Facts (doc. no. 46) at ¶¶ 129-39.

[26] *Id.* ¶ 78.

"security features."[27] In other words, as the state argues, New Hampshire schools do not issue "REAL ID"-compliant identification cards, nor are they required by federal law to integrate security features into their cards.[28] Third, a companion Senate bill's sponsor, Senator Sullivan, stated she introduced the bill because constituents do not want "out of state" students living temporarily on campus to vote in New Hampshire elections.[29]

Opposition testimony at legislative hearings from, *inter alia*, the Hanover Town Clerk, a former Plymouth State University student, and the Durham Town Clerk argued the bill would effectively disenfranchise first-time voters, that student ID issuance involves rigorous verification processes, and that no fraud involving student IDs had ever been documented.[30] Separately, the parties agree that a 2022 "Special Committee on Voter Confidence" convened by the Secretary of State took evidence at nine public hearings and found high public confidence in New Hampshire elections and no evidence of widespread voter fraud.[31] The Committee made no recommendation regarding student ID elimination specifically.[32]

### C. <u>Implementation of HB 323</u>

The Secretary of State's office has been communicating with the public (externally, in a public-facing way) and clerks and local election officials (internally,

---

27 *Id.* ¶ 84.

28 *Id.* ¶ 139. A "REAL ID" is a "federally compliant" driver's license or non-driver ID card that is "marked with a star in the top right corner to indicate it may be used for federal identification." *See* REAL ID, NH DMV, https://www/dmv.nh.gov/drivers-licensenon-driver-ids/real-id.

29 *Id.* ¶ 81. The Assistant Attorney General representing the State "disavow[ed]" this rationale in court. See Sept. 16, 2026 H'rg Tr. (doc. no. 62) at 86:1.

30 Joint Statement of Facts (doc. no. 46) ¶¶ 41, 69-71.

31 *Id.* ¶¶ 72-74.

32 *Id.* ¶ 75.

within the State's election apparatus) about the change since before the law took effect, including via an April 23, 2026 email to NHVotes@sos.nh.gov that explained the new rule (the "April Directive").[33] Since the law's enactment in June, the Secretary's Office has updated the Election Procedure Manual, ballot clerk manuals, student voting guides, polling place posters, its website, and the statewide voter registration system, and has conducted social media outreach, radio ads, public speaking events, and in-person trainings for election officials to reflect the new identification requirements.[34]

The April Directive, titled "Secretary of State Shares Election Resources for New Hampshire Students," cites HB 323 and states: "Effective June 2, 2026, student IDs cannot be used as proof of ID when *registering to vote, requesting an absentee ballot, or checking in to vote in an election.*"[35] The Directive also announced "new election resources for students who plan to register to vote in New Hampshire or vote in an upcoming election."[36]

The new election resources, along with other internal and external communications aimed at election workers and the public reiterated the April Directive's guidance that a change in law prohibited the use of student IDs to both register to vote and obtain a ballot. For instance, the original press release attached copies of a "Student Guide to Voting in NH"[37] and a "Student Guide to Registering to Vote in NH,"[38] both of

---

[33] *Id.* ¶¶ 3, 16.
[34] *Id.* ¶¶ 102-04.
[35] Id. ¶ 16; Defs.' Ex. E (emphasis added).
[36] Defs.' Ex. E.
[37] Defs.' Ex. K.
[38] Defs.' Ex. J.

which highlight in red "Student ID not acceptable" under forms of identification for registration and obtaining a ballot. Similarly, a flyer titled "Student Guide to Voting Absentee in NH" states "Student ID not acceptable" as qualifying voter identification to vote absentee. An "explanatory document" of the New Hampshire Voter ID law (citing only RSA 659:13) provides in bold that to register to vote *and* to check in and receive a ballot, "*****Student photo ID <u>CANNOT</u> be used to prove identity*****".[39] Radio ads and PSAs inform the public that "student IDs are not accepted" or "cannot be used to prove identity."[40] Several social media posts by the Secretary of State's office cite a "recent law change" and state that "student IDs are not accepted" or "no longer accepted" to register to vote and vote in New Hampshire.[41]

Internally, the Election Procedure Manual, a document promulgated by the Secretary of State's office for election workers, states that "HB323 (2026) eliminates the use of student identification cards for voter registration and obtaining a ballot. Students will need to use other approved forms of identification."[42] The Manual goes on to explain that "a student identification card **<u>cannot</u>** be used to prove identity" under the voter registration provision allowing "any other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be."[43]

Many of the resources promulgated under the April Directive guide prospective student voters without another form of qualifying identification to obtain a NH driver's

---

[39] Defs.' Ex. H (emphasis in original).
[40] Defs.' Exs. L and M.
[41] Defs.' Ex. N.
[42] Defs.' Ex. B at 12.
[43] *Id*. at 17 (emphasis in original).

license, non-driver identification card, or a voter ID card from the New Hampshire Department of Motor Vehicles. *See infra*, Part II.D. for further discussion of these forms of identification.

As detailed above, the New Hampshire legislature has not—through HB 323 or otherwise—expressly excluded student IDs from the acceptable forms of identification in the statute governing voter registration, RSA 654:12. That statute never explicitly enumerated student IDs among the forms of ID that provide "presumptive evidence" of a person's identity; instead, as the state stipulated,[44] student IDs were included in the statute's "catch-all" provision, RSA 654:12(I)(d)(4), which allows a voter's identity to be established using "any other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be." The record shows that through HB 317, passed soon after HB 323, the legislature specifically amended the statute's catch-all provision to remove verification of identity by an election official, but did not address student IDs at all.[45]

Similarly, the record does not support a finding that HB 323 authorized the April Directive's prohibition on the use of student IDs to obtain a ballot. Although the bill removed student IDs as a form of "valid identification" under RSA 659:13(II)(a), the statute still requires ballot officials to direct voters lacking a form of valid identification to supervisors of the checklist, who must attempt to verify the voter's identity. *See* RSA 659:13(I)(c) ("If the voter does not have a valid photo identification, the ballot clerk shall

[44] Joint Statement of Facts (doc. no. 46) at ¶ 12.
[45] *Id.* at ¶ 20; HB 317.

direct the voter to see the supervisor of the checklist…[who] shall review the voter's qualifications and determine if the voter's identity can be verified."). As the State specified, it has consistently interpreted RSA 654:12 and RSA 659:13 "in harmony," so the catch-all provision from RSA 654:12(I)(d) "is the same process set forth in RSA 659:13,"[46] and operates as a "safety valve" for qualified voters lacking one of the listed forms of identification. The state clarified that when undertaking the process of verifying a voter's identity under RSA 659:13(II)(c), supervisors of the checklist apply the catch-all provision of RSA 654:12(I)(d)(4), allowing them to use "any other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be,"[47] which should include student IDs.[48] In short, as the record does not support a finding that the legislature stripped student IDs from RSA 654:12(I)(d)(4), it also lacks support for a finding that HB 323 prohibits the use of student ID's under RSA 659:13(II)(c).

### D. Effects of HB 323 as implemented

***Affected voters.*** At the preliminary injunction hearing, the plaintiff presented testimony from Dr. Michael Herron concerning the effect of HB 323's removal of student identification cards from the forms of identification expressly permitted to establish identity when registering to vote or obtaining a ballot.[49] Dr. Herron estimated that at least

---

[46] Defs.' R. Suppl. (doc. no. 60) at ¶ 9.
[47] *Id.*
[48] *See* Joint Statement of Facts (doc. no. 46) at ¶ 12; Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 173 (Deputy Secretary's testimony that "I think most, if not all situations, I don't see any factual reason why a student ID could not be reasonable evidence" of a person's identity).
[49] *See* Pl.'s Ex. 41, Decl. of Michael Herron ("Herron Decl.").

97% of all voting-eligible New Hampshire citizens possess identification that satisfies HB 323, leaving approximately fewer than 3% without qualifying identification.[50] Among "young" voters—which the plaintiff defines in this litigation as voting-eligible citizens between the ages of 18 and 24—Dr. Herron estimated that approximately 6.56% lack qualifying identification, representing approximately 7,747 individuals.[51] Dr. Herron did not estimate how many of those individuals possess student identification cards. Nor did the court receive evidence concerning how many New Hampshire high schools issue student identification cards that would have qualified under the law in effect before HB 323.

Dr. Herron also examined election-day registration rates. Six of the ten New Hampshire cities and towns with the highest rates of election-day registration contain colleges or universities.[52] Based on that evidence, Dr. Herron opined that college students likely register on election day at higher rates than voters over the age of 24.[53] The court did not receive evidence quantifying the extent to which young voters historically relied on student identification cards when registering on election day. As discussed above, however, the parties agree that before HB 323, qualifying student identification cards could be used to establish identity for registration purposes.[54]

***Alternative forms of identification.*** Under HB 323 *as implemented through the April Directive*, a voter who does not possess a qualifying federal, state, or local

---

[50] *Id.* at ¶ 4.
[51] *Id.* at ¶¶ 6-7.
[52] *Id.* at Table 2.
[53] *Id.* at ¶ 32.
[54] *See* Joint Statement of Facts (doc. no. 46) at ¶ 12.

government-issued photo identification must obtain one to establish identity when registering to vote or obtaining a ballot.[55] The New Hampshire Department of Motor Vehicles (DMV) issues two forms of identification relevant here: a non-driver ID card and a voter ID card. *See* RSA 260:21.

A non-driver ID card is generally comparable to a driver's license except that it does not signify or confer driving privileges.[56] It contains the holder's photograph, signature, identifying information, and address, as well as a barcode that may be scanned by law-enforcement officers and other agencies. A non-driver ID card costs $20 and may be either REAL ID compliant or noncompliant.[57] To obtain a non-driver ID card, an applicant must appear at one of the state's fourteen DMV locations (all of which are accessible by appointment only)[58] and present the documentation necessary to establish the applicant's identity and other required information. An individual may use a current student photo or digital identification card issued for that year as one of his or items to show proof of identity.[59] The DMV issues a temporary non-driver ID card at the completion of a successful transaction and mails the permanent card to the applicant.[60] The temporary card may be used for voting purposes while the applicant awaits the permanent card.[61]

---

[55] *See id.* at ¶ 3.
[56] *See* Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 87:15-24.
[57] *Id.* at 88:4-13. *See* REAL ID, NH DMV, https://www/dmv.nh.gov/drivers-licensenon-driver-ids/real-id (A "REAL ID" is a "federally compliant" driver's license or non-driver ID card that is "marked with a star in the top right corner to indicate it may be used for federal identification.").
[58] Joint Statement of Facts (doc. no. 46) at ¶ 35.
[59] Pl.'s Consolidated Exs. at p. 183 (DMV identity and residency requirements).
[60] *See* Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 107:8-11.
[61] *Id.* at 107:12-108:4/

A voter ID card, by contrast, is issued solely for voting purposes and contains only the holder's name, address, photograph, and signature.[62] It does not contain the holder's date of birth and states on its front and back that it is for voting purposes only.[63] In other words, unlike a non-driver ID card, it cannot generally be used as identification for purposes such as banking, obtaining medication at a pharmacy, boarding a commercial flight, or entering a courthouse.

The procedure for obtaining a voter ID card differs from the procedure for obtaining a non-driver ID card. *See* RSA 260:21(V)(a). First, a voter must obtain a voucher from the appropriate town or city clerk by presenting proof of name, age, and residence, and completing a declaration stating, inter alia, that he or she "require[s] a photo identification for voting purposes." *See* RSA 260:21(V)(b). The voter then takes that voucher to a DMV location, where he or she need not complete an additional application or present additional supporting documents.[64] A DMV employee enters the voter's name and address, takes the voter's photograph and signature, scans the voucher, and completes the transaction.[65] The DMV does not issue a temporary voter ID card (as it does with a non-driver ID card transaction); instead, the permanent card is produced overnight and mailed to the voter.[66]

Although this procedure is established by statute, the evidence at the preliminary injunction hearing raised questions about its implementation and execution in practice.

---

[62] *Id.* at 92:3-12.
[63] *Id.*
[64] *See id.* at 100:9-13.
[65] *Id.* at 91:4-13.
[66] *Id.*

As of April 23, 2026, the DMV had issued no voter identification cards to voting-eligible individuals under the age of 20.[67] Since 2021, it had issued six voter identification cards in total, four of which remained active.[68] Olivia Zink, Director of the Coalition for Open Democracy, testified (without drawing an objection) that she contacted DMV offices in Concord and Keene and was told by employees at both offices that the voter ID program was "not operational."[69] Jennifer Bailey, the Assistant Director of the DMV, attributed this confusion to a "training" issue arising from the infrequency of voter ID card transactions and stated that the DMV circulates reminders regarding how to handle voter ID card transactions in the run-up to elections.[70] The same Assistant Director of the DMV and the Deputy Secretary of State had differing views about the appearance, composition, and information contained on voter ID cards.[71] Court's Exhibit 2 is a voter ID exemplar.

The evidence concerning the September 2026 primary provides an example of the DMV's difficulties in administering the voter ID program. Tatiana Barreto, an 18-year-old eligible voter, attempted to register on election day at her polling place in Manchester but did not possess identification qualifying under HB 323.[72] Several weeks earlier, in events that sounded like a negative stereotype of a DMV office as portrayed in a television show or film, Barreto had attempted to obtain a non-driver identification card

---

[67] Pl.'s Consolidated Exs. at p. 378.

[68] Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 96:22-23.

[69] Aug. 31, 2026 H'rg Tr. (doc. no. 47) at 71:4-11.

[70] Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 114:11-24.

[71] *Compare* Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 92:3-12 (testimony of DMV Assistant Director) *with id.* at 208:2-25 (testimony of the Deputy Secretary).

[72] *See id.* at 12:12-14.

for employment and voting purposes but was unable to complete the transaction because the birth certificate she presented was not a "certified copy."[73] When she later went to the polls, she brought a birth certificate, her social security card, her student ID, and a copy of her mother's lease.[74] Barreto had not researched the identification requirements before going to the polls but believed that her student identification card would suffice because she understood that her brother had previously used one to register.[75]

Election officials informed Barreto that she had to go to City Hall to obtain a voucher and take that voucher to the DMV to obtain a voter identification card.[76] She followed their instructions. When Barreto presented the voucher at the DMV, however, the pop culture DMV cliches continued. The first clerk she encountered did not recognize it, and a supervisor had to get involved.[77] After Barreto waited nearly five hours, DMV personnel told her to leave and advised her that she would be contacted when the identification card was ready.[78] She was not contacted and did not receive the card in time to vote in the primary.[79] When Barreto testified in this case more than a week later, she still had not received a voter ID card.[80]

***2026 primary election.*** The September 8, 2026 primary occurred after the initial preliminary injunction hearing. The court thereafter permitted the parties to present

---

[73] *Id.* at 19:8-12.
[74] *Id.* at 11:25-12:2.
[75] *Id.* at 18:18-19:2; 25:1-6.
[76] *Id*. at 22:18-23:5.
[77] *Id.* at 12:17-24.
[78] *Id.* at 14:11-18.
[79] *Id.* at 19-21.
[80] *Id.*

evidence from the primary relevant to the issues in this case. The Deputy Secretary of State testified that he received two reports of students being turned away from the polls as a result of HB 323.[81] Barreto, whose experience is described above, was one of those two reported voters.

The record also contains evidence from Durham, home to the University of New Hampshire's main campus. Town Clerk Rachel Deane, a supervisor at the Durham polling location, testified that she counseled one voter who presented without a form of qualifying ID on his person, and that individual was not a student.[82]

## III. <u>Standing</u>

In order to ensure the orderly and efficient administration of justice involving a similar challenge between the same parties litigating the ramifications of a closely related provision of state election law in this District Court, the court assumes without deciding that Open Democracy has standing to pursue its challenge to HB 323 and the April 23 directive based on Chief Judge Elliott's reasoning in *New Hampshire Youth Movement v. Scanlan*, 833 F.Supp.3d 93 (D.N.H. 2026) (Elliott, C.J.). That order—including the issue of Open Democracy's organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) and *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)—is presently on appeal before the First Circuit Court of Appeals.

## IV. <u>Preliminary injunction analysis</u>

---

81 *Id.* at 189:18-19.
82 *Id.* at 70:18-25.

**A. <u>Likelihood of success on the merits</u>**

"The movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

**(1) <u>First and Fourteenth Amendment challenge</u>**

The right to vote, which derives from the First and Fourteenth Amendments, is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1885). Constitutional challenges to a state's election laws are governed by framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under this so-called "*Anderson-Burdick*" framework, courts "weigh the 'character and magnitude' of the burden the [s]tate's rule imposes [on rights to vote] against the interests the state contends justify that burden, and consider the extent to which the [s]tate's concerns make the burden necessary." *McClure v. Galvin*, 386 F.3d 36, 41 (quoting *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 359 (1997)).

Because all "[e]lection laws will invariably impose some burden upon individual voters," *Burdick*, 504 U.S. at 433, the *Anderson-Burdick* framework provides for "something of a sliding scale approach," *McClure*, 386 F.3d at 41. "[T]he scrutiny [courts] apply will wax and wane with the severity of the burden imposed on the right to vote." *New Hampshire Youth Movement v. Scanlan*, 833 F. Supp. 3d 93, 130 (D.N.H. 2026) (Elliott, C.J.) (quoting *Fish v. Schwab*, 957 F.3d 1105, 1124 (9th Cir. 2020)). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and

advance a compelling state interest." *McClure*, 386 F.3d at 36 (citing *Timmons*, 523 U.S. at 351). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Id.* (quoting *Timmons*, 386 F.3d at 358).

***Legal framework.*** The *Anderson-Burdick* balancing test proceeds in two steps. *See, e.g., Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 14-15 (1st Cir. 2020) (applying the *Anderson-Burdick* test as a two-part inquiry). At the first step, the court must determine the "character and magnitude of the asserted injury to" the right to vote imposed by HB 323 and the April Directive. *Id.* (quoting *Anderson*, 460 U.S. at 789). Here, the plaintiff contends that HB 323, as implemented through the April Directive, disproportionately burden young persons' right to vote.

The parties agree that Justice Stevens's concurring opinion in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), supplies the proper framework for assessing that burden.[83] They disagree, however, about how *Crawford* should be applied in this case. The plaintiff urges the court to focus on the burdens experienced by young voters, including the extent to which HB 323 makes voting more difficult for them than it was before the law took effect given the particular obstacles young voters face in obtaining government-issued identification. The State, by contrast, contends that the court should assess the burden at the level of the electorate as a whole (*i.e.*, not consider the burden specific to young voters at all) because the law is "broadly applicable" and the

[83] Pl.'s Combined Proposed Findings of Fact & Rulings of Law (doc. no. 58) at ¶ 9; Defs.' Suppl. Proposed Findings of Fact & Rulings of Law (doc. no. 48) at ¶¶ 82-84.

"idiosyncratic experiences" of young voters are not relevant to the evaluation of that burden.[84] In other words, the plaintiff's approach would measure the burden by reference to young voters' experience, while the state's would measure it by reference to the electorate generally.

Both parties are mistaken. Neither proposed approach, standing alone, is fully consistent with *Crawford*. In *Crawford*, Justice Stevens assessed the character and magnitude of Indiana's voter-identification requirement by first examining the burden the new regime imposed on voters generally, and then considering whether that burden fell more heavily on particular subsets of voters. 553 U.S. at 197-202 (opinion of Stevens, J.). The relevant inquiry therefore accounts for both the law's broad application to the general electorate and the extent to which a particular group experiences greater difficulty complying with it, all within the context of the State's election regime as a whole. *See New Hampshire Youth Movement*, 833 F. Supp. 3d at 130 ("To determine the burden, the court must consider *both* the statute's broad application to all voters and its heavier burden on subsets of voters." (emphasis added)); *Fish*, 957 F.3d at 1127 (explaining that, although courts must evaluate "the statute's broad application to all . . . voters" in determining the magnitude of the burden, they may also consider the "limited number of persons" for whom the relevant burdens are "somewhat heavier" (quoting *Crawford*, 553 U.S. at 199-200 (opinion of Stevens, J.))); *see also Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (assessing the "minimal" burden imposed by the

[84] Defs.' Supplemental Proposed Findings of Fact & Rulings of Law (doc. no. 48) at ¶ 83.

elimination of "Golden Week" on Black voters against the "abundant and convenient alternatives that remain for all Ohioans who wish to vote").

The court thus considers the burden HB 323 imposes on young voters in relation to the burden it imposes on the electorate generally and within the context of New Hampshire's election regime as a whole. This approach neither disregards evidence that young voters may encounter greater obstacles nor treats their experience in isolation from the generally applicable voting regime. *See Crawford*, 553 U.S. at 198-201 (opinion of Stevens, J.). Rather, it asks whether, and to what extent, the generally applicable requirements impose a heavier burden on young voters than on the electorate more broadly. *See id.* at 199-200.

The court also considers the practical effects of the April Directive as part of that burden analysis, notwithstanding the plaintiff's separate contention that the directive constitutes a statutorily unauthorized application of HB 323.[85] The court takes this approach because neither the plaintiff's evidentiary showing nor its legal argument attempted to quantify separately the burdens attributable to HB 323 and those attributable to the April Directive. Nor did the State argue that any disenfranchisement attributable to the April Directive should be excluded when assessing the burden imposed by the challenged identification regime. To the contrary, both parties treated HB 323 and the April Directive as *necessarily* operating together in practice.[86] Under those

---

[85] *See* Compl. (doc. no. 1) at Count 4.

[86] *See, e.g.,* Herron Decl. at ¶ 4 (accepting April Directive "at face value" and thus providing expert opinion "as if HB 323 eliminates student identification cards from the set of allowed forms of identification that may be used in New Hampshire to establish identity for the purpose of obtaining a ballot prior to voting, for the purpose of registering to vote, and for the

circumstances, the court assesses their combined practical effect on voters at the first step of the *Anderson-Burdick* inquiry. *See, e.g., Fish*, 957 F.3d at 1129 n.7 (considering disenfranchisement attributable to Kansas's implementation of a statutory documentary-proof-of-citizenship requirement where the state did not argue that "bureaucratic or administrative failures in the implementation of the DPOC regime should not be considered . . . part and parcel of that regime" or that resulting disenfranchisement should be excluded from the *Anderson-Burdick* burden analysis); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319-21 (11th Cir. 2019) (considering "the way in which Florida implements the scheme" in determining the severity of the burden); *cf. New Hampshire Youth Movement*, 833 F. Supp. 3d at 130 ("The court must examine the burden of the challenged provisions in the context of New Hampshire's election laws as a whole and not in isolation.").

This combined treatment is limited to the first step of the *Anderson-Burdick* inquiry. At the second step, the court separately considers "the precise interests put forward by the State as justifications" for each challenged action and determines "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick,* 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789); *see, e.g., N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 230-38 (4th Cir. 2016) (assessing cumulative impact of challenged provisions of state election law on Black voters before evaluating state's proffered justifications for each challenged provision separately). Again, the level

purpose of requesting an absentee ballot"); *see also* Joint Statement of Facts at ¶ 12 (stipulating that "[a]fter HB 323, student voters without driver's licenses or passports will have to present federal, state, or local-issued identification to be able to register to vote and to obtain a ballot").

of scrutiny that the court applies at this step depends on its assessment of the burden imposed, with "[r]estrictions that impose a 'severe' burden on the right to vote . . . subject to 'strict scrutiny,'" *New Hampshire Youth Movement*, 833 F.3d at 130, and restrictions imposing less severe burdens "trigger[ing] [a] less exacting review," *McClure*, 386 F.3d at 36 (citing *Timmons*, 523 U.S. at 351). But restrictions that impose "slight" burdens must still "be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).

**<u>Step 1: Magnitude of burden</u>**

Applying this framework, the record supports a finding that HB 323, as implemented through the April Directive, differentially burdens young voters in a manner that is real but minimal. Even the plaintiff's evidence shows that young voters are only slightly less likely than the electorate at large to possess a qualifying form of identification under the post-HB 323 regime.[87] Standing alone, this modest disparity would not distinguish young voters' experience from the ordinary reality that some voters will find compliance more burdensome than others, which *Crawford* recognized as insufficient to render a facially neutral voter identification law constitutionally suspect. *See* 553 U.S. at 199 (upholding voter identification law notwithstanding that the "evidence in the record and facts of which [the Court] [took] judicial notice. . . indicate that a somewhat heavier burden may be placed on a limited number of persons;

[87] *See* Herron Decl. at Table 6 (estimating a 4% difference in the rates of voter ID possession between voters 24-years-old or younger versus voters 25-years-old or older).

specifically, "elderly persons born out of [s]tate," "persons who because of economic or other personal limitations may find it difficult" to gather the necessary documentation, "homeless persons," and "persons with a religious objection to being photographed"). Generally speaking, the court cannot conclude that obtaining a qualifying government-issued ID card is meaningfully harder for a young voter than it is for any other voter, as the record contains no evidence that the underlying process of visiting the DMV and assembling the required documentation, etc., differs in kind for young persons in particular.[88] *See Lee v. Virginia State Bd. of Elections*, 843 F.3d 592, 598 (4th Cir. 2016) (affirming district court's upholding of voter identification law notwithstanding court's recognition that Black and Latino voters "were slightly less likely to have appropriate identifications than were [White voters]" where "the burden to obtain an appropriate identification" by traveling to the DMV or the local registrar's office was the same across demographics).

Moreover, the court is not well positioned on this record to adequately quantify the scope of whatever disparity does exist. The plaintiff offered no evidence of how many young voters possess a formerly qualifying student identification card in the first place, a gap made more significant by the absence of any evidence establishing which, or how many, New Hampshire high schools even issue student identification cards that satisfied the requirements of RSA 659:13 pre-amendment. Nor is there evidence of how frequently student IDs were historically relied upon to obtain a ballot or register to vote,

---

[88] Indeed, at oral argument, counsel for the plaintiff argued that HB 323 "burdens everyone in the state" and emphasized data concerning the rate of voting eligible individuals of any age who do not hold a passport. *See* Sept. 16, 2026 H'rg Tr. (doc. no. 62) at 29:7, 29:1-7.

whether same-day or otherwise, before HB 323's enactment. Without some baseline showing of reliance and prevalence, the court cannot translate the qualitative fact of a disparity into any reliable quantitative estimate of how many voters are actually affected.[89] The plaintiff bears the consequences of this limitation given its burden to come forward evidence of the asserted injury. *See Crawford*, 553 U.S. at 200-01 (rejecting burden findings unsupported by record evidence of scale).

Unlike in *Crawford*, however, the evidence here is not wholly speculative. The plaintiff introduced evidence that young voters who arrive at the polls lacking qualifying identification are directed by poll workers to obtain a voter ID card. Although the voter ID card program could, in principle, provide a meaningful alternative for many voters, the record contains scant evidence that it is functional in practice. As of April 23, 2026, the DMV had issued no voter ID cards to voting-eligible individuals under the age of 20, and only six cards in total since 2021.[90] Employees at two DMV offices told a witness that the program was "not operational," and the DMV's Assistant Director attributed that confusion to a "training" issue arising from how rarely staff encounter voter ID transactions.[91] Barreto's experience bears this out: the first DMV clerk she encountered

---

[89] *See id.* (responding to court's question regarding the plaintiff's position that HB 323 burdens "thousands of people" by explaining "[t]here is this wide class of people who don't have driver's licenses -- who are not just 18 to 24 who don't have driver's licenses and don't have passports and aren't in the military. So all of those people are affected.").

[90] Pl.'s Consolidated Exs. at p. 378; Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 96:22-23.

[91] Aug. 31, 2026 H'rg Tr. (doc. no. 47) at 71:4-11; Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 114:11-24.

did not recognize her voucher, and after waiting nearly five hours, she was sent home without a voter ID card, which she still had not received a week after the primary.[92]

And even if the program functioned exactly as designed, the State's post-HB 323 practice of sending voters away from the polls with instructions to obtain a voter ID card would remain problematic. As discussed *infra*, the DMV does not issue a temporary voter ID card as it does with non-driver ID cards; rather, the permanent card is produced overnight and mailed to the voter.[93] The process therefore cannot be completed same-day, which renders it functionally useless to a young voter attempting to register and vote on election day itself, as New Hampshire law otherwise permits. This is significant, as the record contains evidence indicating that young voters have a higher election-day registration rate as compared to the general electorate.[94] For the subset of young people who rely on election-day registration and arrive at a polling site without a qualifying government ID, the poll worker's referral is not a genuine alternative but a dead end. The court credits testimony that at least one voter experienced exactly this sequence and was disenfranchised as a result. That evidence moves this component of the burden out of the realm of hypothetical injury because, whatever its ultimate scope, the court has direct evidence that the mechanism produces actual disenfranchisement, not merely a theoretical risk of it. *See Fish*, 957 F.3d at 1109 (crediting evidence of actual, not merely potential, disenfranchisement even absent precise quantification).

---

[92] *Id.* at 12:17-24, 14:11-18.
[93] *Id.* at 91:4-13.
[94] *See* Pl.'s Ex. 41, Herron Decl. at Table 2.

The record also establishes that a voter unable to produce a qualifying identification card on election day may rely on New Hampshire's safety-valve procedure to use another, non-governmental form of identification not enumerated in RSA 659:13 so long as it "reasonably establishes that it is more likely than not that the person is who they claim to be." RSA 659:12(I)(d)(4). Under the post-HB 323 regime as implemented by the April Directive, however, student identification cards are categorically excluded from that safety valve, even though comparably reliable forms of non-government identification cards are not. This categorical exclusion falls exclusively on the population most likely to hold student ID as their only form of identification.

Taken together, the evidence does not establish a high likelihood of showing that HB 323, as implemented through the April Directive, imposes a widespread or severe burden on young voters. But the court cannot characterize the burden as wholly negligible either. Two discrete, well-evidenced mechanisms of the post HB 323-regime—(1) the dead end created by the State's practice of referring voters to obtain a voter ID, and (2) (again, as implemented by the April Directive) the safety valve's exclusion of student IDs specifically—impose a real, if numerically uncertain, disadvantage on a population whose members are demonstrably more likely to rely on student identification cards than the electorate generally. The court finds this burden minimal, but not de minimis, because it is more than a theoretical inconvenience and is supported by direct evidence of at least one actual instance of disenfranchisement.

**Step 2: Weighing burden against State interests**

***HB 323.*** In opposing the motion for preliminary injunction, the State argues that HB 323 is supported by its generalized interests in election integrity, which include counting only the votes of eligible voters, preventing intentional and unintentional wrongful voting before it happens, and running efficient and orderly elections.[95] The legislative record reflects two rationales capable of supporting those interests: (1) that student identification cards, unlike the forms of identification RSA 659:13 continues to accept, often lack expiration dates and can remain in circulation well past their period of reliability;[96] and (2) that they lack the address verification, citizenship confirmation, and security features associated with government-issued identification, since New Hampshire schools are not required to and do not issue REAL ID-compliant cards. These are the kind of generalized, forward-looking concerns with ballot-issuance reliability and administrability that a state may invoke under *Crawford* without producing evidence of actual fraud involving student IDs specifically. 553 U.S. at 191-97 (plurality opinion). The State's litigation position (*i.e.*, that it has an interest in counting only the votes of eligible voters, preventing wrongful voting before it occurs, and administering orderly

[95] Joint Statement of Facts (doc. no. 46) at ¶¶ 129-139.

[96] The plaintiff contends that this rationale is not fully accounted for by the pre-HB 323 regime because, under the prior law, identification had to be "current" at the time it was presented in order to be accepted, and a poll worker could reject a facially stale student ID on that basis regardless of whether the card itself displayed an expiration date. This argument does not necessarily undermine the legislature's broader administrability rationale because a requirement that poll workers assess each student identification card on a case-by-case basis still leaves the determination to the poll worker's subjective judgment about how a particular card looks or how old a particular student appears to be, which is the kind of unreliable, ad hoc verification the legislature could have concluded was worth eliminating in favor of a categorical rule. *See Crawford*, 553 U.S. at 196 (plurality opinion) (reasoning that the state need not show that a problem has "often" occurred to justify a prophylactic rule addressed to it).

elections, etc.) tracks these rationales and is the interest the court weighs at this step. *See id.* at 191 (courts weigh "the precise interests put forward by the State as justifications").[97]

Weighed against these interests, the burden attributable to HB 323 itself does not tip the balance. As discussed above, the statute's removal of student identification from RSA 659:13's list of expressly valid identification produces only a modest disparity in identification possession of the kind *Crawford* found insufficient to render a facially neutral identification requirement constitutionally suspect. *See Crawford*, 553 U.S. at 201 ("A facial challenge must fail where the statute has a plainly legitimate sweep" (citation omitted)). The State's interests in counting only the votes of eligible voters, preventing intentional and unintentional wrongful voting before it happens, and running efficient and orderly elections by eliminating student IDs among the forms of categorically acceptable identification are sufficiently weighty to justify that limited, nondiscriminatory change. *See id.* at 201-02 (holding that facial challenge to voter ID statute failed where record did permit conclusion that statute imposed "excessively burdensome requirements" on any class of voters and the "limited burden" it imposed on voters' rights were justified by state's generalized interests in election integrity). The

[97] The court does not rely on Senator Sullivan's statement that HB 323 was intended to prevent out-of-state students temporarily residing on campus from voting in New Hampshire elections. That rationale is not among the interests the State has articulated in defending HB 323 in this litigation; to the contrary, counsel for the State expressly disavowed that rationale as providing justification for HB 323. Sept. 16, 2026 H'rg Tr. (doc. no. 62) at 85:22-86:1. The court expresses no view on whether a law enacted for that purpose could survive constitutional scrutiny. Put differently, the court's task under *Anderson-Burdick* is to evaluate the interests actually asserted, not those the State has abandoned as legally unsupportable.

plaintiff has therefore not shown a likelihood of success on the merits of its First and Fourteenth Amendment challenge to HB 323 itself.

***April Directive.*** The same cannot be said of the April Directive because the State has articulated no interest specific to that rule at all. Neither the State's briefing nor its oral argument defends the April Directive on its own terms. Rather, it defends HB 323 and treats the April Directive as though it is a straightforward extension of HB 323 in the registration context. But, as detailed above, RSA 654:12 was not amended by HB 323, and the State has offered no explanation—legislative, administrative, or otherwise—for why the interests that justify tightening ballot-issuance documentation under RSA 659:13 should justify excluding student identification from RSA 654:12's safety valve provision that apparently extends to other forms of non-governmental identification. The State has not identified any security or integrity concern specific to student ID cards and why they are unique among other non-governmental forms of identification such that they cannot satisfy a standard the legislature left untouched.[98] To the contrary, the Deputy Secretary of State conceded that he "did not see any factual reason why a student ID could not be reasonable evidence" of a prospective voter's identity under the safety valve included in New Hampshire's voter identification regime.[99]

---

[98] "Under the meaningful-variation canon, we presume that, when a statute uses one term in one place and a distinct term elsewhere, the difference matters—that is, the distinct words have different meanings." *Sunshine State Reg'l Ctr., Inc. v. Dir., US Citizenship & Immigr. Servs.*, 143 F.4th 1331, 1344 (11th Cir. 2025) (citing *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022)); Scalia & Gardner, Reading Law, 170-174 (2012).

[99] Sept. 15 H'rg Tr. (doc. no. 61) at 173:16-18.

An unexplained measure of this kind is not the sort justification that can offset even a minimally burdensome rule under the *Anderson-Burdick* balancing test. *See Eakin v. Adams Cnty. Bd. of Elections*, 775 F. Supp. 3d 903, 917 (W.D. Pa.), *aff'd*, 149 F.4th 291 (3d Cir. 2025) (deeming state election law that imposed only "minimal burdens" constitutionally invalid where the commonwealth "[did] not identif[y] what specific regulatory interest [was] furthered" by rule and "despite formal notification," did not "defend[] the constitutionality of the" rule). The plaintiff has expressly and repeatedly argued that the April Directive represents a statutorily unauthorized application of HB 323, yet the State chose not to engage with that argument on its merits.[100] In so doing, it passed on its opportunity to argue that the concerns underlying HB 323's elimination of student IDs as an expressly valid form of identification in the ballot-issuance context mean that student IDs are categorically barred from use under a broad safety valve provision the legislature did not amend, or otherwise attempt to reconcile the directive with the legislature's decision to leave RSA 654:12 untouched.

The court does not reach whether such an argument, if developed, would justify the April Directive, as it is the State's burden to articulate and support the interest it asks the court to weigh, and a court applying *Anderson-Burdick* is not obligated to construct a justification the state has not offered. *See Crawford*, 553 U.S. at 190 (reaffirming *Anderson's* requirement "that a court evaluating a constitutional challenge to an election regulation weigh the asserted injury to the right to vote against the "*precise interests put*

[100] *See* Opp. to Motion for Preliminary Injunction (doc. no. 25) at 20 (defending against claim that April Directive is statutorily unauthorized on jurisdictional grounds).

*forward by the State* as justifications for the burden imposed by its rule") (emphasis added)). Because no interest specific to the April Directive has been put forward, the exclusion of student identification from RSA 654:12's safety valve fails at step two when weighed against the minimal burden described above.

**(2) <u>Twenty Sixth Amendment challenge</u>**

Having found that the plaintiff has shown a likelihood of success on their First and Fourteenth Amendment claim on the limited question of the April Directive, but not HB 323, the court takes up the plaintiff's Twenty-Sixth Amendment claim. As with the First and Fourteenth Amendment claim, the court analyzes the burden of HB 323 and the April Directive together, but distinguishes between the two with respect to the states' interests.

The Twenty-Sixth Amendment guarantees that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. The First Circuit Court of Appeals recognized that the amendment was particularly concerned with the voting rights of young people and students: "while the Twenty-Sixth Amendment speaks only to age discrimination, it has … particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 100-01 (1st Cir. 1973) (*Walgren I*).

The First Circuit Court of Appeals has not articulated a precise standard for Twenty-Sixth Amendment claims. The *Walgren I* court advances two standards: first, if the case is "simply as one in which a large, identifiable class is burdened" by a statute or

regulation, it directs courts to follow *Rosario v. Rockefeller*, 410 U.S. 752 (1973) rather than the "rigorous compelling interest standard." *Walgren I*, 482 F.2d at 100. In *Rosario*, the Supreme Court considered whether the law before it was "so severe as itself to constitute an unconstitutionally onerous burden" on the exercise of the franchise; whether the law was "arbitrary" and "unconnected to any important, [legitimate, and valid] state goal"; and finally whether "there were no less drastic (and feasible) means to effectuate the state's goal." 410 U.S. at 760-62. Later, the *Walgren I* court advanced a slightly different test, saying "without attempting to define the boundaries of 'abridgement',…if a condition, not insignificant, disproportionately affects the voting rights of citizens specially protected by a constitutional amendment, the burden must shift to the governmental unit to show how the statutory scheme effectuates, in the least drastic way, some compelling governmental objective." *Id*. at 102. Finally, the companion case *Walgren v. Bd. of Selectmen of Town of Amherst,* suggests that courts may consider a state actor's intent to disenfranchise young people. 519 F.2d 1364, 1367 (1st Cir. 1975) (*Walgren II*) ("it is difficult to believe that [the Twenty-Sixth Amendment] contributes no added protection to that already offered by the Fourteenth Amendment, particularly if a significant burden were found to have been intentionally imposed solely or with marked disproportion on the exercise of the franchise by the benefactors of that amendment.").

**<u>Burden to students</u>**

*Walgren I* and *II* "require some direct evidence that the state has denied or abridged those voters' ability to vote to state a cognizable claim." *Hagopian v. Dunlap*, No. 1:20-CV-00257-LEW, 2020 WL 4736460 (D. Me. Aug. 14, 2020). The plaintiff

expressly agreed on the record that Count I's burden analysis under the *Anderson-Burdick* framework should apply under *Walgren I* and *II*,[101] which the state does not dispute. The court therefore adopts the burden analysis from Count I with one distinction. Under the *Anderson-Burdick* framework, the court is required to analyze both the law's broad application to the general electorate and the extent to which a particular group experiences greater difficulty complying with it. Under *Walgren I* and *II*, however, the court may focus its analysis on the law's disproportionate effects on the voting rights of students and young people alone, particularly if the burden was "intentionally imposed solely or with marked disproportion on [their] exercise of the franchise." *See* *Walgren II*, 519 F.2d at 1367.

As with the analysis under Count I, the court does not distinguish between the burden imposed by HB 323 and that imposed by the April Directive, as the parties have not presented separate evidence on each. As discussed above, record evidence shows that guidance from the Secretary of State's office directs students without other forms of qualifying ID to obtain voter IDs. *See supra*, Part IV.A(1). But the system for obtaining a voter ID does not operate effectively, is little used, and demonstrably disenfranchised a voter who testified before the court. *Id.* The record also establishes that the April Directive's post-HB 323 guidance categorically excludes, without statutory authority, student ID cards from New Hampshire's safety-valve procedure, described *supra*, Part

[101] *See* Pl. Proposed Findings of Fact and Rulings of Law (doc. no. 53) at 19 ("For the reasons discussed above with regard to the *Anderson-Burdick* analysis, the conditions imposed by HB 323 satisfy the First Circuit's *Walgren* test."); Sept. 15 H'rg Tr. (doc. no. 61) at 7:21-8:6 (agreeing that *Anderson-Burdick* framework applies to burden analysis under Twenty Sixth Amendment).

II.C., even though comparably reliable forms of non-government identification cards are permitted. Taken together, the two mechanisms impose a real, if numerically uncertain, burden on students and young people.

As discussed *supra,* Part IV.A(1), based on the record before the court, the burden imposed on students and young people is minimal, but not de minimis.[102] Students and young people relying on student IDs face a distinct burden not imposed on other age groups because of the April Directive's categorical exclusion of student IDs from the safety valve provision, when other equally reliable forms of identification are accepted. *See* *Grant v. Belangia*, No. 25-1413, 2026 WL 2409681, at *8 (4th Cir. Aug. 18, 2026) ("Voting laws must adhere to the Amendment's 'mandate of neutrality' when it comes to age. In other words, a voting law cannot make it harder for one group to vote than another because of their age." (citing *Rice v. Cayetano*, 528 U.S. 495, 512 (2000))).

**<u>Intentional imposition of burden</u>**

*Walgren II* suggests that greater scrutiny may apply where the state acted with the intent of imposing a burden on students. *See* 519 F.2d at 1367 (Twenty Sixth Amendment adds to protection afforded by the Fourteenth Amendment "particularly if a significant

[102] This burden is less onerous than many of those in cases in which courts found that the right to vote had been abridged or denied. *See, e.g.* *Jolicoeur v. Mihaly*, 5 Cal.3d 565, 96 Cal. Rptr. 697, 488 P.2d 1, 2 (1971) (Twenty-Sixth Amendment violation where unmarried minors prohibited from to establishing domicile separate from their parents for voter registration); *Ownby v. Dies*, 337 F.Supp. 38 (E.D. Tex. 1971) (Twenty-Sixth Amendment violated by heightened residency standard for individuals under 21); *Sloane v. Smith*, 351 F. Supp. 1299 (M.D. Pa. 1972) (rigorous documentation requirements applied only to students, sometimes preventing voting).

burden were found to have been intentionally imposed solely or with marked disproportion on the exercise of the franchise by [students and young people].").

The plaintiff here argues that the legislature acted with discriminatory intent in passing HB 323, though does not argue that the implementation of the April Directive was motivated by animus.[103] The record of discriminatory animus is mixed. For instance, though counsel for the state expressly declined to adopt Senator Sullivan's statements that constituents did not want "out-of-state" college students voting in New Hampshire elections, the statements may nevertheless constitute some evidence that the bill represented an intentional attempt to burden college students' voting franchise. The legislative record also contains other concerns about student ID reliability and REAL-ID compliance. The plaintiff argues that these concerns are pretextual.[104] As the plaintiff points out, voters may use non-REAL ID-compliant drivers' licenses or non-driver identification cards under HB 323 and the April Directive. More importantly, as the plaintiff argues, students may use student IDs to obtain other, qualifying forms of voter identification, undermining the rationale for excluding them at the polls.[105]

One might question the wisdom, utility, or efficacy of a statuary scheme that prohibits the use of student ID cards for identification at polling places on one hand, but

[103] The court finds no evidence that the Secretary of State acted with animus or intent to burden students or young peoples' right to vote in issuing the April Directive. Rather, it merely sought to implement HB 323, although it did so more broadly than the applicable statutes permit. *See supra*, Part II.C.

[104] Mem. Mot. Prelim. Inj. (doc. no. 2-1) at 18.

[105] *See* Pl.'s Consolidated Ex. at 183 (DMV Identity and Residency Requirements, allowing "current student photo/digital image ID card" as proof of identity); Sept. 15 H'rg Tr. (doc. no. 61) at 11:25-12:2

on the other permits the very same cards to be used as identification to obtain state-issued "voter ID" cards that are acceptable identification at the very same polling places. The Deputy Secretary of State—who admittedly does not speak for the New Hampshire legislature but as a trained lawyer and election official nonetheless speaks with experience-based authority and a granular knowledge of the issues involved—testified that in "most, if not all situations, I don't see any factual reason why a student ID card could not be reasonable evidence" of a voter's identity.[106]

But an arguably illogical law, or application thereof, does not render the April Directive, nor HB 323 itself, intentionally discriminatory, or the legislature's stated concerns pretextual. "[T]he law need not be in every respect logically consistent with its aims to be constitutional…" *Willams v. Lee Optical*, 348 U.S. 483, 487 (1985). "Under the system of government created by our Constitution, it is up to the legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963); *see also New York State Bd. Of Elections v. Lopez Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring) ("The Constitution does not prohibit legislatures from enacting stupid laws.").

**Weighing burden against State's justifications**

As previously discussed, the standard for Twenty-Sixth Amendment claims is unclear. At a minimum, if a "not insignificant" burden "disproportionately affects the voting rights of citizens specially protected by a constitutional amendment," the burden must shift to the governmental unit to "show how the statutory scheme effectuates, in the

---

[106] Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 173:16-18.

least drastic way, some compelling governmental objective." *Walgren I*, 482 F.2d at 102. Without further guidance on what constitutes a "not insignificant" burden, the court is "disinclined in a case raising important issues to rest [its] decision on the technical point of burden of proof." *See Walgren II*, 519 F.2d at 1367. The court therefore turns to whether the state's interests in HB 323 and the April Directive are "tied to a particularized legitimate purpose" *see Rosario*, 410 U.S. at 762; *Walgren I*, 482 F.2d at 100.[107] As in Count I, the court separates the state's interest in HB 323 from its interest in the April Directive, analyzing each separately. *See supra*, Part IV.A(1).

***HB 323.*** As noted *supra*, in support of HB 323, the state asserts legitimate generalized interests in ensuring elections are efficient, orderly, and secure, and that only qualified voters are allowed to vote. *See supra*, Part IV.A(1); *see also Perez-Guzman v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003) (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974) ("There is a strong state interest in regulating all phases of the electoral process, including ballot access."). The legislature asserted two rationales "tied" to these interests, *see Rosario*, 410 U.S. at 672—that student IDs may be old or stale, and that they lack the security measures associated with REAL ID-compliant cards—which are somewhat undermined by other aspects of the voting system. At trial, however, the state may nevertheless be able to demonstrate that HB 323 is logically tied to and advances its

[107] In *Rosario*, the Court discusses the logical rationale tying the challenged state law to the state's "legitimate and valid" interests, finding that because the rationale supported the interest asserted, the statute was properly "tied to a particularized legitimate purpose, and is in no sense invidious or arbitrary." 410 U.S. at 761-62. This suggests that under the Twenty Sixth Amendment, though a compelling interest standard is not required, the state action must nevertheless be "tied" to a "particularized" interest.

stated interests.[108] Given the level of uncertainty in the standard under the Twenty-Sixth Amendment and the lack of evidence before the court, at this stage, on both the magnitude of the burden imposed by HB 323 and the state's justifications for it, the court is reluctant to strike a law duly enacted by the New Hampshire legislature. The court therefore finds no likelihood of success on the merits on the plaintiff's Twenty-Sixth Amendment claim with respect to HB 323.

***April Directive.*** The state articulated no interests specific to the April Directive. As discussed in Part IV.A(1), *supra*, neither the state's briefing nor its oral argument defends the directive on its own terms, and treats the directive as a straightforward application of HB 323. But, as discussed above, the directive effects changes to New Hampshire's voting system beyond those expressly contemplated by HB 323. Without express statutory authority, it excludes student IDs from RSA 654:12(d)'s catch-all provision (*i.e.,* that "presumptive evidence" of voter's identity includes "any other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be") and RSA 659:13(c)'s safety valve (*i.e.*, that "[i]f the voter does not have a valid photo identification, the ballot clerk shall direct the voter to see the supervisor of the checklist…[who] shall review the voter's qualifications and determine if the voter's identity can be verified"). The state has offered no interest specific to this departure from HB 323, nor articulated a rationale for excluding concededly reasonable

[108] *See supra*, n.96.

evidence specific to students from the "any reasonable evidence" standard left in place by the legislature under RSA 654:12.[109]

As discussed in Part IV.A(1), *supra*, the Secretary of State had notice of the plaintiff's separate challenge to the April Directive and did not attempt to justify the Directive with respect to HB 323 or to offer state interests specific to the Directive. "The public is not served by a court enforcing a rule that may exceed an agency's statutory authority." *R J Reynolds Tobacco Co. v. Food & Drug Admin.*, No. 25-40137, 2026 WL 2409778, at *10 (5th Cir. Aug. 18, 2026). In light of the modest, but distinct, burden imposed by the April Directive on students, and the lack of *any* articulated interest or justification for it by the state, the Directive's exclusion of student IDs from consideration as "reasonable evidence" of a person's identity under RSA 654:12(d)(4) and RSA 659:13(c) likely violates the Twenty-Sixth Amendment. In light of this finding, the court does not analyze whether the Directive was the least drastic means of effectuating the state's goal. *See Walgren I*, 482 F.2d at 100, 102.

Having found likelihood of success on the merits of counts I and II, the court does not address counts III and IV.

**B. Irreparable harm**

"Likelihood of success is the 'sine qua non' of the preliminary injunction inquiry." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 100 (1st Cir. 2020). Where, as here, the

[109] *See* Sept. 15, 2026 H'rg Tr. (doc. no. 61) at 173:16-18. (Deputy Secretary of State concession that he "did not see any factual reason why student [identification cards] could not be reasonable evidence" of a prospective voter's identity under the safety-valve provision set forth in RSA 654:12.)

plaintiff has shown a likelihood of success on the merits of their First Amendment claim with respect to the April Directive, "it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012).

Moreover, courts routinely find that restrictions on the right to vote constitute irreparable harm. *See, e.g.*, *Count US IN v. Morales*, 830 F. Supp. 3d 753 (S.D. Ind. 2026) ("Even if Defendants are right that SB 10 does not make it impossible for [the plaintiff] to vote, the moderate burden that it imposes on his right to vote still constitutes irreparable harm as a matter of law."); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote...constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon."). The plaintiff therefore satisfies this requirement for injunctive relief.

### C. <u>Balance of equities and public interest</u>

Lastly, the court weighs the latter two factors: balance of the hardships and the public interest, which "merge when the [g]overnment is the opposing party." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

***Purcell.*** The court denied preliminary relief for the September 8 primary under the so-called *Purcell* principle. *See* *Coal. for Open Democracy v. Scanlan*, 2026 WL

2583044, at *5-6 (D.N.H. Sept. 1, 2026) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006)). Specifically, the court found that, because of the plaintiff's delay in bringing this suit, absentee voting was "already in progress," and an injunction would have therefore created "precisely the type of 'conflicting orders' problem that *Purcell* warns against." *Id.* at *6 (quoting *Purcell*, 549 U.S. at 4-5). In doing so, however, the court also noted that "the general election may be on different footing." *Id.* The court now confirms that to be the case.

To start, general-election voting has not yet meaningfully begun. Unlike the primary, no absentee ballots have been returned, as town and city clerks could not distribute the ballots until the Secretary began mailing them on September 29.[110] The only ballots already distributed went to UOCAVA voters,[111] who hold military IDs or passports and are therefore "highly unlikely" to rely on student IDs.[112]

The risk of voter confusion is also negligible, because the limited injunction will not negatively impact any qualified voter's right to cast their ballot:

- Voters who already possess a qualifying form of government-issued ID are unaffected.
- Voters without a qualifying form of government-issued ID may again offer a student ID under the safety valve provision of RSA 659:12.

[110] Single Updated Statement of Agreed & Disputed Facts (doc. no. 46) at ¶¶ 125, 152-53.

[111] "UOCAVA" refers to the Uniformed and Oversees Absentee Voting Act of 1986), 42 U.S.C. § 1973ff et seq.

[112] *Id.* ¶¶ 124, 157.

- Voters who never learn of the limited injunction, and stay home on election day because they believe that their student IDs will not suffice to register or obtain a ballot, are in the same posture as they would be without the limited injunction.

Denying relief, by contrast, potentially leaves young and often first-time voters without government-issued forms of ID to get through DMV appointments, fees or vouchers, and trips to multiple offices before election day.[113] Because no voter is likely to be impaired in his or her ability to exercise their constitutional right to vote as a result of the limited injunction, the court agrees with the plaintiff that *Purcell* does not preclude the court from enjoining the April Directive.

***Administrative burden.*** The court does not ignore the burden on the Secretary that enjoining application of the April Directive will cause, but assesses that burden to be modest and surmountable. The remedy leaves ballot design, printing, and shipping untouched.[114] *See People Not Politicians, et al. v. Onder, et al.*, No. 26A388 (Sept. 25, 2026) (applying *Purcell* principles to preclude late-breaking change to election map where "[b]allots using the 2022 map [had] been printed and mailed" and absentee voting was underway) (per curiam). This court's injunction requires only updated guidance, and the Secretary has both shown and testified that it can issue guidance quickly. The day after the *NHYM* ruling, the office emailed all clerks new guidance, and the First Circuit Court of Appeals found that it "immediately reinstated" the affected affidavits. *New Hampshire Youth Movement v. Scanlan*, 2026 WL 2620381, at *1 (1st Cir. Sept. 4, 2026).

[113] *Id.* ¶¶ 35-46, 49, 51.
[114] *Id.* ¶¶ 119-28

Town and city clerks and supervisors are reachable through SVRS,[115] and the upcoming October 8 clerks' conference will provide another channel to deliver the updated guidance.[116] The Secretary's office lacks direct contact with poll workers, but that is equally true of every directive it issues, including the April Directive itself.[117]

***Laches.*** The state's laches argument fares no better. It is true that the plaintiff sued 130 days after HB 323 was signed and 70 days after it took effect, and that delay "put the [c]ourt in the undesirable position of considering an important constitutional challenge on an expedited basis." *We the People PAC v. Bellows*, 519 F. Supp. 3d 13, 52 (D. Me. 2021), *aff'd*, 40 F.4th 1 (1st Cir. 2022). Both parties, however, have since contributed to the difficulty of this case. The court has repeatedly lamented the underdeveloped record.[118] After the first of the two preliminary injunction hearings and the court's denial of injunctive relief with respect to the September 8 primary, counsel for the plaintiff somewhat surprisingly informed the court that it wished to present no further evidence regarding its claims and would rely solely on legal arguments at the hearing regarding the general election. The court declined to proceed in that fashion and ordered further evidentiary proceedings, ordering additional filings and expressly identifying witnesses that should return to the courtroom.[119] It was only during this second hearing,

---

[115] *Id.* ¶¶ 97-100, 105.
[116] *Id.* ¶ 126.
[117] *Id.* ¶¶ 98–99.
[118] *See, e.g.*, doc. no. 44 at ¶ 2.
[119] Post-Primary Election Procedural Order (doc. no. 44). As Justice Holmes noted in his dissent in *Lochner v. New York*, "[g]eneral propositions do not decide concrete cases." 198 U.S. 45, 76 (1905). And what the late Circuit Judge Selya said about appellate jurisprudence is just as applicable to trial court proceedings: counsel over-rely on doctrinal arguments and neglect facts and evidence at their peril. "The mission of the [ ] judiciary is neither to mull theoretical abstractions nor to practice clairvoyance. Rather, [ ] judges fulfill their [ ] function by matching

not desired by the plaintiff but ordered by the court, that the plaintiff produced or even identified a single individual allegedly burdened by the new HB 323 regime as implemented by the April Directive. And for the State's part, there were occasions during the courtroom proceedings where the Assistant Attorneys General and state officials on the witness stand seemed to learn of significant unbriefed election procedures, legal requirements, and factual scenarios in real time, just as this court learned or came to understand them.

At bottom, the practical difficulties presented by this case are not the plaintiff's making alone, and the court will not tip the equities toward defendants based on a delay whose consequences both sides share. The plaintiff has shown a likely meritorious constitutional claim with respect to the April Directive, and the injunction creates only a modest burden for the state to implement. Thus, in total, the balance of the equities and the public interest favors the plaintiff.

## V. <u>Remedy</u>

HB 323 did one specific thing: it removed student ID cards from the forms of identification that are expressly valid to obtain a ballot. The legislature made that choice, and the court upholds it at this preliminary stage because the plaintiff has not demonstrated a likelihood of proving that it is unconstitutional. But the State's April Directive did something different and broader: it instructed election officials that student

---

applicable principles of law to the discerned facts and circumstances of litigated cases." *Moore v. Murphy*, 47 F. 3d 8, 11 (1st Cir. 1995). "We therefore focus our analysis on specific facts and not on the right in the abstract." *El Dia, Inc. v. Rosselló*, 165 F. 3d 106, 109 (1st Cir. 1999) (Stahl, J.). Counsel for both parties would be wise, when this case moves from the preliminary stage to a final trial on the merits, to seek to develop a more fulsome factual record.

IDs no longer satisfy the catch-all provision in HB 654:12(d)(4)—the safety valve allowing any voter to establish identity through other reasonably reliable means—that applies to both obtaining a ballot and voter registration. HB 323 made no such provision, and the Secretary of State has offered no independent justification for making it. The legislature decided and has provided that a student ID is no longer, on its own, a expressly valid of identification. It does not follow, and the State has not explained why it should follow, that it also decided that a student ID also may not constitute evidence a polling station official may rely on to establish voter identity when no other form of ID is available at all.

## **ORDER**

For these reasons, the court thus denies the plaintiff's request for preliminary injunctive relief with respect to the enforcement of RSA 659:13, as amended by HB 323, in the November 2026 general election.

The court does, however, preliminarily enjoin the State from enforcing the April Directive to the extent that it prohibits or discourages New Hampshire election officials and polling station personnel from reviewing and considering student identification cards, as previously defined under RSA 659:13, as evidence of voter identity under either RSA 654:12(d)(4)[120] or the voter qualification verification procedures set forth in RSA

[120] Providing that "presumptive evidence" of voter's identity includes "any other evidence that reasonably establishes that it is more likely than not that the person is who they claim to be."

659:13(c)(1) and (3).[121] The Secretary of State is therefore ordered to issue, as soon as practicable, revised guidance for the November 2026 general election clarifying that, although student identification cards are no longer expressly valid to establish voter identity under RSA 659:13, election officials may consider them, along with other available evidence, when determining voter identity under RSA 654:12(d)(4) and RSA 659:13(c)(1) and (3).

For the reasons stated above, the motion for preliminary injunction[122] is GRANTED in part and DENIED in part.

SO ORDERED.

Joseph N. Laplante
United States District Judge

Dated: October 2, 2026
cc: Counsel of Record

[121] Providing that "[i]f the voter does not have a valid photo identification, the ballot clerk shall direct the voter to see the supervisor of the checklist…[who] shall review the voter's qualifications and determine if the voter's identity can be verified.

[122] Doc. no. 2.