**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF NEW HAMPSHIRE**

COALITION FOR OPEN DEMOCRACY,

*Plaintiff*,

v.

DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General,

*Defendants*.

Case No. 1:26-cv-00647-JL-TSM

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

Defendants New Hampshire Secretary of State David M. Scanlan and New Hampshire Attorney General John M. Formella, each in his official capacity, by and through counsel, the Office of the Attorney General, submit the following points and authorities in support of Defendants' Motion to Dismiss Plaintiff Coalition for Open Democracy's Complaint.

## INTRODUCTION

Plaintiff Open Democracy asks much of this Court. It seeks to invalidate a state election law enacted pursuant to New Hampshire's authority under Article I, Section 4 of the United States Constitution. Specifically, Open Democracy objects to New Hampshire's requirement that all registering voters and voters obtaining ballots verify their identities with government-issued identification. Open Democracy's Complaint, however, does not clear the constitutional or prudential thresholds required to obtain such a drastic remedy.

The first obstacle confronting Open Democracy is standing. Although the Court assumed Open Democracy's organizational standing when the organization moved for preliminary relief, the Court must now independently determine whether Open Democracy's diversion-of-resources

theory meets Article III's exacting requirements. The Court should conclude that it does not. Open Democracy does not challenge a law that regulates the organization itself. Instead, it alleges that changes to voter identity verification requirements caused it to redirect resources. Under well-settled Supreme Court jurisprudence, an organization cannot acquire Article III standing merely by spending resources in response to government action. Open Democracy has not alleged reasonably definite facts establishing that voter identity verification requirements caused a direct operational interference, perceptibly impairing a related core business activity. The Complaint must be dismissed for lack of subject-matter jurisdiction.

The Complaint faces a second jurisdictional obstacle, as well. Open Democracy asks this Court—a federal court—to decide whether New Hampshire's Secretary of State violated New Hampshire's state constitutional guarantee of separation of powers. State sovereign immunity and the *Pennhurst* abstention doctrine foreclose this claim. The state's judiciary may be a proper forum to resolve Open Democracy's dispute regarding the authority assigned to New Hampshire's constitutional officer by the New Hampshire Constitution and RSA 659:13, as amended by House Bill 323 ("HB 323"), but a federal court is certainly not the place.

Open Democracy's other three claims are federal constitutional challenges that independently fail on the face of the Complaint. Counts I, II, and III are facial challenges to generally applicable identity verification requirements, yet Open Democracy does not plausibly allege that the requirements lack a plainly legitimate sweep—at registration or when obtaining a ballot. Nor does the Complaint plausibly allege that requiring registrants and voters verify their identities using government-issued identification unjustifiably burdens the right to vote or discriminates on the basis of age. The challenged provisions do not classify voters by age (or in any other classification). Moreover, the Complaint's speculation about the circumstances of an

unnamed few hypothetical "younger voters" cannot transform a generally applicable identification requirement into unconstitutional age discrimination claim.

Open Democracy cannot overcome these obstacles to the Court's jurisdiction or its pleading deficiencies. Accordingly, Defendants respectfully request that the Court dismiss the Complaint, in its entirety.

**BACKGROUND & PROCEDURAL POSTURE**

Plaintiff Coalition for Open Democracy filed a four-count Complaint and a Motion for Preliminary Injunction on August 11, 2026. Compl., ECF No. 1; Mot. Prelim. Inj., ECF No. 2. The Complaint alleges that RSA 659:13, amended by HB 323 and interpreted in guidance issued by the Secretary of State, violates the First, Fourteenth, and Twenty-Sixth Amendments to the United States Constitution, and Part I, Article 37 of the New Hampshire Constitution. *Id.* ¶¶ 232-271. Open Democracy seeks declaratory and injunctive relief, pursuant to 42 U.S.C. §§ 1983 and 1988. *Id.* ¶¶ 2-3.

Concerning Open Democracy's Motion for Preliminary Injunction, the Court set expedited briefing deadlines and held three days of evidentiary hearings. After the first hearing (Aug. 31, 2026), the Court issued its Order Denying Preliminary Injunction. ECF No. 43 (Sept. 1, 2026). The Court denied Plaintiff's Motion because the *Purcell* principle foreclosed a preliminary injunction so near to the September 8, 2026 primary elections. *Id.* at 2 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006)). After the September 15 and 16 hearings, the Court issued its Order Granting Partial Preliminary Injunctive Relief. ECF No. 68 (Oct. 2, 2026). The Court denied the injunction as to HB 323's amendment to RSA 659:13. *Id.* at 2. The Court held that Open Democracy had not shown that it was likely to succeed in its facial challenge to HB 323's repeal of student IDs as a valid form of identification to obtain a ballot. *Id.* However, the Court issued the injunction as to the Secretary's April 2026 guidance that instructed local

election officials that student IDs were not a valid form of identity when registering to vote. *Id.* at 3. Defendants have appealed the partial injunction to the First Circuit Court of Appeals. *See Coal. Open Democracy v. Scanlan, et al.*, No. 26-2132 (1st Cir.).

**STANDARD OF REVIEW**

Article III "standing is a prerequisite to a federal court's subject matter jurisdiction." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016). So, federal courts presume that causes of action lie outside their limited Article III constitutional authority. *See Spencer v. Doran*, 560 F. Supp. 3d 648, 651 (D.N.H. 2021) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). It is each plaintiff's burden to overcome the court's presumption that it lacks subject matter jurisdiction to adjudicate the plaintiff's claims. *Id.* Moreover, "where standing is at issue, heightened specificity is obligatory at the pleading stage[.]" *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (quoting *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992)).

A defendant may challenge the sufficiency of a plaintiff's jurisdictional allegations under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Fed. R. Civ. 12(b)(1). When considering motions to dismiss for lack of standing, a court "accept[s] as true all well-pleaded factual averments in the plaintiff's complaint and indulge[s] all reasonable inferences therefrom in his favor." *Strahan v. Nielsen*, No. 18-cv-161-JL, 2018 U.S. Dist. LEXIS 139544, *3 (D.N.H. Aug. 17, 2018) (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 70 (1st Cir. 2012)) (internal quotes omitted). The court may consider, however, "material outside the pleadings, such as affidavits." *Id.* (citing *Gonzalez v. United States*, 284 F.3d 281, 287-88 (1st Cir. 2002)). A plaintiff "must set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing." *Id.* (quoting *AVX Corp.*, 962 F.2d at 115) (internal quotes omitted). The factual record supporting standing must be clear—standing "cannot be inferred

argumentatively from averments in the pleadings." *See id.* (quoting *AVX Corp.*, 962 F.2d at 115).

A defendant may also assert that a complaint does not sufficiently allege facts that state a claim upon which a court could grant relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

## ARGUMENT

The Court should dismiss Open Democracy's Complaint for two independent reasons. First, the Court lacks subject-matter jurisdiction to reach the merits of this case because Open Democracy does not have standing to challenge either RSA 659:13, II or the Secretary's interpretation of RSA 654:12, I(d)(4), and the Eleventh Amendment bars Open Democracy's state constitutional question. Second, Open Democracy has not sufficiently alleged facts to set forth claims upon which this Court may grant relief.

### I. Open Democracy Lacks Organizational Standing, Depriving the Court of Subject Matter Jurisdiction

Open Democracy has not demonstrated its Article III organizational standing to assert its claims. The Supreme Court has explained that in "unusual" cases, organizations may assert

direct standing to sue on their own behalf. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2024). But to do so, organizations must "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* at 393-94 (citing *Havens Realty Corp. v. Coleman*, 455 U. S. 363, 378-79 (1982)). Where an organization challenges a law that does not directly regulate it, a plaintiff's standing "is ordinarily substantially more difficult to establish." *Id.* at 382 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)) (quotations omitted). The Supreme Court has explained that one significant obstacle is causation: "that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *See id.* at 382-83 (collecting cases). Plaintiffs cannot adequately allege or prove causation by "rely[ing] on speculation about the unfettered choices made by independent actors not before the courts." *See id.* at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415, n.5 (2013)) (quotations omitted). So, "to thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *Id.* (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)).

Open Democracy is required to plausibly allege each of the foregoing elements with heightened specificity. *See Draper*, 827 F.3d at 3. But it does not. Open Democracy's allegations are either purely conclusory or speculative arguments that do not rise to the required standard of "reasonably definite factual allegations." *See AVX Corp.*, 962 F.2d at 115.

### A. This Court Must Independently Examine Open Democracy's Organizational Standing to Challenge New Hampshire's Voter Identity Verification Requirements

In reaching its September and October preliminary injunction decisions, the Court assumed, without deciding, that Open Democracy had standing to pursue its challenge to HB 323's repeal of student IDs as verification of identity and Secretary Scanlan's subsequent guidance regarding RSA 654:12, I(d)(4). *See* ECF No. 43 at 10 *and* No. 68 at 20. The Court

explained that it relied upon Chief Judge Elliott's reasoning in *N.H. Youth Movement v. Scanlan*, 833 F.Supp.3d 93 (D.N.H. 2026), because it was in the orderly and efficient administration of justice to do so. *See* ECF No. 68 at 20. The Court noted that Defendants have appealed the *Youth Movement* court's decision regarding Open Democracy's organizational standing to the First Circuit. *Id.*

On this Motion to Dismiss, however, the orderly and efficient administration of justice requires that the Court engage in its own Article III standing analysis. This Court must apply its independent judgment to determine whether ***this*** lawsuit presents a case or controversy because federal courts are prohibited from exercising "hypothetical jurisdiction." *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 101 (1998) ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning."). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* at 94 (quoting *Ex parte McCardle*, 74 U.S. 506, 7 Wall. 506, 514 (1869)) (internal quotes omitted). So, "a federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding on the merits." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) (citing *Steel Co.*, 523 U.S. at 94); *Seafreeze Shoreside v. United States DOI*, 123 F.4th 1, 15 (1st Cir. 2024) ("[W]e must satisfy ourselves that we have subject-matter jurisdiction before addressing the merits of a claim[.]") (citation omitted).

Open Democracy is a plaintiff in two lawsuits asserting facial constitutional challenges to election laws that do not directly regulate Open Democracy's activities. In each case, Open Democracy asserts *Havens Realty*-organizational standing. But Open Democracy grounds its

two complaints, theories of recovery, purported injuries, and causal nexuses to the challenged laws, in materially different facts and statutory provisions. Moreover, since the May 28, 2026 *Youth Movement* decision, the First Circuit and sister circuits have provided more context to assist in applying the Supreme Court's organizational standing jurisprudence. *See, e.g.*, *League of Women Voters of Mass. v. Trump*, Nos. 26-2029, 26-2030, 26-2031, 26-2032, 2026 U.S. App. LEXIS 27790, at *34-35 (1st Cir. Sept. 10, 2026) (citing *All. for Hippocratic Med.* to find standing where a regulation's proximity to an election caused direct interference with core activities); *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 633-34 (9th Cir. 2026) (*en banc*) (citing *All. for Hippocratic Med.* to unanimously reverse three decades of Ninth Circuit organizational standing jurisprudence); *Friends of the Earth U.S. v. Exp.-Import Bank of the U.S.*, No. 25-5387, 2026 U.S. App. LEXIS 24910, *21 (D.C. Cir. 2026) (citing *All. for Hippocratic Med.* to find insufficient causal nexus to plaintiff's injuries); *U.S. Inventor, Inc. v. Squires*, No. 2024-2378, 2026 U.S. App. LEXIS 25316, *10-12 (Fed. Cir. Aug. 21, 2026) (citing *All. for Hippocratic Med.* to find that where organizations divert resources to educate members and the challenged action impaired their missions, that is not enough to establish standing).

If the Court were to adopt another court's analysis of Open Democracy's standing without examining the dynamics of this specific lawsuit, the Court would be impermissibly dispensing standing in gross. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages).") (citations omitted). Accordingly, before considering the merits of Open Democracy's claims, the Court must first determine whether Open Democracy has standing.

### B. Open Democracy Has Not Alleged Reasonably Definite Facts Establishing an Injury-in-Fact to Its Core Business Activities

To secure direct Article III standing, a non-regulated organization may establish that a law perceptibly impairs its core business activities. *See All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens Realty Corp.*, 455 U.S. at 379). The Supreme Court's perceptible impairment framework requires a showing of: (1) a concrete and demonstrable injury to an established core activity; (2) resulting in an involuntary "drain" on resources caused by the challenged law's operational interference with the core activity. *See Havens Realty Corp.*, 455 U.S. at 379; *All. for Hippocratic Med.*, 602 U.S. at 394-96; *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173-74 (2d Cir. 2021); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). This means that

> the ***consequent*** "drain" on resources must go beyond normal operating costs—that is, an organization does not suffer an injury in fact where it "expend[s] resources to educate its members and others" unless doing so subjects the organization to "operational costs ***beyond those normally expended***."

*Military-Veterans Advocacy v. Sec'y of Veterans Affairs*, 7 F.4th 1110, 1129 (Fed. Cir. 2021) (quoting *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)) (emphasis added). HB 323 does not directly regulate Open Democracy—that fact is undisputed. *See, e.g.*, Zink Decl., ECF No. 2-2, ¶ 20 (Aug. 11, 2026) (alleging only "expenditures and diversion of resources to mitigate the effect of HB 323"); Hr'g Tr., ECF No. 47 at 87:10-88:4 (Aug. 31, 2026) ("We would still run voter registration drives, yes."). Open Democracy has not plausibly alleged a perceptible impairment to its core business activities.

Even accepting Executive Director Zink's Declaration in Support of Plaintiff's Motion for Preliminary Injunction (ECF No. 2-2) as true for the purpose of this Motion, Open Democracy has not sufficiently alleged injury-in-fact. Open Democracy's "mission is to bring about and safeguard political equality for the people of New Hampshire[,]" and it focuses its

activities on young people—high schoolers—in particular. ECF No. 2-2, ¶¶ 2, 4, 6. Ms. Zink identified three categorical activities that advance Open Democracy's mission: (i) planning and hosting events; (ii) developing and printing educational materials; and (iii) training its volunteers. *See id.* ¶ 5. She asserts that Open Democracy's core impaired service is its high school voter registration drive program. *See id.* ¶¶ 6, 8, 11-13. She alleges that the organization has diverted resources to update promotional materials, sample letters, and social media posts; retrain volunteers; and recruit additional poll workers and observers. *See id.*; ECF No. 47 at 61:3-9, 77:4-14.

These allegations are not reasonably definite to serve as injuries-in-fact because ordinary expenditures that are consistent with an organization's mission are not concrete injuries. *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001) ("[O]rdinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing."); *Coal. for Humane Immigrant Rights v. Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 88 (D.D.C. 2025) ("[I]t is not enough if the organization merely 'diverts its resources in response to a defendant's actions' such that it has not been 'subjected . . . to operational costs beyond those normally expended' to fulfill its core aims.") (quoting *All. for Hippocratic Med.*, 602 U.S. at 395); *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (explaining that resource diversion must reflect differences from routine activities); *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 320 (5th Cir. 2025). If an anticipated or routine expense established "a cognizable injury[,] would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'" *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)). Where expenditures simply frustrate an organizational mission, the organization has not suffered injury-in-fact. *See Vilsack*, 808 F.3d

at 919 ("The court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised.") (citations omitted).

A voter-advocacy organization whose core activities are public education and coordinating voter registration drives must always allocate its finite resources toward updating its education materials and public outreach, each time a voting law changes. *See Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1181 (9th Cir. 2024), *aff'd en banc*, 186 F.4th 622 (9th Cir. 2026). And that it may retrain volunteers or recruit additional poll workers and observers out of fear of future injury does not allege direct operational interference with core activities. *See U.S. Inventor, Inc.*, 2026 U.S. App. LEXIS 25316 at*12-13 (Fed. Cir. Aug. 21, 2026) ("[T]he future injury that appellants allege is not one that 'directly affect[s]' the appellants. *Alliance*, 602 U.S. at 395 (emphasis added) (characterizing *Havens*)"). So, even if Open Democracy plausibly alleged that it experienced a resource drain after HB 323, it has not alleged definite facts to plausibly show that the new identity verification requirements operationally interfered with its related core activities. *See Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 122 (D. Mass. 2020) ("Courts, therefore, do not find standing when the organizational goal is one in the same with the injury because those organizations have only a 'mere interest' in a problem.") (citing *Lane v. Holder*, 703 F.3d 668, 674-75 (4th Cir. 2012)).

Open Democracy merely alleges that its operational ***goals*** have experienced a setback, but it concedes that its operational ***activities*** have not. *See, e.g.*, ECF No. 46, 87:20-22 ("We would still run voter registration drives, yes."). This does not plausibly reflect a direct interference with Open Democracy's core activities of voter education and outreach. If these allegations are sufficient to establish standing, any "law school professor who teaches election

law would have standing … because she would have to expend resources to change her curriculum and further educate her students about the state of the law." *Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1181 (9th Cir. 2024), *aff'd en banc*, 186 F.4th 622 (9th Cir. 2026). "Article III standing cannot be based on such fanciful or speculative harm." *Id.* Accordingly, Open Democracy has not offered reasonably definite facts to plausibly allege that state voter ID verification requirements concretely and demonstrably injured a core activity though an involuntary drain on resources. *See Havens Realty Corp.*, 455 U.S. at 379.

### C. Open Democracy Has Not Alleged Reasonably Definite Facts Establishing a Causal Nexus Linking Voter Identity Verification When Registering or Obtaining a Ballot to an Involuntary Resource Diversion

Even if Open Democracy's allegations suffice to show injury-in-fact, it has not threaded the causation needle by linking the purported injury to the new voter identity verification requirements. Causation requires more than just a diversion of resources in response to a change in the law. *All. for Hippocratic Med.*, 602 U.S. at 395. Were it otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.*

Moreover, Open Democracy has not shown that "third parties will likely react in predictable ways" and that those predictable actions will likely cause it injury. *See All. Hippocratic Med.*, 602 U.S. at 383. For example, it alleges that many "younger voters" find obtaining a state-issued identification card to be a significant burden. ECF No. 1, ¶ 60. Instead of supporting this assertion with empirically verifiable facts, Open Democracy alleges generalities about where DMVs are located, whether public transportation is "robust," whether parking is restricted on some college campuses, and speculates about many other sundry summaries and opinions about students' lives. *See id.* ¶¶ 61-79.

The evidentiary record does not support standing, and Open Democracy's generalized allegations are, at best, impermissibly hypothetical. Open Democracy's expert witness, Dr. Michael Herron, chose 18 to 24 year-olds as the range for "younger voters." *See* ECF No. 47 at 30:3-21. He concluded that this range is "more burdened" by government-issued ID requirements than older voters. *Id.* But Dr. Herron's estimate is based on ANES data that only identified whether a person had a passport or driver's license. Pl.'s Ex. 41, ¶¶ 80-82. New Hampshire law is not so restrictive—nondriver and voter IDs, among other government IDs, are acceptable. *See* RSA 659:13, II; 654:12, I(d)(4). ANES' survey allowed respondents to choose "other form of identification," but it did not record which "other form" a respondent possessed. Pl.'s Ex. 41, ¶¶ 80-82, 110 (*e.g.*, variable V241538 is a catch-all that includes, but is not limited to, state ID cards and military IDs without distinction). Perhaps more importantly, it does not indicate whether any respondent's ***only*** form of ID is a student ID. *See generally id.* ¶ 110 (no ANES variables captured whether any respondent ever held a student ID). Even if the Court were to accept that younger people are less likely to have passports and driver's licenses, Open Democracy merely hypothesizes that the ***same*** people possess pre-HB 323-acceptable student IDs and that they are ***not already registered*** voters.

Additionally, Open Democracy has not offered any reliable context for the choices that any individual student has made or will make due to voter ID requirements, much less how any one student's choice can be extrapolated to the broader student population. *See* ECF No. 47 at 45:25-47:4. Neither Open Democracy nor its expert can predict how many voting-eligible students will acquire valid IDs before the next election or currently possess acceptable government-issued IDs other than driver's licenses, passports, or "other" that respondents may have mistakenly believed included only state ID cards and military IDs. It is impossible to

reasonably infer from these allegations that Open Democracy must divert resources to its high school voter registration activities, much less establish the causal link to HB 323. Its allegations are far too attenuated to support standing.

The inquiry into whether an organization has suffered a "perceptible impairment" is not a measure of the degree of harm suffered, it is the causal nexus of the alleged harm to the challenged law. *See All. Hippocratic Med.*, 602 U.S. at 395. In other words, Open Democracy must show that HB 323 operationally interfered with its related core business activities. *See Havens Realty*, 455 U.S. at 379; *All. for Hippocratic Med.*, 602 U.S. at 395-96; *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173-74 (2d Cir. 2021); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). As discussed above, it has not offered any evidence to establish that its resource allocations were involuntary. Open Democracy alleges that HB 323 and the Secretary's interpretation are "forcing Open Democracy to abandon its core services and organization priorities," and that "the law makes it effectively impossible for Open Democracy to provide its core services[.]" ECF No. 2-2, ¶¶ 17, 20. But such allegations are naked conclusions—they do not articulate plausible facts from which the Court could infer causation. Resource-reallocation, even when coupled with mission-frustration, does not suffice to establish that HB 323 or Defendants' actions ***caused*** Open Democracy's alleged injuries. *See Havens Realty Corp.* at 379 (requiring plaintiff to show a "***consequent*** drain on the organization's resources") (emphasis added); *see also Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992 (6th Cir. 2025) ("*Alliance* thus clarified that the expenditure of resources in opposition to a defendant's actions, standing alone, is insufficient to establish standing under *Havens*.").

### D. Open Democracy Has Not Established Redressability Because the Court Cannot Issue the Permanent Injunction Open Democracy Seeks and an Injunction Would Not Remedy Open Democracy's Purported Injuries

The Court does not have authority to grant the prospective relief that Open Democracy requests, nor has Open Democracy established that a favorable decision would remedy its alleged injuries. "To satisfy the redressability requirement, 'the plaintiff [must] allege that a favorable resolution of [its] claim would likely redress the professed injury.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 319 (1st Cir. 2024) (quoting *Dantzler, Inc. v. Empresas Berríos Inventory & Ops., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020)) (quotations omitted). Redressability may not require certainty, but it requires more than mere speculation and a court must have the authority to award the requested relief. *See id.*

Although this Court may declare a state law unconstitutional and enjoin an unconstitutional law's enforcement, the Court cannot use a prospective injunction to rewrite state law. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006). Open Democracy asks the Court to enjoin implementing and enforcing HB 323, but that is not how an injunction would operate. In the two months between HB 323's enactment and its effective date, HB 323 was implemented. The Secretary ***completed*** that process on June 2, 2026. Ongoing training and support of local election officials continues, but HB 323's amendment to RSA 659:13 was in full force and effect for ***70 days*** before Open Democracy filed this lawsuit. The current state of New Hampshire election law is the status quo ante, and an injunction would impose affirmative duties on Defendants to reinstitute prior policies, procedures, and guidance.[1]

Also, Open Democracy has not clearly established that its requested relief would redress its alleged injuries. This is so because "causation and redressability—are often flip sides of the

---

[1] The Court's preliminary injunction enjoining implementation of the Secretary's interpretation of HB 323's effect on voter registration is pending appeal.

same coin." *All. for Hippocratic Med.*, 602 U.S. at 380 (quotations and citations omitted). For the reasons stated above, Open Democracy's allegations are too threadbare to plausibly establish injury-in-fact, and too attenuated from RSA 569:13 or the Secretary's interpretation of RSA 654:12 to plausibly establish a causal link to HB 323.

## II. State Sovereign Immunity Bars Federal Court Adjudication of Open Democracy's Claim that the Secretary of State's Interpretation of State Law Violates New Hampshire's Constitutional Separation of Powers

The Eleventh Amendment and *Pennhurst* Doctrine bar subject-matter jurisdiction over Count IV. Open Democracy alleges that Secretary Scanlan—a state constitutional officer—"issued a directive to local municipalities that HB 323 has amended RSA 654:12 (governing the registration process) as well as RSA 659:13 (governing the voting process) and student identification cards are no longer valid forms of identification for registering to vote." ECF No. 1, ¶ 268. This, Open Democracy reasons, violates the New Hampshire Constitution's separation of powers. Id. ¶ 268. "[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). Open Democracy cannot pursue its purely state constitutional claim in this Court. *Id.*

Additionally, the Court should consider abstaining from deciding Counts I, II, and III, if the Court sees a substantial uncertainty over the meaning of the state law at issue (*i.e.*, the interplay between RSA 654:12, RSA 569:13, and the Secretary's guidance), where a state court's clarification of the law would obviate the need for a federal constitutional ruling. *Rivera-Puig v. Garcia-Rosario*, 983 F.2d 311, 322 (1st Cir. 1992). *Pullman* abstention "serves a dual purpose: it avoids the waste of a tentative decision as well as the friction of a premature constitutional adjudication." *Ford Motor Co. v. Meredith Motor Co.*, 257 F.3d 67, 71 (1st Cir. 2001) (internal

quotes and citations omitted). "[A]mong those cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law." *Id.* (citing *Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 84 (1974)). The New Hampshire Supreme Court could consider a certified question from this Court, which could advance the prudential goals of *Pullman* abstention. *See* N.H. Sup. Ct. R. 34.

## III. Even Assuming Subject-Matter Jurisdiction, Open Democracy Fails to State Claims Upon Which the Court May Grant Relief

On its face, RSA 659:13 and HB 323's amendments to it establish a broadly applicable law that does not impose special burdens on any class of voter. ECF No. 68 at 32. It applies to all registering voters and all voters obtaining ballots. RSA 659:13, II. It is an evenhanded restriction to protect integrity and reliability of the electoral process itself. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-90 (2008) (plurality). Similarly, the Secretary's guidance to local election officials and the public regarding HB 323's application to RSA 654:12, I(d)(4) is broadly applicable and does not impose burdens on any group. *See* ECF No. 1, ¶ 209. Even if this Court had subject-matter jurisdiction to hear this case, Open Democracy has not plausibly alleged that RSA 659:13, II and RSA 654:12, I(d)(4), as amended and interpreted, violate the First, Fourteenth, or Twenty-Sixth Amendments to the United States Constitution.

### A. Open Democracy Has Not Plausibly Alleged that RSA 659:13, II and RSA 654:12, I(d)(4) Lack a Plainly Legitimate Sweep

The first three Counts alleging United States constitutional violations encounter an identical pleading-stage hurdle. As facial constitutional challenges, Open Democracy has a heavier burden to state a plausible claim for relief, than if the same allegations supported as-applied challenges. *See United States v. Salerno*, 481 U.S. 739, 745 (1987); *Local 8027 v. Edelblut*, 651 F. Supp. 3d 444, 454 (2023) ("Generally, a facial challenge raises constitutional defects as to the terms of the statute itself, independent of its application to a plaintiff's particular

set of circumstances.") (citing *United States v. Playboy*, 529 U.S. 803, 834 n.3 (2000) (Scalia, J., dissenting)).

A facial constitutional challenge requires a plaintiff to demonstrate that "no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotations and citations omitted). So, "[a] facial challenge must fail where the statute has a plainly legitimate sweep." *Crawford*, 553 U.S. at 202 (plurality) (internal quotes and citations omitted). Critically, a court must not "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449-50 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)). The Supreme Court disfavors facial challenges because they often rely upon speculation and barebone facts, they risk premature statutory interpretation, they may cause a court to anticipate constitutional questions or to formulate broader constitutional rules than necessary, and they threaten to short-circuit the democratic process. *See id.* at 450-51 (collecting cases). So, where a plaintiff asks a court to invalidate a state law in all its applications, a plaintiff "bear[s] a heavy burden of persuasion." *Crawford*, 553 U.S. at 200 (plurality).

Time and again, federal courts have held that minimal voting restrictions related to voter ID are not facially unconstitutional. *See, e.g.*, *March for our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128 (D. Idaho 2024); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749 (M.D. Tenn. 2015). Minimal voting restrictions and burdens include traveling to a polling place, producing identity, and waiting in line. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 669 (2021); *Crawford*, 553 U.S. at 198.

### B. Open Democracy Has Not Plausibly Alleged that RSA 659:13, II and RSA 654:12, I(d)(4) Unjustifiably Burden the Right to Vote (Count I)

Even accepting all well-pleaded facts as true, the Complaint does not offer allegations from which the Court could make a reasonable inference that RSA 659:13, II and RSA 654:12, I(d)(4) violate the First or Fourteenth Amendments to the United States Constitution. Courts apply the *Anderson-Burdick* framework where a facial constitutional challenge alleges that a state law unduly burdens the right to vote. *Libertarian Party v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011). Count I alleges that prohibiting a voter from verifying identity with a student photo ID to obtain a ballot or register to vote is an unjustifiable burden, which is prohibited by the First and Fourteenth Amendments. *See* ECF No. 1, ¶¶ 232-239. Taking Open Democracy's allegations in the light most favorable to it, Count I fails to state a plausible claim that New Hampshire's requirement that all registrants and voters verify their identities with government-issued identity cards is unconstitutional in all its applications.

The *Anderson-Burdick* framework requires weighing the character and magnitude of the burden to the state's justification. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). In other words, the level of scrutiny that must be applied to a challenged law depends on the purported burden created by that law. *See Crawford*, 553 U.S. at 191 (plurality) (explaining that voters' purported burdens be justified by relevant and legitimate state interests "sufficiently weighty to justify the limitation"). So, not every election requirement is subject to strict scrutiny. *Burdick*, 504 U.S. at 433. "Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* at 434. Here, the Court should apply the rational basis test to the identity verification requirements if it reaches the merits of this lawsuit. But even if the Court applies a higher level of scrutiny, Claim I will fail nevertheless.

Open Democracy cannot reasonably dispute that the voter ID verification requirements are broadly applicable. Where a law is broadly applicable, the *Anderson-Burdick* analysis weighs the voting restriction as it purportedly burdens voters across the entire electorate. *See Crawford*, 553 U.S. at 206 (Scalia, J., concurring). Even if there is a subset of voters whose circumstantial burdens are greater than that typically experienced across the electorate, their idiosyncratic experiences should not be considered on the burden-side of the equation. *See id.* at 206. Open Democracy's only alleged voter-burden is minimal and common among the electorate. Open Democracy may allege that an eligible voter might wait until election day to register and may be unable to receive a free voter-ID, but a hypothetical lack of planning or understanding of what the law requires is uncommon and cannot be extrapolated beyond personal circumstances. Here, the voter identification requirements are a widespread experience that is common to every voter, so the burden cannot be deemed severe, regardless of how the requirement could affect any single voter imagined in Open Democracy's Complaint. *See id.* (citing *Clingman v. Beaver*, 544 U.S. 581, 590-91 (2005)).

As a matter of law, the State has an interest in regulating ballot access. *Perez-Guzman v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003) (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974) ("Consequently, there is a strong state interest in regulating all phases of the electoral process, including ballot access."). The State has an interest in election integrity and administering orderly elections. *See, e.g.*, *Crawford*, 553 U.S. at 196 (plurality) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *Perez-Guzman*, 346 F.3d at 238 ("Consequently, there is a strong state interest in regulating all phases of the electoral process, including ballot access."). Identifying oneself when registering or voting is an expected condition to exercise the franchise that serves these

State interests. *See, e.g.*, *Crawford*, 553 U.S. at 193 (plurality) (discussing state and federal laws designed to identify voters). On the face of the Complaint, Defendants' important state interests exceed any plausible minor burden imposed by RSA 659:13 or by the Secretary's interpretation of it, even if the law were subjected to greater scrutiny than rational basis.

### C. Open Democracy Has Not Plausibly Alleged that RSA 659:13, II and RSA 654:12, I(d)(4) Unconstitutionally Discriminate on the Basis of Age (Counts II and III)

Even accepting all well-pleaded facts as true, the Complaint does not offer allegations from which the Court could make a reasonable inference that RSA 659:13, II and RSA 654:12, I(d)(4) violate the Fourteenth or Twenty-Sixth Amendments to the United States Constitution. Counts II and III are age discrimination claims asserting two different theories. In Count II, Open Democracy alleges HB 323's amendment and interpretation violate the Twenty-Sixth Amendment. *See* ECF No. 1, ¶¶ 240-255. In Count III, Open Democracy alleges HB 323's amendment and interpretation violate the Fourteenth Amendment's equal protection clause. *See id.* ¶¶ 256-264. Counts II and III fail to state a plausible claim that New Hampshire's requirement that all registrants and voters verify their identities with government-issued identity cards is unconstitutional in all its applications.

Regarding Count II's Twenty-Sixth Amendment claim, the First Circuit requires a Twenty-Sixth Amendment claim to set forth at least "***some*** direct evidence that the state has denied or abridged those voters' ability to vote to state a cognizable claim." *See Hagopian v. Dunlap*, 480 F. Supp. 3d 288, 299 (D. Me. 2020) (citing *Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364 (1st Cir. 1975)) (emphasis added). Open Democracy has not provided any plausible allegations from which to reasonably infer direct evidence to support its claim. Open Democracy also makes generalized statements about the age of most students or most people who probably used student IDs to register or cast ballots, but these allegations are too

vague and hypothetical to support a facial constitutional challenge. *See AVX Corp.*, 962 F.2d at 115 ("[Pleadings] must be something more than an ingenious academic exercise in the conceivable.") (internal quotes and citations omitted).

Regarding Count III's equal protection claim, the voter ID verification requirements do not classify voters by age. For the reasons stated above, the *Anderson-Burdick* framework would require a rational basis test for the validity of RSA 659:13. But even if the law classified by age, age is not a suspect classification. *Donahue v. City of Bos.*, 371 F.3d 7, 15 (1st Cir. 2004). So, even if Count III were a stand-alone age discrimination claim, it would still receive rational basis scrutiny. *See id.* Open Democracy has not provided any plausible allegations from which to reasonably infer evidence of a denial or abridgment of a right based on age, and the State's interest in regulating ballot access by requiring verification of identity through government-issued identity cards is manifest, whether when obtaining a ballot or registering to vote. Moreover, the First Circuit has held that "states may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest." *Id.* (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000)) (internal quotations omitted). Even when viewed in the light most favorable to Open Democracy, there are no plausible facts supporting its age-discrimination claims.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

Respectfully submitted,

DEFENDANTS DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: October 14, 2026

*/s/ Michael P. DeGrandis*

Matthew T. Broadhead, N.H. Bar No. 19808
Associate Attorney General
Michael P. DeGrandis, N.H. Bar No. 277332
Assistant Attorney General
James H. Holl, N.H. Bar No. 279633
Assistant Attorney General
matthew.t.broadhead@doj.nh.gov
michael.p.degrandis@doj.nh.gov
james.h.holl@doj.nh.gov

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all parties of record through the Court's e-filing system.

*/s/ Michael P. DeGrandis*
Michael P. DeGrandis